Nicola A. Pisano (CA Bar No. 151282)
npisano@foley.com
Jose L. Patiño (CA Bar No. 149568)
jpatino@foley.com
Shawn E. McDonald (CA Bar No. 237580)
semcdonald@foley.com
Justin E. Gray (CA Bar No. 282452)
jegray@foley.com
Christopher C. Bolten (CA Bar No. 268284)
cbolten@foley.com
FOLEY & LARDNER LLP
3579 Valley Centre Drive, Suite 300
San Diego, CA 92130-3302
Telephone:  858.847.6700
Facsimile:   858.792.6773

Attorneys for Defendant and Counter-Plaintiff
SHENZHEN MINDRAY BIO-MEDICAL
ELECTRONICS CO., LTD.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SANTA ANA DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>SHENZHEN MINDRAY BIO-MEDICAL ELECTRONICS CO., LTD, a corporation of the People's Republic of China,<br><br>Defendants. | Case No:  SACV12-02206 CJC (JPRx)<br><br>**FOURTH AMENDED ANSWER AND COUNTERCLAIMS OF SHENZHEN MINDRAY BIO-MEDICAL ELECTRONICS CO., LTD. TO FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |
| SHENZHEN MINDRAY BIO-MEDICAL ELECTRONICS CO., LTD, a corporation of the People's Republic of China,<br><br>Counter-Plaintiff,<br><br>v.<br><br>MASIMO CORPORATION, a Delaware corporation,<br><br>Counter-Defendant. | |

Shenzhen Mindray Bio-Medical Electronics Co., Ltd., ("Shenzhen Mindray"), by and through its undersigned attorneys, hereby files its fourth amended answer and asserted counterclaims in response to the First Amended Complaint filed by Masimo Corporation ("Masimo"), as follows:

## PARTIES

1.      Shenzhen Mindray admits the allegations of Paragraph 1.

2.      Shenzhen Mindray admits that Masimo is a medical technology company and that Masimo's pulse oximetry systems acquire and detect signals generated by passing light from red and infrared light-emitting diodes through tissue, which signals are used to extract oxygen saturation and pulse rate values. Shenzhen Mindray is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 2 of Masimo's First Amended Complaint, and on that basis denies those allegations.

3.      Shenzhen Mindray denies that it develops, manufactures, and markets medical devices worldwide, including through its affiliate Mindray DS USA, Inc. Mindray DS USA, Inc. has been dismissed from this case, thus allegations in Paragraph 3 directed to Mindray DS USA, Inc. require no response by Shenzhen Mindray.  Shenzhen Mindray admits the remaining allegations of Paragraph 3.

## JURISDICTION AND VENUE

4.      Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

5.      Shenzhen Mindray admits that Masimo contends in Paragraph 5 of the First Amended Complaint that this action includes claims for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 100 et seq., more particularly, 35 U.S.C. § 271, but Shenzhen Mindray denies that Masimo has stated a claim for patent infringement against Shenzhen Mindray and denies that Masimo's infringement claims have merit.  Shenzhen Mindray admits that, because Masimo contends in Paragraph 5 of the Complaint that this action arises

2

4836-1853-1610.4

under the patent laws of the United States, Title 35 of the United States Code, this Court has subject matter jurisdiction of these claims under 28 U.S.C. § 1338(a).

6. Shenzhen Mindray admits that the First Amended Complaint purports to include claims for breach of contract, breach of the covenant of good faith and fair dealing, accounting, interference with prospective economic advantage, declaratory relief, and unfair competition against Shenzhen Mindray. Shenzhen Mindray is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 6 of Masimo's First Amended Complaint, and on that basis, denies those allegations.

7. Shenzhen Mindray admits the Agreement between Shenzhen Mindray and Masimo includes purported consent to personal jurisdiction in the Central District of California for any dispute or difference concerning the rights or obligation of either Masimo or Shenzhen Mindray arising under the Agreement. Shenzhen Mindray admits that the Agreement in Section 18 states "any claim or cause of action shall be filed in any court in Orange County, California USA. MASIMO and MINDRAY each consents to personal jurisdiction in any action brought in the United States District Court for the Central District of California[.]" Shenzhen Mindray denies the remaining allegations of Paragraph 7 of Masimo's First Amended Complaint.

8. Shenzhen Mindray denies the allegations of Paragraph 8 of Masimo's First Amended Complaint.

9. Shenzhen Mindray admits that Masimo contends that venue is proper in this Court under Title 28 United States Code §§ 1391, 1400(b). Shenzhen Mindray denies that venue is convenient in this district and contends that dismissal based on the doctrine of *forum non conveniens* is appropriate. Shenzhen Mindray denies the remaining allegations of Paragraph 9 of Masimo's First Amended Complaint.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS OF SHENZHEN MINDRAY

4836-1853-1610.4

## THE PATENTS IN SUIT

10.    Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

11.    Shenzhen Mindray admits that on December 14, 1999, the United States Patent and Trademark Office issued U.S. Patent No. 6,002,952 ("the '952 patent") entitled "Signal Processing Apparatus and Method."  Shenzhen Mindray denies that the '952 patent was duly or lawfully issued.  Shenzhen Mindray is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 11 of Masimo's First Amended Complaint, and on that basis denies those allegations.

12.    Shenzhen Mindray admits that on July 17, 2001, the United States Patent and Trademark Office issued U.S. Patent No. 6,263,222 ("the '222 patent") entitled "Signal Processing Apparatus."  Shenzhen Mindray denies that the '222 patent was duly or lawfully issued.  Shenzhen Mindray is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 12 of Masimo's First Amended Complaint, and on that basis denies those allegations.

13.    Shenzhen Mindray admits that on June 17, 2003, the United States Patent and Trademark Office issued U.S. Patent No. 6,580,086 ("the '086 patent") entitled "Shielded Optical Probe and Method."  Shenzhen Mindray denies that the '086 patent was duly or lawfully issued.  Shenzhen Mindray is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 13 of Masimo's First Amended Complaint, and on that basis denies those allegations.

14.    Shenzhen Mindray admits that on March 2, 2004, the United States Patent and Trademark Office issued U.S. Patent No. 6,699,194 ("the '194 patent") entitled "Signal Processing Apparatus and Method."  Shenzhen Mindray denies that the '194 patent was duly or lawfully issued.  Shenzhen Mindray is without

4

knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 14 of Masimo's First Amended Complaint, and on that basis denies those allegations.

15.     Shenzhen Mindray admits that on June 1, 2004, the United States Patent and Trademark Office issued U.S. Patent No. 6,745,060 ("the '060 patent") entitled "Signal Processing Apparatus." Shenzhen Mindray denies that the '060 patent was duly or lawfully issued. Shenzhen Mindray is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 15 of Masimo's First Amended Complaint, and on that basis denies those allegations.

16.     Shenzhen Mindray admits that on May 8, 2007, the United States Patent and Trademark Office issued U.S. Patent No. 7,215,986 ("the '986 patent") entitled "Signal Processing Apparatus." Shenzhen Mindray denies that the '986 patent was duly or lawfully issued. Shenzhen Mindray is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 16 of Masimo's First Amended Complaint, and on that basis denies those allegations.

17.     Shenzhen Mindray admits that on February 10, 2009, the United States Patent and Trademark Office issued U.S. Patent No. 7,489,958 ("the '958 patent") entitled "Signal Processing Apparatus and Method." Shenzhen Mindray denies that the '958 patent was duly or lawfully issued. Shenzhen Mindray is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 17 of Masimo's First Amended Complaint, and on that basis denies those allegations.

18.     Shenzhen Mindray admits that on March 24, 2009, the United States Patent and Trademark Office issued U.S. Patent No. 7,509,154 ("the '154 patent") entitled "Signal Processing Apparatus." Shenzhen Mindray denies that the '154 patent was duly or lawfully issued. Shenzhen Mindray is without knowledge or

4836-1853-1610.4

information sufficient to form a belief regarding the remaining allegations of Paragraph 18 of Masimo's First Amended Complaint, and on that basis denies those allegations.

19.     Shenzhen Mindray admits that on July 24, 2012, the United States Patent and Trademark Office issued U.S. Patent No. 8,229,533 ("the '533 patent") entitled "Low-Noise Optical Probes For Reducing Ambient Noise."  Shenzhen Mindray denies that the '533 patent was duly or lawfully issued.  Shenzhen Mindray is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 19 of Masimo's First Amended Complaint, and on that basis denies those allegations.

20.     Shenzhen Mindray is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 20 of Masimo's First Amended Complaint, and on that basis denies those allegations.

## GENERAL ALLEGATIONS AS TO PATENT CLAIMS

21.     Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

22.     Shenzhen Mindray denies the allegations in Paragraph 22 of Masimo's First Amended Complaint.

23.     Shenzhen Mindray denies the allegations in Paragraph 23 of Masimo's First Amended Complaint.

24.     Shenzhen Mindray denies the allegations in Paragraph 24 of Masimo's First Amended Complaint.

25.     Shenzhen Mindray denies the allegations in Paragraph 25 of Masimo's First Amended Complaint.

26.     Shenzhen Mindray denies the allegations in Paragraph 26 of Masimo's First Amended Complaint.

27.     Shenzhen Mindray denies the allegations in Paragraph 27 of Masimo's First Amended Complaint.

4836-1853-1610.4

28.     Shenzhen Mindray denies the allegations in Paragraph 28 of Masimo's First Amended Complaint.

29.     Shenzhen Mindray denies the allegations in Paragraph 29 of Masimo's First Amended Complaint.

## GENERAL ALLEGATIONS AS TO NON-PATENT CLAIMS

30.     Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

31.     Shenzhen Mindray admits the allegations of Paragraph 31 of Masimo's First Amended Complaint, but denies that the Original Agreement is enforceable by Masimo.

32.     Shenzhen Mindray denies the allegations in Paragraph 32 of Masimo's First Amended Complaint.

33.     Shenzhen Mindray denies the allegations of Paragraph 33 of Masimo's First Amended Complaint.

34.     Shenzhen Mindray denies the allegations of Paragraph 34 of Masimo's First Amended Complaint.

35.     Shenzhen Mindray denies the allegations of Paragraph 35 of Masimo's First Amended Complaint.

36.     Shenzhen Mindray denies the allegations of Paragraph 36 of Masimo's First Amended Complaint.

37.     Shenzhen Mindray admits the allegations of Paragraph 37 of Masimo's First Amended Complaint, but denies that Amendment One is enforceable by Masimo.

38.     Shenzhen Mindray denies the allegations of Paragraph 38 of Masimo's First Amended Complaint.

39.     Shenzhen Mindray admits the allegations of Paragraph 39 of Masimo's First Amended Complaint, but denies that Amendment Two is enforceable by Masimo.

7

40.     Shenzhen Mindray admits the quoted language in Paragraph 40 of Masimo's First Amended Complaint appears in the paragraph numbered "7" of Amendment Two.  Shenzhen Mindray denies the remaining allegations of Paragraph 33 of Masimo's First Amended Complaint.

41.     Shenzhen Mindray denies the allegations of Paragraph 41 of Masimo's First Amended Complaint.

42.     Shenzhen Mindray admits the quoted language appears in the paragraph number "7" of Amendment Two.  Shenzhen Mindray denies the remaining allegations of Paragraph 42 of Masimo's First Amended Complaint.

43.     Shenzhen Mindray denies the allegations of Paragraph 43 of Masimo's First Amended Complaint.

44.     Shenzhen Mindray admits the allegations of Paragraph 44 of Masimo's First Amended Complaint, but denies that Amendment Three is enforceable by Masimo.

45.     Shenzhen Mindray admits the allegations of Paragraph 45 of Masimo's First Amended Complaint.

46.     Shenzhen Mindray admits the allegations of Paragraph 46 of Masimo's First Amended Complaint, but denies that Amendment Four is enforceable by Masimo.

47.     Shenzhen Mindray admits that Amendment Four extended the terms of the Original Agreement and prior amendments to March 31, 2011, but denies the remaining allegations of Paragraph 47 of Masimo's First Amended Complaint.

48.     Shenzhen Mindray admits the allegations of Paragraph 48 of Masimo's First Amended Complaint, but denies that Amendment Five is enforceable by Masimo.

49.     Shenzhen Mindray admits that Amendment Five extended the terms of the Original Agreement and prior amendments to March 31, 2012,

8

4836-1853-1610.4

but denies the remaining allegations of Paragraph 49 of Masimo's First Amended Complaint.

50.     Shenzhen Mindray admits the allegations of Paragraph 50 of Masimo's First Amended Complaint, but denies that Amendment Six is enforceable by Masimo.

51.     Shenzhen Mindray admits the allegations of Paragraph 51 of Masimo's First Amended Complaint, but denies that Amendment Seven is enforceable by Masimo.

52.     Shenzhen Mindray admits the Original Agreement sets forth at Section 18 the quoted language in Paragraph 52 of Masimo's First Amended Complaint except of the "[sic]" set forth as part of the quote.  Shenzhen Mindray denies the remaining allegations of Paragraph 52 of Masimo's First Amended Complaint.

53.     Shenzhen Mindray admits that on or about November 9, 2011, Masimo purported to exercise audit rights with respect to Shenzhen Mindray pursuant to the Original Agreement.  Shenzhen Mindray denies the remaining allegations of Paragraph 53 of Masimo's First Amended Complaint.

54.     Shenzhen Mindray admits that on or about February 27, 2012, Masimo purported to give notice of a dispute between Mindray Corporation and Masimo Corporation under Paragraph 18 of the Original Agreement, including purported reason to believe that Mindray Corporation is in breach of various provisions of the Original Agreement.  Shenzhen Mindray denies the remaining allegations of Paragraph 5 of Masimo's First Amended Complaint.

55.     Shenzhen Mindray admits that on or about May 14, 2012, Masimo sent a letter purporting to describe certain breaches of the Original Agreement, but denies the remaining allegations of Paragraph 48 of

9

4836-1853-1610.4

Masimo's First Amended Complaint.

## FIRST CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 6,002,952

56.     Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

57.     Shenzhen Mindray admits that the First Claim for Relief purports to be a claim for patent infringement that arises under the Patent Laws of the United States, Title 35 of the United States Code, but denies that Masimo has stated a claim for patent infringement against Shenzhen Mindray and denies that Masimo's infringement claims have merit.

58.     Shenzhen Mindray denies the allegations of Paragraph 58 of Masimo's First Amended Complaint.

59.     Shenzhen Mindray denies the allegations of Paragraph 59 of Masimo's First Amended Complaint.

60.     Shenzhen Mindray denies the allegations of Paragraph 60 of Masimo's First Amended Complaint.

## SECOND CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 6,263,222

61.     Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

62.     Shenzhen Mindray admits that the Second Claim for Relief purports to be a claim for patent infringement that arises under the Patent Laws of the United States, Title 35 of the United States Code, but denies that Masimo has stated a claim for patent infringement against Shenzhen Mindray and denies that Masimo's infringement claims have merit.

63.     Shenzhen Mindray denies the allegations of Paragraph 63 of Masimo's First Amended Complaint.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

64.     Shenzhen Mindray denies the allegations of Paragraph 64 of Masimo's First Amended Complaint.

65.     Shenzhen Mindray denies the allegations of Paragraph 65 of Masimo's First Amended Complaint.

## THIRD CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 6,580,086

66.     Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

67.     Shenzhen Mindray admits that the Third Claim for Relief purports to be a claim for patent infringement that arises under the Patent Laws of the United States, Title 35 of the United States Code, but denies that Masimo has stated a claim for patent infringement against Shenzhen Mindray and denies that Masimo's infringement claims have merit.

68.     Shenzhen Mindray denies the allegations of Paragraph 68 of Masimo's First Amended Complaint.

69.     Shenzhen Mindray denies the allegations of Paragraph 69 of Masimo's First Amended Complaint.

70.     Shenzhen Mindray denies the allegations of Paragraph 70 of Masimo's First Amended Complaint.

71.     Shenzhen Mindray denies the allegations of Paragraph 71 of Masimo's First Amended Complaint.

## FOURTH CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 6,699,194

72.     Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

73.     Shenzhen Mindray admits that the Fourth Claim for Relief purports to be a claim for patent infringement that arises under the Patent Laws of the United States, Title 35 of the United States Code, but denies that

11

Masimo has stated a claim for patent infringement against Shenzhen Mindray and denies that Masimo's infringement claims have merit.

74.    Shenzhen Mindray denies the allegations of Paragraph 74 of Masimo's First Amended Complaint.

75.    Shenzhen Mindray denies the allegations of Paragraph 75 of Masimo's First Amended Complaint.

76.    Shenzhen Mindray denies the allegations of Paragraph 76 of Masimo's First Amended Complaint.

## FIFTH CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 6,745,060

77.    Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

78.    Shenzhen Mindray admits that the Fifth Claim for Relief purports to be a claim for patent infringement that arises under the Patent Laws of the United States, Title 35 of the United States Code, but denies that Masimo has stated a claim for patent infringement against Shenzhen Mindray and denies that Masimo's infringement claims have merit.

79.    Shenzhen Mindray denies the allegations of Paragraph 79 of Masimo's First Amended Complaint.

80.    Shenzhen Mindray denies the allegations of Paragraph 80 of Masimo's First Amended Complaint.

81.    Shenzhen Mindray denies the allegations of Paragraph 81 of Masimo's First Amended Complaint.

## SIXTH CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 7,215,986

82.    Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

4836-1853-1610.4

83.    Shenzhen Mindray admits that the Sixth Claim for Relief purports to be a claim for patent infringement that arises under the Patent Laws of the United States, Title 35 of the United States Code, but denies that Masimo has stated a claim for patent infringement against Shenzhen Mindray and denies that Masimo's infringement claims have merit.

84.    Shenzhen Mindray denies the allegations of Paragraph 84 of Masimo's First Amended Complaint.

85.    Shenzhen Mindray denies the allegations of Paragraph 85 of Masimo's First Amended Complaint.

86.    Shenzhen Mindray denies the allegations of Paragraph 86 of Masimo's First Amended Complaint.

## SEVENTH CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 7,489,958

87.    Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

88.    Shenzhen Mindray admits that the Seventh Claim for Relief purports to be a claim for patent infringement that arises under the Patent Laws of the United States, Title 35 of the United States Code, but denies that Masimo has stated a claim for patent infringement against Shenzhen Mindray and denies that Masimo's infringement claims have merit.

89.    Shenzhen Mindray denies the allegations of Paragraph 89 of Masimo's First Amended Complaint.

90.    Shenzhen Mindray denies the allegations of Paragraph 90 of Masimo's First Amended Complaint.

91.    Shenzhen Mindray denies the allegations of Paragraph 91 of Masimo's First Amended Complaint.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

1

2

## EIGHTH CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 7,509,154

3

4

92. Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

5

6

7

8

9

93. Shenzhen Mindray admits that the Eighth Claim for Relief purports to be a claim for patent infringement that arises under the Patent Laws of the United States, Title 35 of the United States Code, but denies that Masimo has stated a claim for patent infringement against Shenzhen Mindray and denies that Masimo's infringement claims have merit.

10

11

94. Shenzhen Mindray denies the allegations of Paragraph 94 of Masimo's First Amended Complaint.

12

13

95. Shenzhen Mindray denies the allegations of Paragraph 95 of Masimo's First Amended Complaint.

14

15

96. Shenzhen Mindray denies the allegations of Paragraph 96 of Masimo's First Amended Complaint.

16

17

## NINTH CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 8,229,533

18

19

97. Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

20

21

22

23

24

98. Shenzhen Mindray admits that the Ninth Claim for Relief purports to be a claim for patent infringement that arises under the Patent Laws of the United States, Title 35 of the United States Code, but denies that Masimo has stated a claim for patent infringement against Shenzhen Mindray and denies that Masimo's infringement claims have merit.

25

26

99. Shenzhen Mindray denies the allegations of Paragraph 99 of Masimo's First Amended Complaint.

27

28

100. Shenzhen Mindray denies the allegations of Paragraph 100 of Masimo's First Amended Complaint.

14

101.   Shenzhen Mindray denies the allegations of Paragraph 101 of Masimo's First Amended Complaint.

### TENTH CLAIM FOR RELIEF

### BREACH OF CONTRACT

102.   Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

103.   Paragraph 103 of Masimo's First Amended Complaint calls for a legal conclusion to which no response is required by Shenzhen Mindray.  To the extent a response is required, Shenzhen Mindray admits that it entered into the Original Agreement and all Amendments thereto, but denies the remaining allegations of Paragraph 103 of Masimo's First Amended Complaint.

104.   Shenzhen Mindray denies the allegations of Paragraph 104 of Masimo's First Amended Complaint.

105.   Shenzhen Mindray denies the allegations of Paragraph 105 of Masimo's First Amended Complaint, and each and every of subpart of Paragraph 105, including  subparts A.1 though A.7, subpart B.1, subpart C.1, subparts D.1 through D.2, subparts E.1 through E.2, and subpart F.1.

106.   Shenzhen Mindray denies the allegations of Paragraph 106 of Masimo's First Amended Complaint.

107.   Shenzhen Mindray denies the allegations of Paragraph 107 of Masimo's First Amended Complaint.

108.   Shenzhen Mindray denies the allegations of Paragraph 108 of Masimo's First Amended Complaint.

109.   Shenzhen Mindray denies the allegations of Paragraph 109 of Masimo's First Amended Complaint.

110.   Shenzhen Mindray denies the allegations of Paragraph 110 of Masimo's First Amended Complaint.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

111.   Shenzhen Mindray denies the allegations of Paragraph 111 of Masimo's First Amended Complaint.

## ELEVENTH CLAIM FOR RELIEF

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

112.   Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

113.   Paragraph 113 of Masimo's First Amended Complaint calls for a legal conclusion to which no response is required by Shenzhen Mindray.  To the extent a response is required, Shenzhen Mindray admits that it entered into the Original Agreement and all Amendments thereto, but denies the remaining allegations of Paragraph 113 of Masimo's First Amended Complaint.

114.   Paragraph 114 of Masimo's First Amended Complaint calls for a legal conclusion to which no response is required by Shenzhen Mindray.  To the extent a response is required, Shenzhen Mindray admits that it entered into the Original Agreement and all Amendments thereto, but denies the remaining allegations of Paragraph 114 of Masimo's First Amended Complaint.

115.   Paragraph 115 of Masimo's First Amended Complaint is unintelligible, and on that basis, Shenzhen Mindray denies the allegations of Paragraph 115 of Masimo's First Amended Complaint.

116.   Shenzhen Mindray denies the allegations of Paragraph 116 of Masimo's First Amended Complaint.

117.   Shenzhen Mindray denies the allegations of Paragraph 117 of Masimo's First Amended Complaint.

118.   Shenzhen Mindray denies the allegations of Paragraph 118 of Masimo's First Amended Complaint.

119.   Shenzhen Mindray denies the allegations of Paragraph 119 of Masimo's First Amended Complaint.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS OF SHENZHEN MINDRAY

4836-1853-1610.4

120.    Shenzhen Mindray denies the allegations of Paragraph 120 of Masimo's First Amended Complaint.

## TWELFTH CLAIM FOR RELIEF

## ACCOUNTING

121.    Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

122.    Shenzhen Mindray denies the allegations of Paragraph 122 of Masimo's First Amended Complaint.

123.    Shenzhen Mindray denies that any amount of money is due from Shenzhen Mindray to Masimo, and denies the remaining allegations of Paragraph 123 of Masimo's First Amended Complaint.

124.    Shenzhen Mindray denies the allegations of Paragraph 124 of Masimo's First Amended Complaint.

## THIRTEENTH CLAIM FOR RELIEF

## INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

125.    Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

126.    Paragraph 126 of Masimo's First Amended Complaint calls for a legal conclusion to which no response is required by Shenzhen Mindray.  To the extent a response is required, Shenzhen Mindray admits that it entered into the Original Agreement and all Amendments thereto, but denies the remaining allegations of Paragraph 126 of Masimo's First Amended Complaint.

127.    Shenzhen Mindray denies the allegations of Paragraph 127 of Masimo's First Amended Complaint.

128.    Shenzhen Mindray denies the allegations of Paragraph 128 of Masimo's First Amended Complaint.

129.    Shenzhen Mindray denies the allegations of Paragraph 129 of Masimo's First Amended Complaint.

4836-1853-1610.4

130.   Shenzhen Mindray denies the allegations of Paragraph 130 of Masimo's First Amended Complaint.

131.   Shenzhen Mindray denies the allegations of Paragraph 131 of Masimo's First Amended Complaint.

132.   Shenzhen Mindray denies the allegations of Paragraph 132 of Masimo's First Amended Complaint.

133.   Shenzhen Mindray denies the allegations of Paragraph 133 of Masimo's First Amended Complaint.

134.   Shenzhen Mindray denies the allegations of Paragraph 134 of Masimo's First Amended Complaint.

## FOURTEENTH CLAIM FOR RELIEF

## DECLARATORY RELIEF

135.   Shenzhen Mindray incorporates by reference its responses to the preceding paragraphs of Masimo's First Amended Complaint.

136.   Shenzhen Mindray admits that an actual controversy has arisen between the parties concerning their respective rights and duties under the Original Agreement and Amendments thereto, but denies the remaining allegations of Paragraph 136 of Masimo's First Amended Complaint.

137.   Shenzhen Mindray admits that Masimo purports to desire a judicial determination of the respective rights and duties under the Original Agreement and Amendments thereto, but denies the remaining allegations of Paragraph 137 of Masimo's First Amended Complaint.

138.   Shenzhen Mindray denies the allegations of Paragraph 138 of Masimo's First Amended Complaint.

## FIFTEENTH CLAIM FOR RELIEF

## UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200

139.   Shenzhen Mindray incorporates by reference its responses to the

18

4836-1853-1610.4

preceding paragraphs of Masimo's First Amended Complaint.

140.   Shenzhen Mindray admits that the Fifteenth Claim for Relief purports to be a claim for statutory unfair competition under California Business & Profession Code § 17200 et seq., but denies that Masimo has stated a claim for relief, and denies that Shenzhen Mindray has engaged in statutory unfair competition under California Business & Profession Code § 17200 et seq.

141.   Shenzhen Mindray denies the allegations of Paragraph 141 of Masimo's First Amended Complaint.

142.   Shenzhen Mindray denies the allegations of Paragraph 142 of Masimo's First Amended Complaint.

143.   Shenzhen Mindray denies the allegations of Paragraph 143 of Masimo's First Amended Complaint.

144.   Shenzhen Mindray denies the allegations of Paragraph 144 of Masimo's First Amended Complaint.

## **PRAYER FOR RELIEF**

Shenzhen Mindray denies that Masimo is entitled to judgment against Shenzhen Mindray as follows:

A.   An Order adjudging Shenzhen Mindray to have infringed, directly and indirectly, each of the '952, '222, '086, '194, '060, '986, '958, '154 and '533 patents, because Shenzhen Mindray has not infringed, directly or indirectly, the '952, '222, '086, '194, '060, '986, '958, '154 or '533 patents;

B.   A permanent injunction enjoining Shenzhen Mindray, as well as its officers, agents, servants, employees, and attorneys and those persons in active concert or participation with Shenzhen Mindray, from infringing each of the '952, '086, '194, '986, '958, '154 and '533 patents, because Shenzhen Mindray has not infringed the '952, '086, '194, '986, '958, '154 or '533 patents;

C.   An accounting of all gains, profits, and advantages derived by Shenzhen Mindray's infringement of each of the '952, '222, '086, '194, '060, '986,

19

'958, '154 and '533 patents and for damages adequate to compensate Masimo for Shenzhen Mindray's infringement of each of the '952, '222, '086, '194, '060, '986, '958, '154 and '533 patents, because Shenzhen Mindray has not infringed the '952, '222, '086, '194, '060, '986, '958, '154 or '533 patents;

D.    An Order adjudging Shenzhen Mindray to have willfully infringed one or more of the '952, '222, '086, '194, '060, and '986 patents because Shenzhen Mindray has not infringed, willfully or otherwise, the '952, '222, '086, '194, '060, '986 patents;

E.    An Order trebling damages due to Shenzhen Mindray's willful infringement under 35 U.S.C. § 284 because Shenzhen Mindray has not infringed, willfully or otherwise, the '952, '222, '086, '194, '060 or '986 patents;

F.    An Order declaring this to be an exceptional case under 35 U.S.C. §285, and an award to Masimo of its attorneys' fees incurred in connection with this action because this is an exceptional case in favor of Shenzhen Mindray, and it is Shenzhen Mindray that is entitled to an award from Masimo of Shenzhen Mindray's attorneys' fees incurred in connection with this action;

G.    An award of pre-judgment and post-judgment interest and costs of this action against Shenzhen Mindray, because such interest and costs are not available to Masimo from Shenzhen Mindray;

H.    Judgment that Shenzhen Mindray has breached the Original Agreement and the Amendments thereto because Shenzhen Mindray has not breached an enforceable or valid provision of the Original Agreement and the Amendments thereto;

I.    Judgment that Shenzhen Mindray has tortiously interfered with Masimo's prospective economic advantage because Shenzhen Mindray has not interfered, tortiously or otherwise, with Masimo's prospective economic advantage;

J.    Judgment that Shenzhen Mindray competed unfairly with Masimo under California Business & Professions Code § 17200, et seq., and that Mindray

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

1   Shenzhen's actions in doing so be adjudged as intentional and willful, because
2   Shenzhen Mindray has not competed unfairly with Masimo under California
3   Business & Professions Code § 17200, et seq.;

4       K.      Judgment that Shenzhen Mindray competed unfairly with Masimo
5   under the common law of the State of California and that Mindray Shenzhen's
6   actions in doing so be adjudged as intentional and willful, because Shenzhen
7   Mindray has not competed unfairly with Masimo under the common law of the
8   State of California;

9       L.      An accounting of all gains, profits, and advantages derived by
10  Shenzhen Mindray, and an award of such gains, profits and advantages to Masimo
11  because Masimo is not entitled to an accounting from Shenzhen Mindray;

12      M.      Judgment in the form of specific performance to require Shenzhen
13  Mindray to perform under its contractual obligations because Masimo is not
14  entitled to specific performance of any provision of the Original Agreement or the
15  Amendments thereto;

16      N.      For an order that interest be awarded on all applicable damages
17  resulting from Shenzhen Mindray's breach of contract under California Civil Code
18  § 3289 because Masimo is not entitled to damages from Shenzhen Mindray on any
19  claim for relief;

20      O.      For a recovery of reasonable attorneys' fees for Shenzhen Mindray's
21  tortious interference with prospective advantage because Shenzhen Mindray has
22  not tortiously interfered with Masimo's prospective advantage;

23      P.      For a recovery of punitive damages for Shenzhen Mindray's wrongful
24  conduct because Shenzhen Mindray's conduct has not been wrongful and does not
25  support punitive damages in favor of Masimo;

26      Q.      An award to Masimo of all damages sustained on account of
27  Shenzhen Mindray's wrongful conduct, in an amount to be proven at trial, because
28  Shenzhen Mindray has not engaged in wrongful conduct and Masimo cannot prove

21

recoverable damages at trial;

R.      Preliminary and permanent injunctive relief enjoining Shenzhen Mindray, its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them from engaging in any act or practice that 1) constitutes a breach of the Original Agreement and the Amendments therefore, 2) intentionally interferes with Masimo's prospective economic advantage, 3) constitutes unfair competition against Masimo, because Masimo is not entitled to injunctive relief on any claim for relief against Shenzhen Mindray; and

S.      Such other and further relief as the Court may deem just and proper because no relief is just and proper in favor of Masimo in this case.

## JURY DEMAND

Shenzhen Mindray joins Masimo's request for a trial by jury of any and all issues in this action so triable.

## AFFIRMATIVE DEFENSES

Shenzhen Mindray asserts the following affirmative defenses without admitting or acknowledging that it bears the burden of proof as to any of them.

## FIRST AFFIRMATIVE DEFENSE
## (Failure to State a Claim)

1.      Masimo's First through Fifteenth Claims each fail to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE
## (Lack of Infringing Acts in the United States)

2.      Masimo's claims and requested relief under Title 35 of the United States Code are barred because Shenzhen Mindray has not made, used, sold, or offered for sale in the United States, or imported into the United States, the accused patient monitoring devices or accessories.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

**THIRD AFFIRMATIVE DEFENSE**

**(Lack of Knowledge and Intent Regarding Infringing Acts)**

3.     Masimo's claims and requested relief under Title 35 of the United States Code are barred because Shenzhen Mindray did not employ, intentionally or otherwise, extraterritorial means to contribute to, or induce, acts within the United States known to be infringing.

**FOURTH AFFIRMATIVE DEFENSE**

**(Failure To Conduct A Reasonable Presuit Investigation)**

4.     Masimo's claims and requested relief under Title 35 of the United States Code are barred, and its infringement causes of action are subject to dismissal and other sanctions, because Masimo failed to conduct a reasonable investigation to determine that Shenzhen Mindray engaged in infringing acts in the United States.

**FIFTH AFFIRMATIVE DEFENSE**

**(Non-Infringement)**

5.     Shenzhen Mindray does not infringe, directly or indirectly, or under the doctrine of equivalents, any claim of the '952 patent.

6.     Shenzhen Mindray does not infringe, directly or indirectly, or under the doctrine of equivalents, any claim of the '222 patent.

7.     Shenzhen Mindray does not infringe, directly or indirectly, or under the doctrine of equivalents, any claim of the '086 patent.

8.     Shenzhen Mindray does not infringe, directly or indirectly, or under the doctrine of equivalents, any claim of the '194 patent.

9.     Shenzhen Mindray does not infringe, directly or indirectly, or under the doctrine of equivalents, any claim of the '060 patent.

10.     Shenzhen Mindray does not infringe, directly or indirectly, or under the doctrine of equivalents, any claim of the '986 patent.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS OF SHENZHEN MINDRAY

4836-1853-1610.4

11.     Shenzhen Mindray does not infringe, directly or indirectly, or under the doctrine of equivalents, any claim of the '958 patent.

12.     Shenzhen Mindray does not infringe, directly or indirectly, or under the doctrine of equivalents, any claim of the '154 patent.

13.     Shenzhen Mindray does not infringe, directly or indirectly, or under the doctrine of equivalents, any claim of the '533 patent.

**SIXTH AFFIRMATIVE DEFENSE**

**(Prosecution History Estoppel)**

14.     Masimo's claims of infringement of the '952 patent are barred in whole or in part by the doctrine of prosecution history estoppel.

15.     Masimo's claims of infringement of the '222 patent are barred in whole or in part by the doctrine of prosecution history estoppel.

16.     Masimo's claims of infringement of the '086 patent are barred in whole or in part by the doctrine of prosecution history estoppel.

17.     Masimo's claims of infringement of the '194 patent are barred in whole or in part by the doctrine of prosecution history estoppel.

18.     Masimo's claims of infringement of the '060 patent are barred in whole or in part by the doctrine of prosecution history estoppel.

19.     Masimo's claims of infringement of the '986 patent are barred in whole or in part by the doctrine of prosecution history estoppel.

20.     Masimo's claims of infringement of the '958 patent are barred in whole or in part by the doctrine of prosecution history estoppel.

21.     Masimo's claims of infringement of the '154 patent are barred in whole or in part by the doctrine of prosecution history estoppel.

22.     Masimo's claims of infringement of the '533 patent are barred in whole or in part by the doctrine of prosecution history estoppel.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

# SEVENTH AFFIRMATIVE DEFENSE

## (Invalidity)

23.   Each and every claim of the '952 patent is invalid for failure to comply with one or more of the conditions for patentability, including but not limited to inventorship, utility, novelty, non-obviousness, enablement, indefiniteness, and written description, as set forth in 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

24.   Each and every claim of the '222 patent is invalid for failure to comply with one or more of the conditions for patentability, including but not limited to inventorship, utility, novelty, non-obviousness, enablement, indefiniteness, and written description, as set forth in 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

25.   Each and every claim of the '086 patent is invalid for failure to comply with one or more of the conditions for patentability, including but not limited to inventorship, utility, novelty, non-obviousness, enablement, indefiniteness, and written description, as set forth in 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

26.   Each and every claim of the '194 patent is invalid for failure to comply with one or more of the conditions for patentability, including but not limited to inventorship, utility, novelty, non-obviousness, enablement, indefiniteness, and written description, as set forth in 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

27.   Each and every claim of the '060 patent is invalid for failure to comply with one or more of the conditions for patentability, including but not limited to inventorship, utility, novelty, non-obviousness, enablement, indefiniteness, and written description, as set forth in 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

28.     Each and every claim of the '986 patent is invalid for failure to comply with one or more of the conditions for patentability, including but not limited to inventorship, utility, novelty, non-obviousness, enablement, indefiniteness, and written description, as set forth in 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

29.     Each and every claim of the '958 patent is invalid for failure to comply with one or more of the conditions for patentability, including but not limited to inventorship, utility, novelty, non-obviousness, enablement, indefiniteness, and written description, as set forth in 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

30.     Each and every claim of the '154 patent is invalid for failure to comply with one or more of the conditions for patentability, including but not limited to inventorship, utility, novelty, non-obviousness, enablement, indefiniteness, and written description, as set forth in 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

31.     Each and every claim of the '533 patent is invalid for failure to comply with one or more of the conditions for patentability, including but not limited to inventorship, utility, novelty, non-obviousness, enablement, indefiniteness, and written description, as set forth in 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

32.     The provision of the Original Agreement suggesting a bar to challenging the validity of Masimo's patents by Shenzhen Mindray is void as a matter of law, unenforceable as anti-competitive, and inapplicable given Masimo's breach of the Original Agreement.

33.     Pursuant to the unfair competition law in the People's Republic of China, a provision in a contract or license restricting a party's ability to challenge the validity of patent rights is void, and any judgment entered abroad based at least

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

1   in part on a preclusion of a party from challenging the validity of patents in suit is

2   unenforceable through the courts of the People's Republic of China.

3   **EIGHTH AFFIRMATIVE DEFENSE**

4   **(License)**

5   34.    Masimo's claims and requested relief under Title 35 of the United

6   States Code are barred in whole or in part because the Original Agreement and

7   Amendments thereto licensed Shenzhen Mindray to practice Masimo's patented

8   technology, including each of the '952, '222, '086, '194, '060, '986, '958, '154 and

9   '533 patents.  In addition, Masimo has not been injured with respect to pulse

10  oximetry technology incorporating Shenzhen Mindray SpO2 algorithms sold to

11  Mindray DS USA, Inc. because such products are directly or impliedly licensed

12  under the Masimo's Agreement with that company.

13  **NINTH AFFIRMATIVE DEFENSE**

14  **(Implied License)**

15  35.    Masimo's claims and requested relief under Title 35 of the United

16  States Code are barred in whole or in part by an implied license to each of the '952,

17  '222, '086, '194, '060, '986, '958, '154 and '533 patents.

18  **TENTH AFFIRMATIVE DEFENSE**

19  **(Patent Exhaustion)**

20  36.    Masimo's claims and requested relief under Title 35 of the United

21  States Code are barred in whole or in part because Shenzhen Mindray's products

22  were imported into the United States by third parties authorized by Masimo to sell

23  the allegedly infringing products.

24  **ELEVENTH AFFIRMATIVE DEFENSE**

25  **(Patent Misuse)**

26  37.    Masimo is barred from asserting the '952, '222, '086, '194, '060, '986,

27  '958, '154 and '533 patents against Shenzhen Mindray based on the doctrine of

28

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

patent misuse, because Masimo engaged in acts designed to broaden the scope of its patent rights and Masimo did so with anti-competitive effect.

## TWELFTH AFFIRMATIVE DEFENSE

### (Inequitable Conduct)

38.     Shenzhen Mindray incorporates herein by reference the facts set forth with particularity in paragraphs 76 to 239 of its Counterclaims, *infra*.  As alleged in the incorporated paragraphs, Masimo's '222, '986, '958 and '154 patents are unenforceable for inequitable conduct.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Other Equitable Defenses)

39.     Masimo's claims and requested relief under Title 35 of the United States Code are barred by one or more of the equitable doctrines of acquiescence, unclean hands, waiver, laches or estoppel.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Limitation of Damages and Costs)

40.     Masimo's claim for damages and costs under Title 35 of the United States Code are limited, in whole or in part, by one or more of 35 U.S.C. §§ 286, 287, and 288.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Failure of Consideration)

41.     Masimo's claims and requested relief based on the Original Agreement and Amendments thereto are barred by failure of consideration.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Failure To Perform)

42.     Masimo's claims and requested relief based on the Original Agreement and Amendments thereto are barred by Masimo's failure to perform in accordance with its duties and obligations under the Original Agreement and Amendments thereto.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Excuse of Performance)

43.     Shenzhen Mindray has fully performed all obligations under the Original Agreement and Amendments thereto except for any conditions excused by virtue of Masimo's anticipatory repudiation and/or Masimo's contractual breach.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Illegality)

44.     Masimo's claims and requested relief based on the Original Agreement and Amendments thereto are barred by the illegality created by the anti-competitive provisions of the Original Agreement and Amendments thereto.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Statutes of Limitation)

45.     Masimo's claims for damages are limited in whole or in part by applicable statutes of limitation.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Contract of Adhesion)

46.     Masimo's claims based on the Original Agreement and Amendments thereto are barred in whole or in part in light of provisions that are the product of disparate bargaining power and/or the failure of knowing and voluntary agreement by Shenzhen Mindray.

## TWENTY FIRST AFFIRMATIVE DEFENSE

### (Insufficient Service of Process)

47.     This Court is deprived of jurisdiction to enter a judgment in favor of Masimo against Shenzhen Mindray until Shenzhen Mindray is effectively served, and Shenzhen Mindray has not been effectively served at least for the following reasons: (1) the Complaint was transmitted by postal channels to Shenzhen Mindray in China when such service is illegal under Chinese law, in violation of

29

4836-1853-1610.4

the Hague Convention, and in breach of the strictures of Rule 4 of the Federal Rules of Civil Procedure; (2) in light of the illegality of the method of service used by Masimo under Chinese law, any provisions of a private agreement purporting to circumvent the treaty obligations of the United States and/or to violate the provisions of a foreign country's laws are void, unenforceable, and any service based thereon is ineffective as a matter of law; (3) controlling law requires compliance with the Hague Convention whenever service abroad is attempted, and Hague Convention procedures were not followed by Masimo; (4) Masimo did not comply with the procedures required under Rule 4 of the Federal Rules of Civil Procedure to obviate compliance with the Hague Convention, including securing an appropriate order from the Court prior to the attempted service permitting substitute service consistent with the Hague Convention and Rule 4 of the Federal Rules of Civil Procedure; (5) Masimo failed to translate the Complaint or the asserted patents, depriving Shenzhen Mindray of adequate notice of the asserted claims, and deprive Shenzhen Mindray of due process of law; and (6) the Court failed to honor and give effect to protections afforded Shenzhen Mindray under the United States' treaty obligations and Chinese law with respect to service of process.

## TWENTY SECOND AFFIRMATIVE DEFENSE
### (Forum *Non Conveniens*)

48.     The doctrine of forum *non conveniens* requires that this Court dismiss this case in favor of a forum in the People's Republic of China where an action between Shenzhen Mindray and Masimo regarding Masimo's anti-competitive conduct is presently pending, at least because: (1) the claims asserted by Masimo here arise from actions and omissions that occurred outside of the United States; (2) this Court has no interest in addressing or regulating the conduct of Masimo and Shenzhen Mindray outside of the United States; (3) Shenzhen Mindray would effectively be denied its day in court because its sources of proof in response to

FOURTH AMENDED ANSWER AND COUNTERCLAIMS OF SHENZHEN MINDRAY

Masimo's allegations are third-party customers and their documents located in China which are beyond the subpoena power of this Court; and (4) laws and regulations of the People's Republic of China restrict the delivery outside of China of certain trade secret materials that Masimo will no doubt request in discovery, and which Shenzhen Mindray would require for its defense to Masimo's claims for relief.

### TWENTY THIRD AFFIRMATIVE DEFENSE
### (No Immediate or Irreparable Injury)

49.     Masimo is not entitled to injunctive relief at least because: (1) Masimo has not suffered nor will it suffer irreparable harm because of Shenzhen Mindray's conduct; (2) any harm to Masimo would be outweighed by the harm to Shenzhen Mindray; (3) Masimo has an adequate remedy at law even if it were to prevail in this action; and (4) the public interest would not be served by an injunction in favor of Masimo.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE
### (Prosecution Laches)

50.     Shenzhen Mindray incorporates herein by reference the facts set forth with particularity in paragraphs 75 to 82 of its Counterclaims, *infra*.  As alleged in the incorporated paragraphs, Masimo's '986, '958, '154, '533 and '060 patents are unenforceable under the doctrine of prosecution laches.

### OTHER AFFIRMATIVE DEFENSES

51.     Shenzhen Mindray reserves the right to assert additional affirmative defenses during or upon completion of discovery.

/ /

/ /

31

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

# COUNTERCLAIMS

Shenzhen Mindray Bio-Medical Electronics Co., Ltd. ("Shenzhen Mindray") alleges the following counterclaims against Masimo Corporation ("Masimo"):

## JURISDICTION AND VENUE

1.     Shenzhen Mindray asserts violations of federal antitrust law, specifically Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.  The violations have a direct, substantial and reasonably foreseeable effect on domestic United States commerce and United States import trade and commerce.

2.     Shenzhen Mindray seeks monetary and equitable relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.

3.     Shenzhen Mindray asserts counterclaims under the Federal Declaratory Judgment Act, 28 U.S.C. § 2, seeking declaratory judgments under the patent laws of the United States, United States Code Title 35, that the patents asserted by Masimo are invalid, unenforceable, and not infringed.

4.     Shenzhen Mindray asserts counterclaims of patent infringement under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, and, in particular 35 U.S.C. § 271.

5.     This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 1367(a), 2201, and 2202, and 35 U.S.C. § 1, *et seq.*

6.     Masimo has submitted to the personal jurisdiction of this Court.

7.     Venue is proper in this district for the purpose of compulsory counterclaims pursuant to 28 U.S.C. § 1391, because this suit was filed in this District by Masimo.  Venue is also proper pursuant to 28 U.S.C. §§ 1391(b) and (d) and 1400(b) because, upon information and belief, various acts and transactions constituting at least a substantial portion of some of the counterclaims arose in this judicial district.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

# THE PARTIES

8.      Shenzhen Mindray is a Chinese corporation having its principal place of business at Keji 12th Road South, High-Tech Industrial Park, Nanshan, Shenzhen, People's Republic of China 518057.

9.      Masimo purports to be a Delaware corporation with its principal place of business at 40 Parker, Irvine, California 92618.

# ALLEGATIONS COMMON TO ANTITRUST, UNFAIR COMPETITION, TORTIOUS INTERFERENCE, AND PATENT INFRINGEMENT COUNTERCLAIMS

## A.      Background of Pulse Oximetry

10.     Pulse oximetry involves the noninvasive measurement of oxygen levels in a patient's blood.  This is accomplished by using a system generally comprising a sensor, a monitor and a patient cable that connects the sensor to the pulse oximeter monitor.  The sensor may be reusable or disposable and typically is applied onto the finger of an adult patient or the foot of an infant.  Special purpose sensors also may be used on other parts of the body, such as the ear and the forehead.

11.     A basic pulse oximeter sensor contains two light-emitting diodes ("LEDs") - one red and one infrared.  The LEDs emit light that passes through the patient's tissue, and a receptor generally opposite the LEDs detects the amount of light that is not absorbed by the blood and tissue.  This information is transmitted from the sensor via the patient cable to the pulse oximeter monitor.  The pulse oximeter monitor may be a standalone pulse oximeter monitor that reports pulse rate, blood oxygenation saturation ("SpO2") and a plethysmographic waveform (a waveform that shows the time-varying changes in blood volume in the tissue), or alternatively, a multi-parameter patient parameter monitor ("MPPM") that includes sensors that measure and report other patient parameters, such as ECG, blood pressure, etc.

33

4836-1853-1610.4

12.     Because oxygenated blood absorbs light differently than deoxygenated blood, the monitor is able to use various well-known algorithms to calculate oxygenation saturation of the blood in the tissue based on light absorption, as well as additional patient parameters, such as pulse rate.  On information and belief, pulse oximetry was invented in the 1970s and introduced into the United States healthcare markets during the early 1980s, long before Masimo's existence.

13.     Pulse oximeter monitors are comprised of electronic circuitry and software.  The monitors are reusable, durable pieces of equipment that typically function from 5 to 10 years before being replaced.  Pulse oximeter monitors or "pulse oximeters" typically are sold as either standalone devices or components of a multi-parameter patient monitoring system ("MPPM").

14.     Patient cables and sensors are commodity products that must be replaced frequently.  Hospitals generally purchase either disposable sensors, which must be replaced after each use, or reusable sensors, which typically are replaced every 1 to 2 years.  Likewise, patient cables typically have a limited useful life of about a year.

## B.     The Relevant Markets

15.     There is a relevant product market for pulse oximeter monitors.  The relevant geographic market for this product is the United States.  The pulse oximeter monitor market contains several relevant submarkets − a market for stand-alone pulse oximeter monitors, a market for MPPM monitors, and an underlying technology market (OEM circuit boards, as set forth below).  There is virtually no cross-elasticity of demand between pulse oximeter monitors and other forms of obtaining blood oxygen saturation, such as invasive methods of analyzing blood oxygen saturation via analysis of periodic blood draws.

16.     There is a second relevant product market for pulse oximetry sensors.  Absent anti-competitive constraints, customers would make buying decisions for

34

4836-1853-1610.4

less expensive and more durable sensors independently from decisions to purchase pulse oximeter monitors.  The relevant geographic market for this product is the United States.  There is no cross-elasticity of demand between sensors for non-invasive use with pulse oximeter monitors and sensors used in connection with invasive methods of obtaining blood oxygen saturation via analysis of periodic blood draws.

17.     There is a third relevant product market for patient cables used to connect sensors to pulse oximeter monitors.  Absent anti-competitive constraints, customers would make buying decisions for less expensive and more durable patient cables independently from decisions to purchase pulse oximeter monitors. The relevant geographic market for this product is the United States.  There is no cross-elasticity of demand between patient cables for non-invasive use with pulse oximeter monitors and accessories used with invasive methods of obtaining blood oxygen saturation via analysis of periodic blood draws.

18.     Masimo markets pulse oximeters under the brand name "Masimo SET®."  Masimo manufactures its own pulse oximeter monitors but also has licensed its technology to third parties in the form of circuit boards that include the "Masimo SET®" pulse oximeter functionality ("OEM circuit boards").  These third parties, including Nellcor Puritan Bennett LLC (a subsidiary of Covidien Inc.), Philips Medical Systems (part of Royal Philips Electronics), and Mindray DS USA, Inc. (prior to 2008, Datascope Corporation), manufacture pulse oximeter monitors pursuant to their agreements with Masimo.  On information and belief, Nellcor is currently the largest manufacturer of Masimo-licensed pulse oximeters, which are sold under the brand name "Oximax."  In addition, Masimo sells OEM circuit boards for incorporation into MPPMs.

19.     Shenzhen Mindray incorporates Masimo-branded SET® circuit boards into its pulse oximeters and MPPMs.  Shenzhen Mindray also makes and sells pulse oximeter monitors that use pulse oximetry algorithms developed by

35

Shenzhen Mindray.  Shenzhen Mindray's monitors are purchased by third-party

distributors and other Mindray Medical International Limited subsidiaries located

worldwide.  Mindray DS USA, Inc. ("Mindray USA") imports and sells monitors

and accessories manufactured by Shenzhen Mindray, including pulse oximeter

monitors, sensors and patient cables, in the United States.  In the alternative,

Masimo alleges, *e.g.*, at paragraph 22 of the First Amended Complaint, that

Shenzhen Mindray has conducted substantial business in the United States,

including without limitation importing, marketing, selling, and distributing patient

monitoring devices that include Mindray Sp02 Technology that is alleged to

infringe Masimo's patents asserted herein, and also has actively promoted its

patient monitoring devices that include Mindray Sp02 Technology in the United

States market.  On that basis, Shenzhen Mindray is a direct participant in the

United States in the relevant market for pulse oximetry, including the submarkets

for pulse oximeter monitors, sensors and patient cables, and has been directly

injured in the United States by Masimo's anti-competitive activities as detailed

*supra*.

20.     The relevant market for pulse oximeter monitors (including

standalone pulse oximeter monitors, MPPMs and OEM circuit boards) is highly

concentrated.  On information and belief, Masimo currently controls over 80% of

the market by manufacturing its own products and by directing the competitive

activities of its licensees and distributors.  The market for pulse oximeter monitors

is also subject to high barriers to entry, including the cost of developing intellectual

property and defending against lawsuits.

21.     The markets for sensors and patient cables are moderately

concentrated with lower barriers to entry due to the commodity nature of both

products and relatively low technical hurdles to production.

22.     Sensor and patient cable sales account for significantly more revenue

than sales of pulse oximeter monitors in any given year.  For companies like

36

4836-1853-1610.4

Masimo and Shenzhen Mindray, the primary driver for sales of sensors and patient cables is an installed base of pulse oximeter monitors (including standalone pulse oximeter monitors, MPPMs and third-party monitors that incorporate Masimo OEM circuit boards).  On information and belief, more than 80% of Masimo's revenues are derived from forcing Masimo pulse oximeter monitor customers to purchase Masimo sensors and patient cables, to the exclusion of other competitors in the United States, including Shenzhen Mindray.

### C.    Masimo's Market Power

23.    Masimo has engaged in a systematic effort to monopolize pulse oximetry in the United States and that effort has caused irreparable damage and distortion to the pulse oximetry market in the United States, resulting in supracompetitive prices for pulse oximetry products and exclusion of competitors, to the ultimate harm of the market participants, including Shenzhen Mindray, and consumers.  Masimo's systematic efforts to monopolize the pulse oximetry markets in the United States have forced existing companies in the field of pulse oximetry to convert to Masimo SET® or face disruptive and debilitating lawsuits, and have threatened and disrupted the ability of new entrants to gain a substantial foothold, such that the pulse oximetry field as a whole has stagnated, with virtually no innovation for more than a decade.   Masimo's efforts to monopolize have directly injured Shenzhen Mindray's ability to introduce safe, effective, lower-cost, durable pulse oximetry products into the relevant markets in the United States, have injured consumers in the United States market, and have affected the United States market, by causing supracompetitive prices and exclusion of competitors, depriving consumers of alternative safe, effective, low-cost and durable pulse oximetry products.

24.    Masimo currently wields market power in the sale of pulse oximeter monitors, sensors and patient cables in the United States.  It has the ability to control price and exclude competition in the United States, and routinely exercises

37

those powers, with direct, foreseeable and substantial effect on domestic commerce in the United States and United States import trade.  In exercising those powers, Masimo has illegally threatened and interfered with Shenzhen Mindray's ability to compete in the relevant market and submarkets in the United States, thereby causing threatened and actual antitrust injury to Shenzhen Mindray's business and property.  Masimo's market power extends equally into the corresponding submarkets for standalone pulse oximeter monitors, MPPM monitors, OEM circuit boards, and the markets for pulse oximeter sensors and patient cables.  Masimo's market power is maintained through the coordinated direction of its own branded products and its licensed pulse oximeter products.

25.	Masimo's market power is derived in part from the abuse of its technology position, in part from its decade-long campaign of anti-competitive licensing strategies, and its abuse of the United States patent system, and in particular, patent continuation application practice as permitted in the United States.

26.	Masimo has entered into numerous contracts to restrain competition for the sale of pulse oximeter technology by third parties in the United States. Masimo exerts control over the United States market by dictating the terms under which licensees or distributors can compete using their own branded pulse oximeter monitors or Masimo-branded pulse oximeter monitors.  Masimo's anti-competitive contracting policies have affected the United States market by causing supracompetitive prices and exclusion of competitors, and have directly harmed Shenzhen Mindray in the United States by limiting Shenzhen Mindray's ability to introduce safe, effective, low-cost, durable pulse oximetry products into the United States, and by threatening existing Shenzhen Mindray customers to cause those customers to cease buying product from Shenzhen Mindray not sanctioned by Masimo, thereby causing antitrust injury to Shenzhen Mindray's business and property.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

27.     Upon information and belief, Masimo's licensing agreements usually demand that its licensees promote Masimo SET® as their primary pulse oximetry technology. In many of its licenses, Masimo requires the licensee to abandon marketing or sales of its own pre-existing pulse oximetry technology and forego development of any competing technology. Through its agreements and technically useless and exclusionary changes to its OEM circuit boards, Masimo has directed licensees and distributors to exclude competition in the pulse oximeter monitor, sensor, and patient cable markets in the United States. Masimo extracts the anti-competitive profits from these exclusionary practices by recovering royalties for the sale of both patented and unpatented goods. As a result of Masimo's technically useless tying arrangements, detailed *supra*, Shenzhen Mindray has been hampered in its ability to compete in the relevant markets in the United States in introducing safe, effective, low-cost, durable pulse oximetry products, threatening Shenzhen Mindray's continuing ability to do so, thereby causing antitrust injury to Shenzhen Mindray's business and property.

28.     Through the combination of its direct pulse oximeter monitor and accessory sales and its control over third-party pulse oximeter monitor manufacturers, Masimo has become the single dominant firm in the market for pulse oximeter monitors, including the submarkets for standalone pulse oximeter monitors, MPPM monitors, OEM circuit boards, and in the market for sensors and patient cables. Masimo's dominant market position empowers it to control pricing and exclude competition in the United States, including competition from Shenzhen Mindray arising from Shenzhen Mindray's importation, sale and offers for sale of pulse oximetry products alleged to infringe Masimo's patents asserted here, as contended by Masimo.

29.     As detailed below, Masimo has created and maintained its unlawful monopoly position through various unlawful anti-competitive practices. Masimo has further exploited its unlawful monopoly position in the United States market

for pulse oximeter monitors to capture additional profits from the relevant markets for patient cables and sensors. As detailed below, Masimo's unlawful and anti-competitive exclusionary practices include the following:

    a)    Exclusionary exclusive dealing agreements and licenses with competitors and distributors (¶¶ 36-46)

    b)    Exclusionary technological interfaces used to unlawfully tie and condition the use of Masimo sensors and patient cables to the use of Masimo pulse oximeter monitors (¶¶ 47-67)

    c)    Exclusionary pricing and bundling practices (¶¶ 68-74)

    d)    Exclusionary inequitable conduct and actual and attempted enforcement of the invalid and unenforceable '222, '986, '958, '154, '194 and '952 patents (¶¶ 75-243)

30.    As a result of Masimo's anticompetitive conduct and exclusionary practices, the United States market for pulse oximetry products has been unlawfully affected, leading to supracompetitive prices for pulse oximetry products and the exclusion of competitors.

31.    As a result of Masimo's anticompetitive conduct and exclusionary practices, Shenzhen Mindray has suffered threatened and actual antitrust injury to its business and property by being excluded from the United States market for pulse oximetry products, thereby suffering actual losses and lost sales and profits.

32.    In the alternative, Masimo alleges at Paragraph 22 of the First Amended Complaint that Shenzhen Mindray has conducted substantial business in the United States by importing, marketing, selling and distributing pulse oximetry products into the United States market.  On that basis, Shenzhen Mindray has been injured in conducting such business as a result of Masimo's unlawful exclusionary practices, which continue to the present.

33.    Shenzhen Mindray by way of its Fourth Amended Answer and Counterclaims bases its antitrust claims against Masimo exclusively on injury to

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

United States domestic commerce and import trade.  Shenzhen Mindray does not, nor does it intend to, by way of this Fourth Amended Answer and Counterclaims to assert any claims barred by the Foreign Trade Antitrust Improvements Act (the "FTAIA").   On the contrary, the acts of Masimo complained of herein are those effecting domestic commerce in and import trade to the United States, and caused direct, substantial and foreseeable to Shenzhen Mindray's business interests in the United States.

34.    Masimo, by its conduct in parallel proceedings before the Chinese courts, has insisted that Shenzhen Mindray's claims that Masimo has engaged in anti-competitive conduct against Shenzhen Mindray must be heard by this Court. Specifically, in an appeal of a ruling against it by the Shenzhen Intermediate People's Court on an unfair competition claim asserted by Shenzhen Mindray, Masimo argued to the the Supreme Court of Guangdong Province that the Chinese lower court did not have jurisdiction over Shenzhen Mindray's unfair competition claims against Masimo and that those claims of unfair competition – based on the very acts underlying the antitrust allegations made by Shenzhen Mindray here – are more appropriately before this Court based on the venue provision of the 2002 Masimo-Shenzhen Mindray Agreement.

35.    As a result of the foregoing, Shenzhen Mindray asserts the following claims for relief:

a)    Monopolization (Counterclaim 1, ¶¶248-253);

b)    Attempted monopolization (Counterclaim 2, ¶¶ 254-261 and Counterclaim 3, ¶¶ 262-268);

c)    Conspiracy to monopolize (Counterclaim 4, ¶¶ 269-276);

d)    Tying (Counterclaim 5, ¶¶ 277-289)

e)    Group boycott (Counterclaim 6, ¶¶ 290-299);

f)    Agreement in restraint of trade (Counterclaim 7, ¶¶ 300-306);

41

g)   Walker Process monopolization claim (Counterclaim 8, ¶¶ 307-316);

h)   Walker Process attempted monopolization claim (Counterclaim 9, ¶¶ 317-324);

i)   Tortious interference with contract (Counterclaim 10, ¶¶ 325-337); and

j)   Statutory unfair competition under California Business & Professions Code §17200(Counterclaim 11, ¶¶ 338-344).

**D.   Exclusionary Agreements with Competitors and Distributors**

36.   Masimo has forced many of its current and former competitors to enter into exclusive dealing arrangements under threat of onerous patent litigation. These agreements require the licensee or distributor to produce and sell primarily Masimo branded pulse oximeter monitors, patient cables, or sensors, and to abandon such licensee's competing pulse oximetry technologies.  These agreements either expressly prohibit the sale of non-Masimo pulse oximeter monitors, patient cables, or sensors, or create a threat of patent litigation for continued sale of non-Masimo pulse oximeter monitors, patient cables and sensors, even if the non-Masimo products would not infringe any of Masimo's patents. Masimo has compounded the anti-competitive effect of such license provisions by demanding that its licensees forego challenges to the validity of Masimo's patents to retain the license, a provision that is facially unenforceable.

37.   Masimo has further engaged in anti-competitive conduct in unreasonably interpreting its licenses to have extra-territorial effect. The foregoing conduct has affected the United States market by causing supracompetitive prices and exclusion of competitors.  All of the foregoing provisions have harmed Shenzhen Mindray's ability to compete in the relevant markets for pulse oximetry products in the United States by preventing Masimo licensees and distributors from

42

4836-1853-1610.4

adopting, selling and distributing Shenzhen Mindray's safe, effective, low-cost, durable pulse oximetry products in the United States, thereby causing injury to Shenzhen Mindray's business and property.

38.    Masimo's licensing and distribution agreements have foreclosed significant commerce in the United States market for pulse oximeters by preventing the sale or introduction of competing products.  In addition, the licensing and distribution agreements have stifled the incentive to innovate, as a large percentage of distributors would be unable to offer a competing non-Masimo pulse oximeter monitor even if it could be sold at a lower price or with superior features.  The licensing and distribution agreements also preclude the sale of unpatented competing patient cables and sensors for use with Masimo pulse oximeter monitors in the United States, even though these are commodity products for which Masimo would otherwise face competition from a variety of branded and generic products, including products from Shenzhen Mindray.

39.    Masimo has also entered into agreements prohibiting the promotion of competing products, regardless of whether such products might offer better quality or more competitive prices to customers.  In some cases Masimo has required its licensees and distributors to discontinue sales of competing products in the United States.  For example, Masimo has forced Shenzhen Mindray's customer, Mindray USA, to discontinue purchases of Mindray SpO2 from Shenzhen Mindray, which has a direct and immediate effect on domestic United States commerce and United States import trade for those customers no longer able to obtain Shenzhen Mindray pulse oximetry products.

40.    Masimo has also required licensees and distributors to agree not to offer any competing pulse oximeter monitors at a lower price than Masimo's SET® pulse oximeter monitor, even if customers would benefit from differentiated pricing.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

41.     As of 2011, according to its public statements, Masimo had licensing or distribution agreements with 53 OEM partners, which accounted for over 90% of the worldwide shipments of pulse oximeter monitors.  On information and belief, Masimo systematically requires its licensees and partners to agree to provisions designed to exclude competition in the United States, such as those outlined in Paragraphs 28 through 31 above.  Such provisions can be found in current and former agreements with Respironics, Medical Data Electronics, Invivo, Shenzhen Mindray, Royal Philips Medical Systems, Datascope Corporation and others.

42.     Masimo also has engaged in unfair and anti-competitive conduct by threatening to disrupt its agreements with existing licensees unless those licensees require affiliated OEM manufacturers also to make Masimo the primary pulse oximetry technology of such OEM manufacturers,   For example, despite a decade-long history of dealing directly with Shenzhen Mindray on the basis of the 2002 Agreement identified in Masimo's First Amended Complaint, Masimo now contends that Shenzhen Mindray was under a different obligation imposed by Masimo's separate agreements with Mindray USA.  Masimo's unlawful exclusionary practices have injured both Shenzhen Mindray and its customers, and have had a direct and substantial effect on domestic commerce in, and import trade to, the United States.

43.     Masimo's exclusionary licensing and distribution provisions are specifically designed and intended to stabilize the market and exclude competition in the United States, including competition from Shenzhen Mindray.  Such conduct has a direct, substantial, and reasonably foreseeable effect on United States commerce and import commerce.

44.     Masimo's exclusionary licensing and distribution provisions have harmed competition in the United States market by causing supracompetitive prices and exclusion of competitors.  For example, as a result of Masimo's

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

exclusionary license provisions, Mindray USA has, except for repair or service,
discontinued purchase, importation and sale of Shenzhen Mindray pulse oximeter
monitors that employ Mindray-based pulse oximetry technology, as well as pulse
oximeter sensors and patient cables for use with such oximeters.

45.     In addition or in the alternative, Masimo's exclusionary licensing and
distribution provisions have directly harmed Shenzhen Mindray's activities as
alleged by Masimo, blocking Shenzhen Mindray from importing, selling or
offering for sale pulse oximetry products in the United States.   Masimo's
exclusionary licensing and distribution tactics, which unlawfully restrict Mindray
USA and other Shenzhen Mindray customers from carrying non-Masimo pulse
oximeter monitors, have caused antitrust injury to Mindray USA, other Shenzhen
Mindray customers, and have caused antitrust injury to Shenzhen Mindray's
business and property in the United States, by, among other things, hurting sales
and imports of Shenzhen Mindray, and other non-Masimo pulse oximetry
products, in and to the United States.

46.     Shenzhen Mindray consumers throughout the United States, and all
other consumers of pulse oximeter products, including consumers located in the
State of California, have been harmed by Masimo's exclusionary licensing and
distribution provisions which have reduced customer choice, restrained output, and
raised prices and have affected the United States market by causing
supracompetitive prices and exclusion of competitors.  As a direct result of
Masimo's exclusionary licensing and distribution provisions and of the harmful
effects of those provisions in the United States, distributors and importers cannot
offer, or have discontinued offering, Shenzhen Mindray sensors and patient cables
in the United States, or competitive third-party sensors and patient cables available
from Shenzhen Mindray, including to customers within the State of California,
thereby causing injury to Shenzhen Mindray's business and property.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

## E.   Exclusionary Technological Interfaces

47.   Prior to 2009, Masimo pulse oximeter monitors and pulse oximetry sensors employed a proprietary interface called "ProCal."  The ProCal interface comprised a patented resistor resident in Masimo's sensor, together with software programming in the pulse oximeter monitor that detected the presence of the resistor once upon insertion of the patient cable and again prior to rendering a measurement.  Masimo's pulse oximeter monitors (including standalone monitors, MPPMs and OEM circuit boards) were programmed not to function unless they detected the presence of a Masimo branded sensor containing ProCal.

48.   Beginning in 2009, Masimo changed its pulse oximeter monitors and OEM circuit boards to include its latest patented and exclusionary technology, called "X-Cal."  Upon information and belief, X-Cal consists of an electronic memory device, such as an electrically programmable memory ("EPROM") disposed in a sensor/patient cable that is checked each time the sensor is connected to the pulse oximeter monitor.  The pulse oximeter monitor reads identifying information for the connected sensor/patient cable, including how long the sensor/patient cable has been in use and compares that information to a threshold. If the pulse oximeter monitor detects that the sensor/patient cable lacks the identifying information, or that usage has exceeded the threshold, the pulse oximeter rejects the sensor/patient cable and does not work.  This in turn requires the hospital or care-giver to replace the rejected sensor/patient cable with a new Masimo unit.

49.   At the time Masimo introduced its X-Cal technology in 2009, it was aware of the existence of U.S. patent 6,308,089, as evidenced by the citation of that patent during prosecution of Masimo's U.S. Patent No. 7,509,494.  Upon information and belief, Masimo knew that its planned X-Cal technology infringed U.S. Patent No. 6,308,089 since at least 2006.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

50.     Also in 2009, Masimo required its licensees and distributors, including Shenzhen Mindray, to re-engineer their pulse oximeter monitors to accept Masimo OEM circuit boards that include the X-Cal technology, which circuit boards are incompatible with earlier versions of Masimo OEM circuit boards.

51.     According to public information, while Masimo originally included its X-Cal technology in reusable components, beginning in 2011, Masimo also incorporated its X-Cal technology into its disposable sensors.

52.     Masimo's ProCal and X-Cal interfaces have a direct, substantial, and reasonably foreseeable harmful effect on United States commerce and import commerce by excluding causing supracompetitive prices on pulse oximeter products and excluding competitors,  including  Shenzhen Mindray in both the sensor and patient cable markets throughout the United States, including the market for such products in the State of California.  In short, Masimo's ProCal and X-Cal interfaces make it so that Masimo's pulse oximeter monitors (including standalone monitors, MPPMs and OEM circuit boards) will not work with non-Masimo branded sensors.  Because Masimo dominates the United States market for pulse oximeter monitors, Masimo's technology, which prevents non-Masimo sensors from being used with Masimo monitors restricts customer choice, restrains output, and raises prices for pulse oximetry sensors. Such conduct causes antitrust injury to Shenzhen Mindray's business and property.

53.     On information and belief, there is no technical need to nest a ProCal resistor in parallel with the LEDs or to insert an X-Cal memory device in the sensor/patient cable.  The purpose of these interfaces is to create a technological tie between the Masimo pulse oximeter monitor and Masimo sensors and patient cables.  As a result of ProCal and X-Cal, Masimo sensors are the only sensors that will function with Masimo pulse oximeters.  Any competing sensor is rejected.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

54.     On information and belief, the further purpose of Masimo's X-Cal interface is to require the hospital or care-giver to discard the sensor/patient cable and to purchase a new sensor or patient cable from Masimo long before the useful life of the sensor or patient cable has been attained.  The X-Cal interface not only ties the customer to using Masimo sensors and patient cables with its Masimo pulse oximeter monitors, but requires the customer to replace such sensors and patient cables more frequently than required if the sensor or patient cable omitted that interface.  Masimo's X-Cal interface prohibits competition from lower-cost, more durable pulse oximeter sensors and patient cables.  Masimo's exclusionary X-Cal interface has harmed competition in the United States and has affected the market by causing supracompetitive prices and exclusion of competitors, including Shenzhen Mindray, by, among other things restricting consumer choice, restraining output, and raising prices with respect to pulse oximeter sensors.  This conduct has caused antitrust injury to Shenzhen Mindray's business and property.

55.     But for Masimo's tying, non-Masimo sensors and patient cables, including sensors and patient cables offered by Shenzhen Mindray, would function with a Masimo pulse oximeter monitor, just as non-Masimo sensors and patient cables routinely function with non-Masimo pulse oximeter monitors, including non-Masimo pulse oximeter monitors manufactured by Shenzhen Mindray.

56.     On information and belief, Masimo has designed its ProCal and X-Cal interfaces to "lock in" customers to Masimo products with anti-competitive effect in the United States.  Masimo's ProCal and X-Cal ties have the effect of increasing changeover costs and raising barriers to entry for competitors.  Masimo has employed the ProCal and X-Cal interfaces with the specific intent to foreclose competition and, among other things, to limit the ability and opportunity of customers to switch to competing pulse oximetry products, including those offered by Shenzhen Mindray, Shenzhen Mindray's customers, and other competitors to Masimo, and sold in the United States.  The X-Cal interface has the further direct,

48

substantial, and reasonably foreseeable effect of eliminating competition  in the United States, with respect to more durable sensors and patient cables available from other competitors, including Shenzhen Mindray, by requiring customers to replace such sensors and patient cables while they are still perfectly functional.  As a result, Masimo's X-Cal and ProCal ties, and the effects of those ties in the United States, have caused antitrust injury to Shenzhen Mindray's business and property, Shenzhen Mindray's customers such as Mindray USA, other competitors to Masimo, and consumers.

57.     On information and belief, Masimo requires its licensee Nellcor to use a similar method of tying with its Oximax pulse oximeter monitors.  In 2006, Masimo prevailed in a lawsuit alleging that Nellcor pulse oximeters infringed certain claims of Masimo patents.  The result of the litigation was Masimo's 2006 Settlement Agreement with Nellcor and subsequent amendments to that agreement, including the Second Amendment to Settlement Agreement and Release of Claims, which has an effective date of March 2011.  Under the terms of the Settlement Agreement and subsequent amendments, including the 2011 Second Amendment, Nellcor is permitted to continue its sale of allegedly infringing pulse oximetry technology under the express condition that it pay a royalty on the revenues derived from all Nellcor oximetry products, including pulse oximeter monitors, sensors, and patient cables that were not subject to the infringement allegations. The agreement and the subsequent amendments thereto contemplate that Nellcor will use a "lock and key" mechanism to ensure that Nellcor ties its pulse oximeter monitors to aftermarket sales of sensors and patient cables in the United States.

58.     Masimo has taken acts in furtherance of its conspiracy in the past four years, and continues to take such acts, by enforcing the Nellcor tying scheme through a covenant not to sue that is expressly nullified if Nellcor manufactures pulse oximeter monitors that are compatible with any third-party (i.e., non-Nellcor) sensors.  Masimo has taken additional steps to broaden the hold of its tying scheme

by amending its covenant not to sue as recently as 2011. Masimo has used and continues to use, including within the limitations period, this provision to unlawfully exclude third-party sensor and patient cable manufacturers and to collect profits on sales of tied sensors and patient cables in the United States.

59.    Nellcor's sensors are tied to its Oximax pulse oximeter monitors through a technological "lock and key" protocol known as DigiCal.  But for this tying arrangement, non-Nellcor sensors and patient cables would function with a Nellcor pulse oximeter monitor, just as non-Nellcor sensors and patient cables routinely function with non-Nellcor pulse oximeter monitors, including pulse oximeters manufactured by competitors including Shenzhen Mindray.

60.    On information and belief, within the limitations period, Masimo has required Nellcor to use the DigiCal interface to "lock-in" customers with Nellcor products.  This requirement directly benefits Masimo by artificially increasing sales of Nellcor sensors and patient cables, on which Masimo collects a high royalty based on its agreement with Nellcor.  DigiCal technology is not available to Shenzhen Mindray other than in connection with sale or resale of Nellcor products.  Masimo has required, and continues to require, the use of DigiCal with the specific intent to foreclose competition in the relevant market for pulse oximetry, including the submarkets for pulse oximeter monitors, sensors and patient cables in the United States and, among other things, to limit the ability and opportunity of customers to switch to competing pulse oximetry products, including those offered by Shenzhen Mindray.

61.    By forcing, and continuing to force within the last four years, Nellcor to tie its sensors to its pulse oximeters, Masimo has been able and continues to extract anti-competitive profits from Nellcor's substantial installed base of pulse oximeter monitor customers in the United States, while blocking competitors, such as Shenzhen Mindray, from making, importing, selling or offering for sale competing products in the United States.  By collecting anti-competitive profits

50

4836-1853-1610.4

from all oximetry products, including current and future products that do not infringe Masimo's patents, Masimo effectively forecloses, and continues to foreclose, Nellcor from any effort to invent around Masimo's technology.

62.     Masimo requires its licensees who use Masimo OEM circuit boards to similarly tie customers to Masimo's ProCal and X-Cal interfaces.  Masimo's license agreements prohibit its licensees from offering pulse oximeter sensors or patient cables that can be used with the Masimo OEM circuit boards, thus ensuring that its licensees tie their Masimo-based pulse oximeter monitors to aftermarket sales of Masimo sensors and patient cables in the United States.  This Masimo practice also prevents competitors, such as Shenzhen Mindray, from making or selling compatible sensors in the United States.

63.     Masimo enforces its tying scheme against licensees by threats to terminate its license if a licensee manufactures Masimo-based pulse oximeter monitors that are compatible with any third-party (i.e., non-Masimo) sensors or patient cables.  Masimo uses such provisions to exclude third-party sensor and patient cable manufacturers and to collect profits on sales of tied sensors and patient cables.

64.     By forcing its licensees to tie their pulse oximeter monitors to Masimo sensors and patient cables, Masimo is able to extract anti-competitive profits from such licensees' installed base of pulse oximeter monitor customers in the United States, and to ensure that such customers are locked into using Masimo pulse oximetry technology for the foreseeable future.  By collecting anti-competitive profits from all licensee-based oximetry products, including current and future products that do not infringe Masimo's patents, Masimo effectively forecloses any effort to invent around Masimo's technology.

65.     By forcing Nellcor and Masimo licensees to tie their pulse oximeter monitors to Nellcor and Masimo sensors and patient cables, Masimo has caused, and continues to cause, direct, substantial and foreseeable harm to  the United

51

4836-1853-1610.4

States market by causing supracompetitive prices and exclusion of competitors. This conduct has caused    antitrust injury to Shenzhen Mindray's business and property.  The direct, substantial, and reasonably foreseeable effect of Masimo's conduct in furtherance of its conspiracy in the last four years is to foreclose distributors and importers from offering Shenzhen Mindray sensors and patient cables, or competitive third-party sensors and patient cables, to customers throughout the United States, including within the State of California.

66.    In the alternative, Shenzhen Mindray is directly harmed by Masimo's conduct and prevented from engaging in the importation, sale and offer for sales in the United States, as alleged by Masimo, of compatible sensors and cables, which causes antitrust injury to Shenzhen Mindray's business and property.  Masimo's conduct, and the effects of that conduct in the United States, has injured and continues to injure Shenzhen Mindray's business and property by, among other things, hurting sales and imports of Shenzhen Mindray, and other non-Masimo sensor and patient cable products, in and to the United States, and threatening Shenzhen Mindray's activities in the United States that Masimo alleges to exist in the First Amended Complaint.

67.    Masimo's forcing of Nellcor and Masimo licensees to tie their pulse oximeter monitors to Nellcor and Masimo sensors and patient cables have injured, and continue to injure, the domestic commerce, import trade and consumers in the United States, including in California.  Among other things, Masimo's foreclosure of the use of non-Masimo or Nellcor sensors and patient cables has reduced customer choice, restrained output, and raised prices.

### F.    Exclusionary Pricing and Bundling Practices

68.    Sensors and patient cables are consumables that must be frequently replaced, often after a single use.  As a result, hospitals must keep a stock of sensors and patient cables on hand at all times.

4836-1853-1610.4

69.     Masimo has engaged in exclusionary predatory and below cost pricing and bundling practices designed to lock United States hospitals into Masimo pulse oximetry products, and to prevent such hospitals from buying products from competitors including Shenzhen Mindray, its distributors and affiliates.  On information and belief, Masimo has induced certain hospitals to convert to Masimo SET® by offering pulse oximeter monitors at no cost in exchange for a commitment to purchase a minimum number of sensors over the course of a long-term contract, typically five to ten years.  After the long-term contract expires, Masimo continues to lock in the customer through its tying of patient cables and sensors to its pulse oximeter monitors.

70.     On information and belief, Masimo's anti-competitive pricing and bundling practices are designed to shift hospital capital costs to consumers and third-party payers, who are charged a premium over the price of the commodity consumable sensors.  These practices injure domestic commerce and import trade into the United States by excluding competitors, and have a direct, substantial and foreseeable effect on consumers and Masimo's competitors, including Shenzhen Mindray.

71.     Once a hospital standardizes on Masimo oximetry products, additional purchases of Masimo pulse oximeter monitors and sensors are mutually reinforcing.  A hospital using Masimo pulse oximeter monitors must maintain a large stock of Masimo sensors and patient cables due to technological ties that prohibit compatibility with competing sensors.  This stock creates a strong economic incentive for the hospital to purchase only Masimo pulse oximeter monitors and discourages the hospital from changing to a competing non-Masimo pulse oximeter technology, such as Mindray SpO2, offered by Shenzhen Mindray. To do otherwise would require the hospital to maintain separate stocks of sensors and patient cables for its Masimo and non-Masimo pulse oximeter monitors, increasing overall costs.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS OF SHENZHEN MINDRAY

72.    Masimo's requirement that Nellcor tie its sensors to its pulse oximeter monitors similarly creates a strong economic incentive for Nellcor's United States hospital customers to purchase only Nellcor pulse oximeter monitors.  To do otherwise would require the hospital to maintain separate stocks of sensors and patient cables for its Nellcor and non-Nellcor pulse oximeter monitors, increasing overall costs.

73.    Masimo's conduct has had a direct, substantial and foreseeable effect on domestic United States commerce and import trade in the United States, including within the State of California by causing supracompetitive prices and excluding competitors.  Its anti-competitive pricing and bundling practices preclude future competition by locking up prospective customers and raising barriers to entry.  Masimo's scheme is designed to preserve market power by depriving customers of product choice and competitive prices in pulse oximetry. Its X-Cal interface further deprives customers from switching to more durable, less expensive non-Masimo sensors and patient cables.  These practices have directly caused antitrust injury to Shenzhen Mindray's business and property in the United States, as alleged by Masimo, and that of Shenzhen Mindray's customers and distributors in the United States.

74.    Masimo's licensing, pricing, bundling practices and tying schemes have caused antitrust injury and continue to cause antitrust injury to Shenzhen Mindray's business and property in the United States.  Masimo's conduct has had the direct, substantial, and reasonably foreseeable effect of precluding hospitals throughout the United States, and within the State of California, from choosing Shenzhen Mindray's pulse oximetry products, which are both more durable and could be offered less expensively than those of Masimo.  As a result of Masimo's conduct in the last four years, as well as its continuing conduct, and the effects of that conduct in the United States, Shenzhen Mindray has lost sales of Mindray-based pulse oximeter monitors and has been precluded from selling its own sensors

54

and patient cables to hospitals using Masimo SET® or Nellcor Oximax pulse oximetry technology.

## ADDITIONAL ALLEGATIONS COMMON TO INEQUITABLE CONDUCT AND WALKER PROCESS ANTITRUST COUNTERCLAIMS

### A.    Background and Development of Masimo's Patent Portfolio

75.    Upon information and belief, Masimo's patent portfolio is the culmination of a systematic and continuous decades' long effort by the officers of Masimo, and in particular Mr. Joe Kiani and Mr. Mohamed Diab, and their patent counsel, Knobbe, Martens, Olsen and Bear LLP to perpetrate fraud on the United States Patent and Trademark Office ("USPTO") and the American public by patenting inventions identically disclosed in the prior art, plainly suggested in the prior art, and/or first invented by others.  Masimo and its patent counsel have cited hundreds, and occasionally, thousands of items of irrelevant prior art, during pendency of Masimo's patent applications, ostensibly under the guise of complying with their duty of candor under 37 C.F.R. 1.56.  The true motive for such voluminous prior art citations, however, was to overwhelm the Patent Examiner in mountains of irrelevant prior art and thereby minimize the chance that the Patent Examiner would be able to locate the features of any relevant prior art reference.

76.    As an integral part of that effort, Masimo and its counsel have abused the practice of filing continuation patent applications and continuation-in-part applications in the United States, by systematically engaging in prosecution laches. Continuation application practice is unique to the United States, and permits an inventor to file a patent application to seek additional claims in a patent application that were not obtained in an earlier application.  A continuation-in-part application enables an applicant to add additional subject matter to a pending application while claiming an earlier priority date that typically forecloses the citation of prior art

dated after the claimed priority date.  Continuation applications and continuation-in-part applications are permitted nowhere outside of the United States.

77.    Upon information and belief, Masimo currently holds title to more than 230 issued U.S. patents, most of which issued from continuation or continuation-in-part applications that claim priority to applications filed more than a decade ago.  For example, according to the United States Patent and Trademark Office website, Masimo has prosecuted, and continues to prosecute, more than thirty-eight (38) continuation applications that claim priority to U.S. patent application Serial No. 08/859,836, filed May 16, 1997, including:

U.S. patent application Serial No. 08/887,815 filed on July 3, 1997;

U.S. patent application Serial No. 10/185,804 filed on June 27, 2002;

U.S. patent application Serial No. 09/110,542 filed on July 06, 1998;

U.S. patent application Serial No. 09/195,791 filed on November 17, 1998;

U.S. patent application Serial No. 09/199,744 filed on November 25, 1998;

U.S. patent application Serial No. 09/996,921 filed on November 28, 2001;

U.S. patent application Serial No. 10/005,631 filed on December 4, 2001;

U.S. patent application Serial No. 10/006,427 filed on December 3, 2001;

U.S. patent application Serial No. 10/062,859 filed on January 30, 2002;

U.S. patent application Serial No. 10/677,050 filed on September 30, 2003;

U.S. patent application Serial No. 10/676,534 filed on September 30, 2003;

U.S. patent application Serial No. 10/838,593 filed on May 4, 2004;

U.S. patent application Serial No. 10/838,814 filed on May 4, 2004;

U.S. patent application Serial No. 11/003,231 filed on December 3, 2004;

U.S. patent application Serial No. 11/070,081 filed on March 2, 2005;

U.S. patent application Serial No. 11/154,093 filed on June 15, 2005;

U.S. patent application Serial No. 11/432,278 filed on May 11, 2006;

U.S. patent application Serial No. 11/533,286 filed on September 19, 2006;

U.S. patent application Serial No. 11/754,238 filed on May 25, 2007;

1    U.S. patent application Serial No. 11/766,700 filed on June 21, 2007;

2    U.S. patent application Serial No. 11/766,714 filed on June 21, 2007;

3    U.S. patent application Serial No. 11/766,719 filed on June 21, 2007;

4    U.S. patent application Serial No. 11/842,117 filed on August 20, 2007;

5    U.S. patent application Serial No. 11/894,716 filed on August 20, 2007;

6    U.S. patent application Serial No. 12/047,274 filed on March 12, 2008;

7    U.S. patent application Serial No. 12/047,286 filed on March 12, 2008;

8    U.S. patent application Serial No. 12/277,221 filed on November 24, 2008;

9    U.S. patent application Serial No. 12/410,422 filed on March 24, 2009;

10   U.S. patent application Serial No. 13/370,239 filed on February 9, 2012;

11   U.S. patent application Serial No. 13/397,564 filed on February 15, 2012;

12   U.S. patent application Serial No. 13/397,579 filed on February 15, 2012;

13   U.S. patent application Serial No. 13/402,782 filed on February 22, 2012;

14   U.S. patent application Serial No. 13/463,746 filed on May 3, 2012; and

15   U.S. patent application Serial No. 13/914,276 filed on June 10, 2013.

16   U.S. patent application Serial No. 08/859,837, to which the above patent

17   family claims priority, was itself the fourth application in a chain of continuation

18   and continuation-in-part applications claiming priority back to U.S. patent

19   application Serial No. 07/666,060, filed on March 7, 1991.  Including the three

20   patents issued on the priority applications, the above chain of U.S. patent

21   applications has resulted in the issuance of 27 U.S. patents, with four continuation

22   applications still pending; the most recent continuation in this chain of applications

23   was filed on June 10, 2013, after this litigation commenced.  Masimo may have

24   filed even more continuation applications, which have not yet published.  Masimo

25   and its patent counsel have filed similarly endless chains of continuation and

26   continuation-in-part applications for many of the above applications.

27       78.    By comparison, as of the date of this pleading, Masimo holds only

28   about 40 patents granted by the European Patent Office, the next most common

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

venue in which patent protection is sought outside of the United States.  This difference between Masimo's U.S. patent portfolio and what has been granted by the European Patent Office is directly related to the lack of continuation practice in Europe, which prevents the abusive patent filing strategy adopted by Masimo in the United States.

79.     Prosecution laches is the practice of filing continuation applications long after the initial filing date of a patent application with the intent of writing claims in those continuation applications based on an invention not actually disclosed in the patent application, but instead to read on products independently developed by others long after the patent applications were filed.  Consequently, patents issue decades after the original patent issues or publishes, with claims broader than and/or unsupported in the application.  *See, e.g., Symbol Technologies, Inc. et al. v. Lemelson Medical, Education & Research Foundation, L.P.*, 277 F.3d. 1361 (Fed. Cir. 2002) (citing *Woodbridge v. United States,* 263 U.S. 50 (1923) (nine year delay in seeking issuance of patent rendered patent unenforceable).  The equitable doctrine of prosecution laches acts as a statute of repose, so that the public can reasonably rely on the coverage of a patent after it has issued.  Masimo's practice of seeking broader patents decades after its initial patent has issued violates the public trust, frustrates the statutory scheme, and renders such patents unenforceable under the doctrine of prosecution laches.

80.     Six of the Masimo patents asserted in this litigation were filed more than nine years after the initially claimed priority application.  The continuation application that matured as the '958 patent was filed on May 3, 2006, almost nine (9) years after its earliest claimed priority date of April 14, 1997.  The continuation application that matured as the '154 patent was filed on August 20, 2007, almost thirteen (13) years after its earliest claimed priority date of October 7, 1994.  The continuation application that matured as the '533 patent was filed on January 25, 2012, more than sixteen (16) years after its earliest claimed priority date of

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

October 16, 1995.  The continuation application that matured as the '986 patent was filed on June 15, 2005, more than ten (10) years after its earliest claimed priority date of October 7, 1994.  The continuation application that matured as the '060 patent was filed on December 3, 2001, more than ten (10) years after its earliest claimed priority date of March 7, 1991.  All of these patents are unenforceable under the doctrine of prosecution laches.

81.    In addition to its abusive number of long-delayed filings, Masimo further abuses U.S. continuation practice by improperly dropping priority claims to extend the term of patents issued on its continuation applications.  This is how Masimo, in the chain of patent applications recited above, apparently justifies filing a continuation patent application on  June 10, 2013, even though the earliest application in the priority chain was filed on March 7, 1991 – more than 20 years after the originally claimed priority date for the patent specification.  Because the term of a U.S. patent filed on or after June 7, 1995 is only 20 years from its earliest claimed priority date, any patent to issue on Masimo's June 10, 2013 continuation application nominally should expire on March 7, 2011, i.e., before it can even issue.  By filing its continuation applications with an early priority date, Masimo misleads the Patent Examiner to disregard the prior art dated after the claimed priority date.  Masimo then selectively withdraws its priority claims, thereby lengthening the term of any patent issued on the application beyond 20 years.

82.    Masimo's goal was to illegally create a dominant position for itself in the market for pulse oximeter monitors in the United States, that extends equally into the corresponding submarkets for standalone pulse oximeter monitors, MPPM monitors, OEM circuit boards, and the markets for pulse oximeter sensors and patient cables, by procuring an extensive portfolio of invalid and/or unenforceable patents; by improperly patenting inventions known to have been created by others; by deliberately pursuing patent claims known to lack support under one or more

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

sections of 35 U.S.C. § 112, first paragraph; and/or by withholding material prior art from the USPTO during prosecution of Masimo's patents.

83.     Mr. Kiani, Mr. Diab and Masimo's patent counsel, Knobbe Martens Olsen and Bear LLP ("the Knobbe Martens firm") have financially profited from this conduct, while innovation and competition in the markets for pulse oximeter circuit boards, MPPMs and accessories have been stifled, to the great loss and expense of the American public.

84.     Upon information and belief, Mr. Kiani founded his company on technology hijacked from a prior employer, Newport Medical Electronics, Inc. ("Newport Medical") and key patents obtained by Masimo since then have claimed inventions that were first invented by Masimo's competitors, including at least Nellcor Incorporated ("Nellcor") and/or Philips Electronics ("Philips").

85.     Upon information and belief, Mr. Kiani was hired in 1989 by Dr. Saum Nour of Newport Medical, a small California-based start-up company, to help Newport Medical develop a low cost pulse oximeter monitor.  In the course of his work for Newport Medical, Mr. Kiani proposed using an adaptive filter, and specifically, an adaptive noise canceller to remove noise in the red and infrared signals generated by the pulse oximeter sensor due to motion noise.  Newport Medical provided Mr. Kiani with the parts and financial resources to develop a breadboard circuit implementing his noise canceller concept.

86.     Upon information and belief, Mr. Kiani thereafter resigned from Newport Medical, and sued Newport Medical to obtain ownership of the adaptive noise canceller concept he had developed while employed by that Company.  Upon information and belief, Mr. Kiani executed a settlement agreement with Newport Medical by which Mr. Kiani agreed not to pursue meritless claims against Newport Medical in exchange for ownership of the technology he had developed for Newport Medical.  In that settlement agreement, Mr. Kiani warranted that he had returned the breadboard circuit and computer coding that he had prepared while

1    working for Newport Medical.  Upon information and belief, Mr. Kiani did not

2    return those items, but instead kept them as the basis for founding of Vital Signals

3    Incorporated, which later became Masimo.

4         87.    Promptly after defrauding Newport Medical of title to the pulse

5    oximetry invention that he had made for it, Mr. Kiani in 1989 founded Vital

6    Signals Incorporated to develop for his own financial gain a pulse oximeter board

7    implementing the adaptive noise canceller technology.  Mr. Kiani soon hired

8    Mohamed Diab to assist in developing the adaptive noise canceller implementation

9    of a pulse oximeter monitor, and by March of 1991, Masimo filed its first patent

10   application directed to pulse oximeter monitors, U.S. patent application Serial No.

11   07/666,060 ("the '060 application") using counsel at the Knobbe Martens firm.

12   That application embodied the adaptive noise canceller filtering technique that Mr.

13   Kiani had taken from Newport Medical.

14        **B.    Commission of Inequitable Conduct in Related Masimo Patents**

15        88.    In or about 1999, Mr. Kiani, as Masimo's CEO, and Mr. Jensen, as

16   litigation counsel for Masimo, sued Nellcor for infringement of U.S. Patent No.

17   6,036,642 ("the '642 patent") ("Masimo I").  That patent is a continuation

18   application of the '060 application first filed on March 7, 1991, and as confirmed

19   by the Federal Circuit, discloses adaptive noise cancellers as the sole adaptive

20   filtering technology for removing motion artifact from pulse oximeter monitor

21   readings.

22        89.    In response to Masimo's infringement claims in Masimo I, Nellcor

23   moved for summary judgment of non-infringement.  In connection with that

24   motion, Nellcor submitted sealed declarations of Dr. Thomas Yorkey and Mr.

25   Clark Baker ("the Yorkey and Baker Declarations"), which described in detail the

26   algorithms used in Nellcor's N-395 pulse oximeter monitor.  The Yorkey and

27   Baker Declarations included as appendices many of the Nellcor internal reports

28   describing Nellcor's independent development of those algorithms, demonstrating

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

that Mr. Yorkey was in possession of the invention of using estimation techniques to compute blood oxygen saturation at least prior to December 1992.  Masimo in *Masimo Corp. v. Mallinckrodt Inc.*, Dkt. No. 8:99-cv-01245 (C.D. Cal. Oct 08, 1999) ("Masimo I") accused Nellcor's N395 pulse oximeter monitor of infringing the '642 patent.

90.    Nellcor prevailed in the Masimo I litigation, with the District Court issuing an Order filed October 4, 2000, granting summary judgment that the term "adaptive filter" used in the claims of that patent was synonymous with "adaptive noise canceller."  The District Court in Masimo I found that Nellcor's commercial pulse oximeter monitors, which are described in the Yorkey and Baker Declarations as using a Kalman filter, did not use adaptive noise cancellers, the only type of adaptive filter disclosed in the '642 patent.

91.    Masimo I conclusively established that Kalman filters were not adaptive filters, and were not disclosed in the '060 application first filed on March 7, 1991.  Moreover, vis-à-vis the '060 application, Masimo I established that Nellcor had invented the use of Kalman filters before Masimo, and that Masimo could not rely on the March 7, 1991 filing date of the '060 application as proof of prior invention of Kalman filters, because no such filter is disclosed in the '060 application.  That decision of the District Court was affirmed on appeal by the Federal Circuit in a decision reported at 18 Fed. Appx. 852 (Fed. Cir. 2001).

92.    Subsequent to the Court's ruling in Masimo I, Masimo promptly filed another patent infringement case against Nellcor, *Masimo Corp. v. Mallinckrodt Inc.*, Dkt. No. 8:01-cv-00638 (C.D. Cal. Jul. 09, 2001) ("Masimo II"), this time asserting a number of patents, including U.S. Patent No. 6,206,830 ("the '830 patent").  The '830 patent issued on March 27, 2001, as a continuation of the '642 patent, and contains an identical disclosure to the '060 application filed March 7, 1991.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

93.     Like the claims of the '642 patent, many claims of the '830 patent require an "adaptive filter" or "adaptive filtering."  However, during prosecution of the '830 patent, Mr. Kiani and Mr. Jensen argued before the USPTO that the term "adaptive filter" as used in the claims should be broadly construed to read on any type of adaptive filter, not just the adaptive noise canceler disclosed in the application.  Masimo did not submit to the Patent Examiner the District Court's decision in Masimo I that found that the disclosure of the '642 patent – which was identical to the disclosure of the application for the '830 patent pending before the Patent Examiner – did not contain support for any "adaptive filter" other than "adaptive noise canceller."  In connection with post-trial proceedings in Masimo II, the District Court held the '830 patent unenforceable because the inventors and Mr. Jensen had withheld the District Court's opinion in Masimo I from the USPTO.

94.     As reported in the Federal Circuit opinion dated September 7, 2005, in Masimo II affirming the District Court's determination that the '830 patent was unenforceable:  "The district court correctly recognized that the Masimo I litigation directly affected the patentability of the invention claimed in the '830 patent because the same terms were at issue in both proceedings."  *Mallinckrodt, Inc. v. Masimo Corp.*, 147 Fed. Appx. 158, 183 (Fed. Cir. 2005).

95.     The Federal Circuit also held that there was clear evidence of intent to deceive the USPTO:  ". . . the district court inferred intent from the actions of Jensen, Masimo's attorney.  Any competent attorney registered to practice before the PTO should have known that the Masimo I litigation was material to the patentability of the invention claimed in the '830 patent.  After all, a registered attorney is required to be familiar with the laws, regulations, and ethical standards implicated in practicing before the PTO.  Hence, that Jensen did not disclose the Masimo I litigation to the PTO, when he for certain knew about it since he was the lead attorney representing Masimo in that litigation, strongly suggests that he intended to deceive the PTO."  *Id.* at 183-84.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

96.     There, as here, Masimo and its patent counsel were engaged in prosecuting patents intended to cover the target of pending litigation, after having received highly proprietary and confidential information regarding the algorithms used in Nellcor's N395 pulse oximeter monitor, which Masimo had unsuccessfully accused of infringement in Masimo I.

97.     The Yorkey and Baker declarations submitted in Masimo I originally had been filed under seal.  Upon information and belief, Masimo's patent prosecution and litigation counsel in Masimo I and II, studied those materials to formulate additional claims that Masimo and the Knobbe Martens firm then prosecuted in subsequent patent applications, including the unenforceable '830 patent.  That these declarations had been considered by Masimo's patent prosecutors at the Knobbe Martens firm is evident from Masimo's selective submission of these declarations in certain of the patents asserted in this litigation, as described *infra*.

98.     The District Court's decision in Masimo II could not lead to a contrary conclusion that the '060 application supported Masimo's claims to have invented Kalman filtering techniques for removing motion noise from pulse oximeter measurements before Nellcor.  That is because Masimo I, which should have been law of the case, established that the '060 application did not disclose anything other than adaptive noise cancelers, and Kalman filters were not adaptive noise cancelers.  Moreover, if Masimo II, as affirmed by the Federal Circuit, had concluded that the '060 application established a reduction to practice by Masimo of Kalman filters, then the Federal Circuit would not have found the related '830 patent unenforceable because in that case the '060 application would have supported an interpretation of "adaptive filter" broader than just adaptive noise cancelers.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

C.     **Unenforceability of the '958 Patent**

**Deliberate Withholding of the Yorkey and Baker Declarations**

99.     The application for the '958 patent was filed on May 3, 2006, and claims priority through a chain of patent applications first filed on April 14, 1997; the '958 patent issued on February 10, 2009.  Apart from being unenforceable for prosecution laches as described above, the '958 patent further is unenforceable because Masimo and its counsel committed inequitable conduct during prosecution of the application by withholding certain exhibits to the Yorkey and Baker Declarations in Masimo I, and the trial testimony and exhibits of Dr. Robert T. Stone from the Masimo II trial, as set forth in detail *infra*.

100.     Issued claim 1 of the '958 patent recites:  In a signal processor, a method of determining measurements for one or more blood parameters of pulsing blood, the method comprising: (a) receiving a first intensity signal from a light-sensitive detector which detects light of a first wavelength attenuated by body tissue carrying pulsing blood; (b) receiving a second intensity signal from the light-sensitive detector which detects light of a second wavelength attenuated by body tissue carrying pulsing blood; (c) electronically transforming the first and second intensity signals into the frequency domain; (d) electronically determining values of the transformed first and second intensity signals that represent desired physiological data; (e) electronically combining the transformed first and second intensity signals to form a composite signal comprising physiological information from both the transformed first and second intensity signals; (f) electronically analyzing the composite signal using one or more physiologically-based rules; and (g) electronically determining the measurement of the blood parameter based at least in part on results of the analysis.  (Reference letters added.)

101.     The prosecution history of the '958 patent reveals that the Patent Examiner, Examiner Winakur, rejected application claims 1, 2, and 4 as anticipated by Mortz, U.S. Patent No. 5,934,277, under 35 U.S.C. § 102(e).  *See* Non-Final

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

Rejection dated January 3, 2008, pp. 3-4.  The Examiner also rejected pending claim 3 as obvious over Mortz under 103(a).  *See id.*

102.   Examiner Winakur further identified Corenman, Nellcor's U.S. Patent No. 4,911,167 ("Corenman"), as prior art.  *See* Amendment dated July 1, 2008, pp. 11-12.  Corenman discloses "a method and apparatus for improving ***the calculation of oxygen saturation and other blood constituents***….The processing may occur in the time domain or in the ***frequency domain***….In the preferred frequency domain embodiment, the time-measure [input signals] are ***Fourier transformed*** into its spectral components to form ***the composite information***."  *See* Corenman, Abstract.  The method disclosed in Corenman includes a photodetector that generates a current in response to the ***red and infrared light*** transmitted in sequence and is converted to a voltage signal.  *See* Corenman, col. 2, ll. 3-5.

103.   Responding to the Examiner's rejections, applicants amended application claim 1 to additionally recite "transforming the first and second intensity signals into the frequency domain," "combining the transformed first and second intensity signals to form a composite signal comprising physiological information from both the transformed first and second intensity signals;" "analyzing the composite signal using one or more ***physiologically-based rules***;" and "determining the measurement of the blood parameter based at least in part on the results of the analysis."  *See* Amendment dated July 1, 2008, p. 2.

104.   Applicants further amended application claim 1 to recite that the method of transforming, combining, determining, and analyzing the signals be performed ***electronically*** in a ***signal processor***.  *See* Amendment dated October 15, 2008, p. 2.  In distinguishing the claims of the '958 patent over Corenman, Masimo and its lawyers specifically argued that the Corenman patent did not disclose "analyzing [a] composite signal using one or more physiologically-based rules."  *See* Amendment filed July 1, 2007 at pages 11-12.  The Examiner allowed pending claim 1 after entering the above amendments.  *See* Notice of Allowance dated

66

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

November 5, 2008.  Thus, the preceding amendments were viewed by the Patent Examiner as patentably distinguishing features of the '958 patent over the cited prior art.

105.   Corenman discloses a method of computing a blood parameter, in particular blood oxygen saturation, using red and infrared data transformed from the time domain to the frequency domain using a Fourier Transform.  *See, e.g.*, Corenman FIG. 10, which discloses practicing in a pulse oximeter each of the following limitations of claim 1 of the '958 patent:

(a) receiving a first intensity signal from a light-sensitive detector which detects light of a first wavelength attenuated by body tissue carrying pulsing blood (*See* Corenman FIG. 10, step 4000 "collect 512 data points on each of the Red and IR data");

(b) receiving a second intensity signal from the light-sensitive detector which detects light of a second wavelength attenuated by body tissue carrying pulsing blood (*See* Corenman FIG. 10, step 4000 "collect 512 data points on each of the Red and IR data");

(c) electronically transforming the first and second intensity signals into the frequency domain (*See* Corenman FIG. 10, step 4070 "Compute F.T. [Fourier Transform] of Red and IR data");

(d) electronically determining values of the transformed first and second intensity signals that represent desired physiological data (*See* Corenman FIG. 10, step 4080 "Locate peaks at Heart Rate" ["desired data"]);

(e) electronically combining the transformed first and second intensity signals to form a composite signal comprising physiological information from both the transformed first and second intensity signals (*See* Corenman FIG. 10, step 4080 "Compute R" [the "ratio of ratios" which is determined by combining the transformed Red and Infrared signals to compute a composite signal of the two transformed signals]); and

67

(f) electronically analyzing the composite signal using one or more physiologically-based rules (*see infra*); and

(g) electronically determining the measurement of the blood parameter based at least in part on results of the analysis (*See* Corenman FIG. 10, final step "Compute SAT (Usual Nellcor Form)" [in which R value of the "ratio of ratios" is used to look up or compute a value of blood oxygen saturation]).

106.   The only limitation of claim 1 that is missing from Corenman is the limitation (f) of claim 1 of the '958 patent – using one or more physiologically-based rules to analyze the composite signal.  That feature, however, is fully disclosed in the Nellcor internal documents appended to the Yorkey and Baker Declarations that Mr. Kiani, Mr. Diab and Masimo's counsel deliberately withheld from the Patent Office during prosecution of the '958 patent.

107.   The Yorkey and Baker Declarations, which were executed in August 2000, had attached thereto Nellcor internal reports created between 1992 and 1994. The Nellcor internal reports predate the 1997 filing date of the '958 patent by several years, and constitute prior art to the '958 patent under at least 35 U.S.C. 102(g).  The Yorkey and Baker Declarations and exhibits, and particularly the Nellcor internal reports, are highly material to the patentability of the '958 patent, because they were both well known to Mr. Kiani and Mr. Diab, and attorneys at Knobbe Martens, including Mr. Jensen and Mr. Grover, and because they disclose the key limitation of the '958 patent that was added to secure allowance of that patent.  Masimo published the Yorkey and Baker Declarations and exhibits in connection with issuance of Masimo's U.S. Patent No. 7,469,157, which names Mr. Kiani, Mr. Diab and Mr. Weber as co-inventors.

108.    More specifically, the Yorkey and Baker Declarations and exhibits thereto disclose details of Nellcor's O4 pulse oximeter project, begun in 1992, to develop software algorithms that provided valid measurements in the present of motion noise.  As described, e.g., Exhibit 2 to the Yorkey Declaration, that system

68

was designed to process values for the red and infrared signals received from the
oximeter sensor to reduce the impact of motion or other noise on the overall
average computed value of blood oxygen saturation.  *See* O4 Summary dated
August 5, 1994, Exhibit 2 to the Yorkey Declaration at page at 1 ("In the fall of
1992, the O4 project began researching oximetry algorithms with the goals of
substantially reducing false alarms compared to the N200, and calculating
saturation and rate *through periods of motion*.")(emphasis added).

109.   As further described at page 3 of Exhibit 2 to the Yorkey Declaration,
a Nellcor document dated August 5, 1994 and entitled "O4 Summary": "O4
calculates two saturations, one with the data that has been comb filtered with the
current estimate of the heart rate, the other is the raw preprocessed data.  *O4
calculates saturation with an adaptive (Kalman) filter that continuously weighs
all data by an estimate of the current noise and limits the rate of change to a
defined limit (currently 1.3 saturation points per second).  Data points which are
obviously non-physiological, such as when IR and red values are moving in
opposite directions, are deemed invalid and not used to adapt saturation*"
(emphasis added).  The foregoing passage of Exhibit 2 to the Yorkey Declaration
plainly discloses limitation (f) of claim 1 of the '958 patent of analyzing a
composite signal using one or more physiologically-based rules.  But for Masimo's
and its counsel's failure to cite the Yorkey and Baker Declarations and exhibits to
the USPTO, the '958 patent would not have issued.

110.   As established above, Exhibit 2 to the Yorkey Declaration, in
combination with the Corenman patent cited by the Patent Examiner, meets *all* of
the limitations of claim 1 of the '958 patent, thus rendering claim 1 *prima facie*
invalid.  The '958 patent would not have issued had Mr. Diab, the inventor, or
Messrs.  Jensen and Grover, the patent counsel, cited the Yorkey and Baker
materials to the Patent Examiner for review.  Had the Examiner known about this

prior art Nellcor work as described in Exhibit 2 to the Yorkey Declaration, at least claim 1 of the '958 patent would not have issued.

111.   The Yorkey and Baker declarations and exhibits were not cited to the Patent Examiner during prosecution of the '958 patent.  Given that Exhibit 2 to the Yorkey Declaration precedes the 1997 filing date for the application for the '958 patent by several years, Masimo could not have filed a declaration "swearing behind" the Nellcor documents had they been submitted by Masimo and cited by the Patent Examiner as prior art under 35 U.S.C. § 102(g).  Mr. Jensen participated in and/or supervised prosecution of the '958 patent, as is evident from his participation with Mr. John Grover, Esq., also from the Knobbe Martens firm, at an Examiner Interview conducted on June 14, 2008, as disclosed in the prosecution history of the '958 patent.  *See* Amendment dated July 1, 2008, p. 10.

112.   The Yorkey and Baker Declarations and exhibits are non-cumulative to the other prior art made of record during prosecution of the '958 patent because the Examiner did not identify or cite any other prior art reference that disclosed analyzing a composite signal using physiological-based rules to determine a blood parameter.

113.   Masimo and its counsel knew about the contents of the Yorkey and Baker Declarations and exhibits since at least August 2000; Mr. Jensen was lead counsel for Masimo in the Masimo I case.  And by 2005, Masimo and its counsel had published the Yorkey and Baker Declarations and exhibits in connection with prosecution of Masimo's U.S. Patent No. 7,469,157.  Yet Masimo's inventors and its patent counsel deliberately choose to withhold those highly material references from the Patent Examiner to prevent having that prior art cited against the '958 patent.

114.   Having had its inequitable conduct in connection with prosecution of the '958 patent exposed, Masimo and its litigation counsel (which also participated in procuring the '958 patent), now contend that the Yorkey and Baker Declarations

70

were brought to the Patent Examiner's attention.  Specifically, Masimo and its counsel now contend that in July 2008, more than two years after the patent application for the '958 patent had been filed, and more than six months after the Examiner had issued the first rejection, Masimo's counsel submitted a transmittal letter to the Patent Examiner informing the Examiner that Masimo had submitted prior art in the files for 27 other Masimo issued patents and pending patent applications.  *See* Transmittal Letter dated July 23, 2008.  That transmittal letter did not identify the Yorkey and Baker Declarations, or even disclose in which of the other 27 files for the pending applications or issued patents relevant prior art could be found.  Masimo also did not provide the Information Disclosure Statements ("IDS's") filed in those 27 other patents and applications.

115.   Even if Masimo had submitted the IDS's filed in those other applications (prior to issuance of the '958 patent in 2009), which Masimo did not, those IDS's total more than 550 pages and collectively identify more than 5200 references, including patents, publications and trial transcripts.  Assuming even a relatively short nominal patent length of 20 pages per patent, those 5200 references would correspond to more than 100,000 pages, or more than 40 completely full archive boxes of material.

116.   During prosecution of the '958 patent, Masimo and its counsel submitted about 200 prior art references, which are actually listed on the IDS's filed for the '958 patent.  Examiner Winakur indicated in the file history that he reviewed all 191 references in a single day on December 21, 2007.  *See* List of References Cited by Applicant and Considered by Examiner, dated September 25, 2008.  Again, assuming a nominal patent length of only 20 pages per reference, Examiner Winakur purportedly read about 4000 pages of prior art on December 21, 2007.  To have reviewed 4000 pages of prior art in an 8-hour work day, assuming no interruption, Examiner Winakur could not have spent more than about 7 seconds, on average, on each page of prior art.  There is no indication in the file

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

history for the '958 patent that he ever considered any of the prior art cited in the 27 other patents and applications mentioned in Masimo's transmittal letter, nor given the foregoing schedule, did he have time to do so.

117.   In view of the circumstances, the single most reasonable inference regarding the '958 patent is that Masimo's inventors and Messrs. Jensen and Grover mentioned the 27 other patent and application files, fully expecting that Examiner Winakur could not review that mountain of prior art, and indeed purposely intended to discourage and prevent Examiner Winakur from reviewing any of the prior art contained in those other patent and application files.  This inference is bolstered by the statement in Masimo's Transmittal Letter that the '958 application did "not claim a priority benefit to any of these patents or pending applications" and thus were directed to different subject matter. *See* Transmittal Letter dated July 23, 2008.

118.   Masimo's inventors and its counsel had a duty to cross-cite all material information irrespective whether the same examiner previously receiving the information is responsible for the patent application at issue, but they deliberately chose not to do so to secure allowance of the '958 patent.  Examiner Winakur has examined and issued at least 173 patents to Masimo; he could not possibly be expected to recall that any particular reference amongst the thousands of references Masimo cited in those other applications might apply to the '958 patent years later.

119.   As set forth above, the Nellcor internal documents attached to the Yorkey and Baker Declarations, and in particular Exhibit 2 to the Yorkey Declaration, was highly material to patentability of at least claim 1 of the '958 patent.  Exhibit 2 to the Yorkey Declaration described exactly the type of application of physiological rules to a composite red and infrared signal that Masimo's inventors and its counsel argued was absent from the Corenman reference; but for withholding that material, claim 1 of the '958 patent would not

72

have issued.  The content of the Yorkey and Baker Declarations was well known to Masimo's inventors and patent/litigation counsel, and they had in fact cited these materials in many other Masimo applications.  Had Masimo or its counsel cited the Yorkey and Baker Declarations and exhibits to the Patent Examiner examining the application for the '958 patent, however, they knew that they could not swear behind the dates of the Nellcor internal reports, in the event the Patent Examiner cited the Nellcor work as prior art.  Under the circumstances, the single most likely inference regarding Masimo's and its counsel's failure to cite the Yorkey and Baker Declarations and exhibits is that Masimo and its counsel deliberately withheld that information from consideration by the Patent Examiner during prosecution of the '958 patent.

## Deliberate Withholding of the Masimo II trial materials

120.    Additionally, Masimo and its counsel committed inequitable conduct in connection with prosecution of the '958 patent, not only for failing to cite the Yorkey and Baker Declarations and exhibits, but also by failing to submit to the USPTO the trial testimony of Dr. Robert T. Stone presented during the Masimo II trial.  Mr. Kiani attended the Masimo II trial, and Mr. Jensen was both litigation counsel in Masimo II and directly participated and/or supervised prosecution of the '958 patent.

121.    Dr. Stone's trial testimony and exhibits disclose a prototype fetal oximeter and methods developed by Nellcor in the late 1980s, which system also constitutes highly material prior art to the claims of the '958 patent, including claim 1, under 35 U.S.C. § 102(g).  But for Masimo's and its counsel's deliberate withholding of the fetal oximeter described in Dr. Stone's trial testimony and exhibits, at least claim 1 of the '958 patent would not have issued.

122.    As discussed *supra*, during prosecution of the '958 patent, Examiner Winakur identified Corenman, Nellcor's U.S. Patent No. 4,911,167 ("Corenman"), as prior art.  *See* Amendment dated July 1, 2008, pp. 11-12.  Corenman discloses

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

"a method and apparatus for improving **the calculation of oxygen saturation and other blood constituents**….The processing may occur in the time domain or in the **frequency domain**…In the preferred frequency domain embodiment, the input signals are **Fourier transformed** into its spectral components to form **the composite information**."  *See* Corenman, Abstract.  The method disclosed in Corenman includes a photodetector that generates a current in response to the **red and infrared light** transmitted in sequence and is converted to a voltage signal. *See* Corenman, col. 2, ll. 3-5.

123.   Responding to the Examiner's rejections, applicants amended application claim 1 of the '958 patent to additionally recite "transforming the first and second intensity signals into the frequency domain," "combining the transformed first and second intensity signals to form a composite signal comprising physiological information from both the transformed first and second intensity signals;" "analyzing the composite signal using one or more **physiologically-based rules**;" and "determining the measurement of the blood parameter based at least in part on the results of the analysis."  *See* Amendment dated July 1, 2008, p. 2.

124.   Applicants further amended application claim 1 to recite that the method of transforming, combining, determining, and analyzing the signals to be performed **electronically** in a **signal processor**.  *See* Amendment dated October 15, 2008, p. 2.  In distinguishing the claims of the '958 patent over Corenman, Masimo and its lawyers specifically argued that Corenman did not disclose "analyzing [a] composite signal using one or more physiologically-based rules."  *See* Amendment filed July 1, 2007 at pages 11-12.  The Examiner allowed pending claim 1 after entering the above amendments.  *See* Notice of Allowance dated November 5, 2008.  Thus, the preceding amendments were viewed by the Patent Examiner as patentably distinguishing features of the '958 patent over the cited prior art.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

125.   Corenman discloses a method of computing a blood parameter, in particular blood oxygen saturation, using red and infrared data transformed from the time domain to the frequency domain using a Fourier Transform.  *See, e.g.*, Corenman FIG. 10, which discloses practicing in a pulse oximeter each of the following limitations of claim 1 of the '958 patent:

(a) receiving a first intensity signal from a light-sensitive detector which detects light of a first wavelength attenuated by body tissue carrying pulsing blood (*See* Corenman FIG. 10, step 4000 "collect 512 data points on each of the Red and IR data");

(b) receiving a second intensity signal from the light-sensitive detector which detects light of a second wavelength attenuated by body tissue carrying pulsing blood (*See* Corenman FIG. 10, step 4000 "collect 512 data points on each of the Red and IR data");

(c) electronically transforming the first and second intensity signals into the frequency domain (*See* Corenman FIG. 10, step 4070 "Compute F.T. [Fourier Transform] of Red and IR data");

(d) electronically determining values of the transformed first and second intensity signals that represent desired physiological data (*See* Corenman FIG. 10, step 4080 "Locate peaks at Heart Rate" ["desired data"]);

(e) electronically combining the transformed first and second intensity signals to form a composite signal comprising physiological information from both the transformed first and second intensity signals (*See* Corenman FIG. 10, step 4080 "Compute R" [the "ratio of ratios" which is determined by combining the transformed Red and Infrared signals to compute a composite signal of the two transformed signals]); and

(f) electronically analyzing the composite signal using one or more physiologically-based rules (*see infra*); and

75

4836-1853-1610.4

(g) electronically determining the measurement of the blood parameter based at least in part on results of the analysis (*See* Corenman FIG. 10, final step "Compute SAT (Usual Nellcor Form)" [in which R value of the "ratio of ratios" is used to look up or compute a value of blood oxygen saturation]).

126.   The only limitation of claim 1 that is missing from Corenman is limitation (f) of claim 1 of the '958 patent – using one or more physiologically-based rules to analyze the composite signal.  That feature and more, however, is disclosed in Dr. Stone's trial testimony at Masimo II regarding Nellcor's fetal oximeter system, which Mr. Kiani, Mr. Diab and Masimo's counsel deliberately withheld from the Patent Office during prosecution of the '958 patent.

127.   Dr. Stone's testimony and the trial exhibits disclose that Nellcor's fetal oximeter computed blood oxygen saturation via two alternative methods:  a first method that used conventional time-based algorithms to compute saturation, and a second frequency domain method in which the red and infrared signals were transformed into the frequency domain and then used to form a composite signal, which in turn was used to compute oxygen saturation.  The Nellcor fetal oximeter output two values of oxygen saturation, from which a correct result was selected based on physiologically-based rules.  *See* Stone Masimo II testimony, pp. 1819-1820 and Slide 4905.

128.   Slide 4905 from the Masimo II trial, presented in conjunction with Dr. Stone's testimony shows Red and IR arrows directed to boxes labeled N-200 Signal Processing and Frequency-Domain Signal Process Techniques, thus meeting limitations (a) and (b) of claim 1 of the '958 patent.  The Frequency Domain Processing meets limitation (c), (d) and (e) of claim 1 of the '958 patent.  *See id.* at 1820-1821 and Slide 4905.  Dr. Stone further testified that the fetal oximeter arbitrates among the values computed by different approaches by selecting the "best result" from those displayed in the fetal oximetry program, and the selection is based on the characteristics of the physiological signal.  *See id.* at

76

4836-1853-1610.4

1821.  This feature of the Nellcor fetal oximeter satisfies limitations (f) and (g) of claim 1 of the '958 patent.  Accordingly, but for the failure by Masimo's inventors and its patent counsel to disclose Dr. Stone's trial testimony and exhibits at the Masimo II trial, at least claim 1 of the '958 patent would not have issued.

129.   In addition to anticipating at least claim 1 of the '958 patent, the Nellcor fetal oximeter disclosed in Dr. Stone's testimony supplied that which was missing from Corenman, and in combination with Corenman renders at least claim 1 of the '958 patent invalid as obvious.  Dr. Stone's trial testimony and trial exhibits are non-cumulative to the prior art cited to and considered by Examiner Winakur during prosecution of the '958 patent because they describe each and every limitation of claim 1, including the purportedly inventive limitation.

130.   Mr. Kiani and Mr. Diab, who upon information and belief attended the Masimo II trial, and Mr. Jensen, who was both litigation counsel at the Masimo II trial and participated in prosecuting the '958 patent, were aware of Dr. Stone's trial testimony and exhibits.  Masimo and its counsel did not provide Dr. Stone's Masimo II trial testimony or exhibits to the Patent Examiner during prosecution of the '958 patent.

131.   Masimo contends that it brought Dr. Stone's testimony at the Masimo II trial to the Patent Examiner's attention during prosecution of the '958 patent by listing the application file, Appl. No. 11/154093, that matured as the '986 patent along with 27 other patent and application files mentioned in a transmittal letter accompanying an IDS filed for the '958 patent.  *See* Transmittal Letter dated July 23, 2008.  However, that application file does not appear amongst the items actually listed on Masimo's IDS, and Masimo has no reason to believe that the Patent Examiner ever looked beyond the prior art actually submitted during prosecution of the '958 patent.  There is no indication in the file history of the '958 patent that the Stone trial testimony from Masimo II was ever considered in connection with examination of the '958 patent.  Moreover, the exhibits that

77

accompanied Dr. Stone's Masimo II trial testimony were not even submitted during prosecution of the '986 patent, ensuring that Dr. Stone's Masimo II trial testimony was not even considered during prosecution of that patent.

132.   As for the Yorkey and Baker Declarations and exhibits, the Nellcor fetal oximeter described in Dr. Stone's Masimo II trial testimony predates the filing date of the '958 patent by many years, and constitutes prior art under 35 U.S.C. § 102(g).  Accordingly, Masimo could not have overcome a rejection by the Patent Examiner citing the Nellcor fetal oximeter, and Masimo could not have filed a declaration "swearing behind" that prior art.

133.   Mr. Kiani, Mr. Diab and Masimo's patent counsel deliberately and intentionally withheld Dr. Stone's Masimo II trial testimony and exhibits regarding Nellcor's fetal oximeter so that it could not be cited by the Patent Examiner as rendering unpatentable the claims that Masimo sought to obtain in the '958 patent. In view of the foregoing, the single most reasonable inference is that Masimo and its patent counsel deliberately withheld Dr. Stone's Masimo II trial testimony and exhibits to induce the Patent Examiner to allow the claims of the '958 patent. Accordingly, all claims of the '958 patent are unenforceable due to inequitable conduct.

134.   As alleged above, Masimo committed inequitable conduct during prosecution of the '958 patent by failing to disclose to the USPTO the Yorkey and Baker materials and by failing to submit to the USPTO Dr. Stone's trial testimony presented during the Masimo II trial, each of which information is both highly material to patentability of the claims of the '958 patent and would have precluded issuance of at least claim 1 of the '958 patent.

135.   The foregoing allegations regarding commission of inequitable conduct regarding the prosecution of the '958 patent are summarized in the following allegations:

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

136.  **WHO**:  As alleged above, but for Mr. Kiani's, Mr. Diab's, Mr. Jensen's and Mr. Grover's decision to deliberately and intentionally withhold during prosecution of the '958 patent (1) the Yorkey and Baker Declarations and exhibits and (2) Dr. Stone's Masimo II trial testimony and exhibits, the claims of the '958 patent would not have issued.

137.  **WHAT**:  As alleged above, Masimo and its counsel withheld the Yorkey and Baker Declarations and exhibits, and in particular Exhibit 2 to the Yorkey Declaration, which discloses at page 3 the use of physiologically based rules to analyze a composite signal based on red and infrared signals.  This was the only element missing from Corenman, which otherwise anticipated claim 1 of the '958 patent.  And separately, as alleged above, Masimo and its counsel withheld Dr. Stone's Masimo II trial testimony and exhibits, which disclosed at pages 1819-1821 and in Slide 4905 a fetal oximeter that generated oxygen saturation values using two different algorithms, including a frequency-based analysis, and then arbitrated between those results using physiologically-based rules to determine a valid output.  That testimony and exhibit anticipates at least claim 1 of the '958 patent, or alternatively renders claim 1 unpatentable in combination with Corenman.

138.  **WHERE**:  Page 3 of Yorkey Declaration Exhibit 2 describes in detail at least one physiologically based rule applied to the composite of the red and infrared signals.  Pages 1819 to 1821 of the Masimo II trial transcript and Slide 4905 used in conjunction with that testimony describe the details of the Nellcor fetal oximeter.  Nellcor technology having the features later claimed by Masimo in the '958 patent was developed well before the 1997 filing date for the application that matured as the '958 patent.

139.  **WHY**:  As alleged, the description of the application of physiologically-based rules at page 3 of the withheld Exhibit 2 to the Yorkey Declaration, dated August 1994, supplies the sole claim limitation missing from

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

Corenman.  More specifically, Corenman disclosed all limitations of claim 1 of the '958 patent except the limitation requiring analyzing a composite signal formed by combining the red and infrared signals using physiologically-based rules.  Exhibit 2 to the Yorkey Declaration provides that missing limitation, rendering claim 1 of the '958 patent unpatentable.  Likewise, Dr. Stone's Masimo II trial testimony and exhibits describe a fetal oximeter developed by Nellcor during Dr. Stone's tenure, prior to 1989, that computed oxygen saturation using alternative calculation methods, one of which was a frequency-based analysis.  If the results of these calculations differed, physiologically-based rules were applied to decide whether to select Saturation 1 resulting from the N-200 Signal Processing Branch or Saturation 2 resulting from the Frequency Domain analysis.  Nellcor's prior art fetal oximeter therefore provides the sole missing element of at least claim 1 of the '958 patent that was not disclosed in Corenman.

140.  **HOW**:  But for the deliberate withholding of the Yorkey and Baker Declarations and exhibits, and separately, withholding of Dr. Stone's Masimo II trial testimony and exhibits, including Slide 4905, Examiner Winakur would have rejected at least claim 1 of the '958 patent, as obvious under 35 U.S.C. § 103 based on Corenman in view of Exhibit 2 to the Yorkey Declaration, under 35 U.S.C. § 102(g) as anticipated by Nellcor's fetal oximeter, or obvious over Nellcor's fetal oximeter in view of Corenman.  Nellcor's prior art materials establish that it first invented limitation (f) that Examiner Winakur found to be absent in the other prior art of record.  The Yorkey and Baker Declarations and exhibits and Dr. Stone's Masimo II trial testimony was not inadvertently omitted by Masimo and its counsel, but rather deliberately withheld to ensure that Examiner Winakur issued the '958 patent.

## D.      Unenforceability of the '986 Patent

141.  Mr. Kiani, Mr. Jensen and others at the Knobbe Martens firm who were involved in the Masimo I and II trials and prosecution of Masimo's patents

80

committed inequitable conduct in connection with prosecuting the '986 patent, asserted in this litigation, by failing to submit to the USPTO the trial exhibits needed to understand key portions of Dr. Stone's Masimo II trial testimony.

142.    During prosecution of the '986 patent, Masimo submitted more than 4000 pages of trial transcript from Masimo II, but did not provide any guidance to the Patent Examiner where any testimony relevant to the claimed invention of the '986 patent could be found.  Masimo also did not provide the Patent Examiner with the trial exhibits or demonstratives that accompanied that trial testimony, so even if the Patent Examiner had the time to review the Masimo II trial testimony, he would not have known where to look in the transcript.  And even if the Examiner did locate the relevant portions of the transcript, he would not have understood it without at least Slide 4905, which forms an integral part of that testimony. Moreover, to the extent that the Masimo II trial testimony was provided at all, it was buried amongst more than 200 patents and 250 items of non-patent literature, representing tens of thousands of pages of material.

143.    Mr. Kiani and Mr. Jensen could have provided the relevant exhibits from the Masimo II trial so the Patent Examiner could get some sense of what was contained in the truckload of references that Masimo dropped on the Examiner's desk.  But instead they deliberately withheld those trial exhibits, especially Slide 4905 used in conjunction with Dr. Stone's testimony at Masimo II, so that the Patent Examiner could not possibly consider Dr. Stone's trial testimony.  Masimo and its patent counsel committed inequitable conduct in connection with prosecution of the '986 patent, and but for withholding of Slide 4905 and Masimo's burying Dr. Stone's Masimo II trial testimony in a mountain of less relevant material, at least claim 1 of the '986 patent would not have issued.

144.    Claim 1 of the '986 patent, which issued in 2007, recites:  A method of determining blood oxygen saturation comprising: (a) sensing physiological signals resulting from the attenuation of light of at least first and second

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

wavelengths by body tissue carrying pulsing blood; (b) determining at least two values corresponding to oxygen saturation based upon at least two alternative methods of using the physiological signals; and (c) determining a resulting value for oxygen saturation from the at least two values corresponding to oxygen saturation, (d) wherein one of the at least two alternative methods comprises at least one calculation in the frequency domain.  (Reference letters added.)

145.   On September 11, 2006, Masimo's patent counsel of record, Messrs. John Grover and Jarom Kesler, and the Patent Examiner, Mr. Winakur, conducted an in-person interview to reach an agreement on the claims then pending in the application for the '986 patent.  As a result of that meeting, claim limitation (d) was amended to recite: wherein one of the at least two alternative methods comprises at least one calculation in the frequency domain.  *See* Amendment dated September 13, 2006, p. 2.  The amendment highlights that claim 1 of the '986 patent requires at least two alternative methods for determining oxygen saturation, and one of the methods must be a calculation in the frequency domain.

146.   At the Masimo II trial, Dr. Robert Stone testified regarding Nellcor's fetal oximeter, which he developed while employed at Nellcor prior to 1989.  Dr. Stone also referred to Slide 4905, which illustrated the arrangement of the processing components making up the fetal oximeter.  Dr. Stone testified with respect to Slide 4905 that Nellcor's fetal oximeter determined two values corresponding to oxygen saturation based upon two alternative methods of using the sensor data, one in the time domain and the other calculation in the frequency domain.  *See* Masimo II trial transcript at pages 1819-1821.

147.   Mr. Kiani, who attended the Masimo II trial, and Mr. Jensen, who was both litigation counsel at the Masimo II trial and participated in prosecuting the '958 patent, were aware of Dr. Stone's trial testimony and exhibits.  Masimo and its counsel provided the Masimo II trial transcripts to the Patent Examiner along with more than 400 other patent and non-patent references, totaling several tens of

82

thousands of pages.  Dr. Stone's testimony regarding the Nellcor fetal oximeter was buried deep within the Masimo II trial transcripts.  To ensure that the Patent Examiner could not possibly find the relevant testimony, Masimo and its patent counsel withheld Dr. Stone's trial exhibits, such as Slide 4905, which is necessary both **to locate** and **to understand** the relevance of Dr. Stone's trial testimony.

148.   But for Masimo's and its counsel's failure to submit Dr. Stone's Masimo II trial exhibits to the Patent Examiner, the '986 patent would not have issued.  This is evident from the fact that the Patent Examiner did not in fact find Dr. Stone's Masimo II trial testimony in the mountain of materials submitted by Masimo during prosecution of the '986 patent, although the fetal oximeter plainly anticipates at least claim 1 of the '986 patent, as explained infra.   Slide 4905 is reproduced below:



149.   Complete correspondence between Nellcor's fetal oximeter and claim 1 of the '986 patent, and thus anticipation of claim may be demonstrated as follows:

(a) sensing physiological signals resulting from the attenuation of light of at least first and second wavelengths by body tissue carrying pulsing blood

(*See* Slide 4905, which shows Red and IR signals being input to the N-200 Signal Processing and Frequency-Domain Signal Process Techniques);

(b) determining at least two values corresponding to oxygen saturation based upon at least two alternative methods of using the physiological signals (*See* Slide 4905, which shows Red and IR signals being input to the N-200 Signal Processing block, a time-based analysis technique, and separately into to the Frequency-Domain Signal Processing block); and

(c) determining a resulting value for oxygen saturation from the at least two values corresponding to oxygen saturation (*See* Slide 4905, which shows a value of Saturation 1 being output from the N-200 Signal Processing block, and a value of Saturation 2 being output from the Frequency-Domain Signal Processing block),

(d) wherein one of the at least two alternative methods comprises at least one calculation in the frequency domain (*See* Slide 4905, in which the Frequency-Domain Signal Processing Technique constitutes at least one calculation in the frequency domain).

150.   Slide 4905 illustrates Dr. Stone's Masimo II trial testimony and explains in a simple and straightforward way how the components of the Nellcor fetal oximeter were arranged and interacted.  By contrast, the trial testimony presented at pages 1817 to 1821 of the Masimo II transcript is disjointed and difficult to understand without the assistance of Slide 4905.

151.   For example, Dr. Stone testified at page 1817 that the fetal oximeter "allowed us to investigate parallel different processing techniques."  At page 1818 Dr. Stone testified that "I wrote the so-called frequency domain techniques and then combined that algorithm in a – I euphemistically used the term portable computer … [which] acquired the data from an N-200, and it acquired the signals, the red and the infrared signals from an N-200 and displayed the data that the N-200 calculated as well as the data that the frequency domain technique calculated

for me to evaluate."  The questions and Dr. Stone's succeeding testimony on pages 1819 through 1821 specifically refers to Slide 4905, including references to "the red and infrared signals coming in on the left" and what is displayed "over on the far right [of Slide 4905]."  Without having Slide 4905 in his possession to understand Dr. Stone's trial testimony, the Patent Examiner could not possibly have understood Dr. Stone's testimony as set forth in the Masimo II trial transcript. Moreover, without having Slide 4905 in his possession, the Examiner Winakur would never have even located the relevant portions of the Masimo II transcript to review in the first place.

152.    During his direct testimony in Masimo II, in response to the question whether "this slide [Slide 4905] represent in a very high level format, some of the processing or alternative calculations that you designed into the fetal oximetry program back in the period between 1983 and 1989," Dr. Stone testified that the "slide is very clear."  Had Slide 4905 been submitted during prosecution of the '986 patent, it would have aided the Patent Examiner to both locate and understand Dr. Stone's Masimo II trial testimony.  Since Masimo and its counsel deliberately withheld Slide 4905 during prosecution of the '986 patent, it is self-evident that the Patent Examiner did not locate Dr. Stone's testimony buried amongst the other references, or if he did (and there is no evidence that he did), the Examiner did not understand because he allowed claim 1 of the '986 patent, which is *prima facie* anticipated by the Nellcor fetal oximeter.

153.    Slide 4905 was not cumulative to the bare transcript of Dr. Stone's Masimo II trial testimony.  As alleged above, Dr. Stone's pages 1817 to 1818 of the transcript do not state that the same red and infrared sensor signals are input to both of the N-200 and Frequency-Domain Processing Techniques, although that arrangement is clearly shown in Slide 4905.  In addition, once Slide 4905 was presented to Dr. Stone, the succeeding questions and answers specifically refer to the arrangement of the fetal oximeter components illustrated in Slide 4905.  Thus,

85

4836-1853-1610.4

references in the bare trial transcript to signals "coming in on the left" or values being displayed "over on the far right" are unintelligible.  Absent Slide 4905, Examiner Winakur could have not have made sense of Dr. Stone's Masimo II trial testimony, and accordingly, Slide 4905 is not cumulative to the bare Masimo II trial transcript or any of the other prior art made of record during prosecution of the '986 patent.

154.   Mr. Kiani, who attended the Masimo II trial and Mr. Jensen, who was litigation counsel for Masimo at the Masimo II trial and upon information and belief, supervised prosecution of the '986 patent, deliberately and intentionally withheld Slide 4905 from the Patent Examiner.  They did so precisely with the purpose of ensuring that the Patent Examiner could not locate Dr. Stone's testimony, or if he did, the Patent Examiner would not be able to understand that testimony.  Masimo's and its patent counsel's deception was successful, as Examiner Winakur did not locate, understand or cite the Nellcor fetal oximeter prior art against claim 1 (or any claim) of the '986 patent, even though that prior art anticipates claim 1.

155.   In allowing the '986 patent over Nellcor's Corenman '167 patent, the Patent Examiner stated in the Reasons for Allowance that "Corenman (4,911,167 - cited by Applicant) teaches that an oximeter may include frequency domain analysis, *but does not teach performing two different calculations*" (emphasis added).  *See* Notice of Allowability at page 2, in the '986 patent prosecution history.  This is precisely the feature illustrated by Slide 4905 to Dr. Stone's Masimo II trial testimony.

156.   As alleged above, it is immaterial that Masimo submitted more than 4000 pages of the Masimo II trial transcript during prosecution of the '986 patent as part of a collection of many thousands of pages of material.  As alleged above, Slide 4905 was not cumulative to the bare trial transcript, and without Slide 4905 the Patent Examiner could neither have located Dr. Stone's testimony nor –

86

4836-1853-1610.4

because much of Dr. Stone's testimony refers to what is depicted in Slide 4905 –
could the Patent Examiner have understood that testimony. But for Masimo's and
its counsel's failure to cite during prosecution of the '986 patent the trial exhibits
accompanying Dr. Stone's testimony during Masimo II, and particularly Slide
4905, the '986 patent would not have issued.

157.   All claims of the '986 patent are unenforceable for inequitable conduct
because Mr. Kiani and Masimo's patent counsel buried the relevant testimony
from Dr. Stone in tens of thousands of pages of irrelevant materials, and moreover,
rendered that testimony unintelligible by withholding Slide 4905 from the Masimo
II trial.

158.   The foregoing allegations regarding commission of inequitable
conduct regarding the prosecution of the '986 patent are summarized in the
following allegations:

159.   **WHO**:  As alleged above, but for the decision by Mr. Kiani, Mr.
Diab, Mr. Jensen and Mr. Grover to deliberately and intentionally bury Dr. Stone's
Masimo II trial testimony in a mountain of less relevant material, and further to
deliberately withhold Slide 4905 to ensure that the Patent Examiner could not
locate that testimony and understand it, at least claim 1 of the '986 patent would
not have issued.

160.   **WHAT**:  As alleged above, Slide 4905 illustrates and renders
intelligible the testimony of Dr. Stone at the Masimo II trial, establishing that
Nellcor's prior art fetal oximeter included each and every limitation of claim 1 of
the '986 patent.  Slide 4905 establishes, in conjunction with Dr. Stone's Masimo II
testimony referring to that exhibit, that Nellcor's prior art fetal oximeter
"determin[es] at least two values corresponding to oxygen saturation based upon at
least two alternative methods of using the physiological signals" and "determin[es]
a resulting value for oxygen saturation from the at least two values corresponding
to oxygen saturation, wherein one of the at least two alternative methods comprises

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

at least one calculation in the frequency domain" as recited in claim 1 of the '986 patent.

161.  **WHERE**:  As alleged above, Slide 4905 depicts the Nellcor fetal oximeter, illustrates the relationship of the components of that system, and renders Dr. Stone's Masimo II trial testimony intelligible, in a way not possible without possession of Slide 4905.

162.  **WHY**:  Slide 4905 makes intelligible Dr. Stone's Masimo II trial testimony, and establishes that Nellcor's prior art fetal oximeter – depicted in Slide 4905 – included alternative processing techniques, one of which included frequency domain calculations.  This feature was not present in the other prior art made of record during prosecution of the '986 patent, such as Nellcor's Corenman '167 patent which disclosed only a single calculation technique using frequency domain calculations.  More specifically, Nellcor's prior art fetal oximeter used processed incoming red and infrared signals with both the Nellcor N-200 Signal Processing Technique (upper block in Slide 4905) and "Frequency Domain Signal Processing Technique" (lower block in Slide 4905).  The fetal oximeter determined at least two values corresponding to oxygen saturation based upon at least two alternative methods of using the physiological signals (Saturation 1 and Saturation 2 depicted in Slide 4905).  And at least one of those oxygen saturation values used at least one calculation in the frequency domain (lower box in Slide 4905).  The Nellcor fetal oximeter, developed by Dr. Stone prior to 1989, constitutes prior art under 35 U.S.C. § 102 (g).  Slide 4095 is not cumulative to the bare trial transcript submitted by Masimo because Dr. Stone's testimony specifically refers to what is depicted in the slide, and the Patent Examiner could not have understood Dr. Stone's testimony without Slide 4905.

163.  **HOW**:  As alleged above, but for the deliberate withholding of Slide 4905, the Patent Examiner would have rejected at least claim 1 of the '986 patent

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

as anticipated.  Slide 4905 shows all of the limitations of claim 1, arranged as claimed in claim 1 of the '986 patent.

### E.  Unenforceability of the '154 Patent

164.   The application for the '154 patent was filed on August 20, 2007, and claims priority through a chain of patent applications first filed on October 7, 1994; the '154 patent issued on March 24, 2009.  Apart from being unenforceable for prosecution laches as described above, the '154 patent further is unenforceable because Masimo and its counsel committed inequitable conduct during prosecution of the '154 patent by misrepresenting the content of other issued Masimo patents, improperly extending the term of the '154 patent, and by withholding certain exhibits to the Yorkey and Baker Declarations in Masimo I, and the trial testimony and exhibits of Dr. Robert T. Stone from the Masimo II trial, as set forth in detail *infra*.

### Misconduct During Prosecution and Improper Term Extension

165.   Claim 1 of the '154 patent recites:  A method of measuring oxygen saturation, the method comprising: (a) obtaining first and second signals that are representative of light of first and second wavelengths detected by a light sensitive detector over a period of time, the detected light of first and second wavelengths being attenuated by body tissue carrying pulsing blood; (b) transforming the first and second signals into the frequency domain; (c) calculating a plurality of possible oxygen saturation values using a plurality of values of each of the transformed first and second signals that correspond to non-zero frequencies; (d) selecting one of the plurality of possible oxygen saturation values as an oxygen saturation measurement based upon an analysis to determine which of the plurality of possible oxygen saturation values corresponds to the oxygen saturation of the pulsing blood; and (e) outputting the oxygen saturation measurement to a user. (Reference letters added.)

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

166.   As filed, the application for the '154 patent included six claims. As filed application claim 1 recited:  A method of calculating oxygen saturation from intensity signals resulting from light of first and second wavelengths attenuated by body tissue carrying pulsing blood, the method comprising: (a) receiving at least a portion of an intensity signal from a light sensitive detector capable of detecting light attenuated by body tissue carrying pulsing blood; (b) transforming the intensity signals; and (c) calculating an oxygen saturation by using the transformed intensity signals (Reference letters added.)

167.   In an Office action dated June 16, 2008, the Patent Examiner, again Examiner Winakur, rejected all of application claims 1-6 as anticipated by Nellcor's '167 Corenman patent.  As set forth in the Office action, "Corenman et al. teach a pulse oximeter apparatus and method for frequency domain analysis of detected optical signals (see columns 11 and 12) that includes performing measurements over time, Fourier transforming the measurements, and determining oxygen saturation from the portions of the transformed signals corresponding to the fundamental frequency of the heartbeat.  Relative maxima of the processed signals are obtained for use in the calculations.  A ratio of red and infrared signals is used in calculating the oxygen saturation.  In addition, heart rate information is determined from the fundamental frequency."  The claims also were rejected for obviousness-type double patenting over a number of prior Masimo patents, including the '060 patent asserted in this litigation.

168.   After a personal interview attended by Examiner Winakur and patent counsel, Messrs. John Grover and Jarom Kesler, Masimo filed an amendment allegedly distinguishing Masimo's claims from Nellcor's Corenman '167 patent. Application claim 1 above was amended to recite:  A method of measuring oxygen saturation, the method comprising: (a') obtaining first and second signals that are representative of light of first and second wavelengths detected by a light sensitive detector *over a period of time*, the detected light of first and second wavelengths

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

being attenuated by body tissue carrying pulsing blood; (b') *transforming the first and second signals into the frequency domain;* (c') *calculating a plurality of possible oxygen saturation values using a plurality of values of each of the transformed first and second signals that correspond to non-zero frequencies*; (d') *selecting one of the plurality of possible oxygen saturation values as an oxygen saturation measurement based upon an analysis to determine which of the plurality of possible oxygen saturation values corresponds to the oxygen saturation of the pulsing blood*; and (e') *outputting the oxygen saturation to a user* (Reference letters added.).  *See* Amendment dated September 18, 2008, p. 3. Amended application claim 1 issued as claim 1 of the '154 patent.

169.   With respect to the obvious-type double-patenting rejection, Masimo argued that "The Office Action also rejects Claims 1-6 for non-statutory obviousness-type double patenting in view of Claims 1, 4, 9, and 12 of U.S. Patent 6,745,060, as well as Claims 1 and 4 in view of Claims 4 and 8 of U.S. Patent 6,826,419.  The Applicants understand that these double patenting rejections were based on the scope of the previously pending claims.  The Applicants submit that such scope has changed with the entry of the present amendment and the Applicants request that the Examiner reconsider the double patenting rejections." *See* Amendment filed September 18, 2008, at pp. 7-8.

170.   Masimo and its patent counsel, Mr. Grover, committed inequitable conduct in connection with prosecution of the '154 patent by misrepresenting to the Examiner that the amendments discussed above substantially changed the scope of the claims, thereby obviating the obviousness double patenting rejection.  The amendments resulting in issued claim 1 of the '154 patent, however, do not patentably distinguish over at least claim 1 of the '060 patent, as shown on the following page:

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

| Claim 1 of '154 Patent | Claim 1 of '060 Patent |
|---|---|
| 1. A method of measuring oxygen saturation, the method comprising: | 1. A method of calculating oxygen saturation from intensity signals resulting from light of first and second wavelengths attenuated by body tissue carrying pulsing blood, comprising: |
| obtaining first and second signals that are representative of light of first and second wavelengths detected by a light sensitive detector over a period of time, the detected light of first and second wavelengths being attenuated by body tissue carrying pulsing blood; | sampling the intensity signals over a first time period; |
| transforming the first and second signals into the frequency domain; | performing a Fourier transform on the sampled intensity signals; and |
| calculating a plurality of possible oxygen saturation values using a plurality of values of each of the transformed first and second signals that correspond to non-zero frequencies; | calculating oxygen saturation by including at least a plurality of magnitudes for each of the Fourier transformed intensity signals for non-zero frequencies in the calculation for the first time period. |
| selecting one of the plurality of possible oxygen saturation values as an oxygen saturation measurement based upon an analysis to determine which of the plurality of possible oxygen saturation values corresponds to the oxygen | [This step is implicit in the method of the '060 Patent, and explained in the disclosure of the '060 Patent.] |

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

| | |
|---|---|
| saturation of the pulsing blood; and outputting the oxygen saturation measurement to a user. | |

171. In the above table, there is no substantial difference between the parsing of the preamble and the first elements of the respective claims. Both elements require generating intensity signals resulting from light of first and second wavelengths attenuated by body tissue carrying pulsing blood. There is also no substantive difference between transforming the intensity signals into the frequency domain and performing a Fourier Transform, except that the former step is broader. There is also no patentable distinction between "calculating a plurality of oxygen saturation values using a plurality of values of each of the transformed first and second signals" as recited in the '154 patent and "calculating oxygen saturation by including at least a plurality of magnitudes for each of the Fourier transformed intensity signals" as recited in the '060 patent.

172. Still referring to the table above, the final step recited in claim 1 of the '154 patent also does not patentably distinguish over the invention recited in claim 1 of the '060 patent. This is so because one of ordinary skill would have understood that following the step of calculating oxygen saturation in the last step of claim 1 of the '060 patent, necessarily must include a step of selecting which of the plurality of plurality of magnitudes to use in calculating possible oxygen saturation and then outputting the oxygen saturation. The '060 patent, which expired in 2011, indisputably disclosed that step because the '154 patent, even after withdrawing its earlier priority claims, *see infra,* still claims to be a continuation of the U.S. patent application Serial No. 08/320,154, filed October 7, 1994. The '060 patent is also a continuation of U.S. patent application Serial No. 08/320,154, filed October 7, 1994, and accordingly has an ***identical disclosure***.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS OF SHENZHEN MINDRAY

4836-1853-1610.4

173.   Moreover, not only did Mr. Grover's deception avoid the necessity for Masimo to file a Terminal Disclaimer tying title to the '154 patent to at least the '060 patent, but Mr. Grover actually dropped several of the earlier claimed priority dates for the '154 patent, thereby extending the term of the '154 patent from March 7, 2011, to nominally October 7, 2014.  *See* Amendment filed September 18, 2008, at p. 2.  Because the '060 patent has an earliest claimed priority date of March 7, 1991, it expired on March 7, 2011.  As demonstrated above, because at least claim 1 of the '154 patent is not patentably distinct from claim 1 of the '060 patent and extends the term of Masimo's exclusivity on its alleged invention beyond March 7, 2011, the '154 patent is void *ab initio*.

174.   Mr. Grover's misrepresentation of the scope of the amended claims of the '154 patent was not accidental.  Rather, Mr. Grover intentionally misrepresented the scope of the amended claims of the '154 patent to avoid filing a Terminal Disclaimer that would have tied expiration of the '154 patent to expiration of the '060 patent.  That Mr. Grover intended to intentionally mislead Examiner Winakur is evident from the fact that he not only did not file the required Terminal Disclaimer, but instead dropped three earlier priority claims for the '154 patent to extend the term of the '154 patent by an additional three and one-half years.

175.   Masimo's and its attorney's inequitable conduct in connection with continuation practice leading to issuance of the '154 patent was not isolated to the '060 patent, as described above.  Instead, Mr. Grover also misled Examiner Winakur with respect to substantially identical claims that Masimo was simultaneously pursuing in the Patent Office at the same time that it was pursuing the claims of the '154 patent.

### **Deliberate Withholding Of The Yorkey and Baker Declarations**

176.   Masimo's inventors, Mr. Kiani and Mr. Diab, and its patent counsel, including Mr. Grover, and upon information and belief, Mr. Jensen, further

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

committed inequitable conduct in connection with prosecution of the '154 patent by withholding from the Patent Examiner the Yorkey and Baker Declarations and exhibits, and Dr. Stone's Masimo II trial testimony and exhibits.

177.   As alleged above, the Amendment dated September 18, 2008, filed in the application for the '154 patent amended application claim 1 require steps of (b') transforming the first and second signals into the frequency domain; (c') calculating a plurality of possible oxygen saturation values using a plurality of values of each of the transformed first and second signals that correspond to non-zero frequencies; (d') selecting one of the plurality of possible oxygen saturation values as an oxygen saturation measurement based upon an analysis to determine which of the plurality of possible oxygen saturation values corresponds to the oxygen saturation of the pulsing blood; and (e') outputting the oxygen saturation to a user. *See* Amended application claim 1 issued as claim 1 of the '154 patent.

178.   As shown infra, steps (b'), (c') and (e') are fully disclosed in the cited Corenman patent, so the purported distinction over the prior art consists of "selecting one of the plurality of possible oxygen saturation values as an oxygen saturation measurement based upon an analysis to determine which of the plurality of possible oxygen saturation values corresponds to the oxygen saturation of the pulsing blood."  This claimed "analysis to determine which of the plurality of oxygen saturation values corresponds to oxygen saturation of the pulsing blood" may comprise, for example, applying physiologically-based rules to reject invalid values resulting from step (c').  Accordingly, claim 1 of the '154 patent is subject to the same arguments regarding inequitable conduct and invalidity as apply to claim 1 of the '958 patent.

179.   Corenman discloses a method of computing a blood parameter, in particular blood oxygen saturation, using red and infrared data transformed from the time domain to the frequency domain using a Fourier Transform.  *See, e.g.*,

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

Corenman FIG. 10, which discloses practicing in a pulse oximeter each of the following limitations of claim 1 of the '958 patent:

(a) obtaining first and second signals that are representative of light of first and second wavelengths detected by a light sensitive detector over a period of time, the detected light of first and second wavelengths being attenuated by body tissue carrying pulsing blood (*See* Corenman FIG. 10, step 4000 "collect 512 data points on each of the Red and IR data");

(b) transforming the first and second signals into the frequency domain (*See* Corenman FIG. 10, step 4070 "Compute F.T. [Fourier Transform] of Red and IR data");

(c) calculating a plurality of possible oxygen saturation values using a plurality of values of each of the transformed first and second signals that correspond to non-zero frequencies (*See* Corenman FIG. 10, step 4080 "Locate peaks at Heart Rate" and step 4080 "Compute R" [the "ratio of ratios" which is determined by combining the transformed Red and Infrared signals to compute a composite signal of the two transformed signals"]);

(d) selecting one of the plurality of possible oxygen saturation values as an oxygen saturation measurement based upon an analysis to determine which of the plurality of possible oxygen saturation values corresponds to the oxygen saturation of the pulsing blood (*see infra*); and

(e) and outputting the oxygen saturation measurement to a user. (*See* Corenman FIG. 10, final step "Compute SAT (Usual Nellcor Form)" [in which R value of the "ratio of ratios" is used to look up or compute a value of blood oxygen saturation]).

180.   The only limitation of claim 1 that is missing from Corenman is the limitation (d) of claim 1 of the '154 patent – performing "an analysis" to determine which of the plurality of possible oxygen saturation values corresponds to the oxygen saturation of the pulsing blood.  That feature, however, is fully disclosed in

the Nellcor internal documents appended to the Yorkey and Baker Declarations that Mr. Kiani, Mr. Diab and Masimo's counsel deliberately withheld from the Patent Office during prosecution of the '154 patent.

181.   The Yorkey and Baker Declarations, which were executed in August 2000, had attached thereto Nellcor internal reports created between 1992 and 1994. The Nellcor internal reports predate the 1994 filing date of the '154 patent by several years, and constitute prior art to the '154 patent under at least 35 U.S.C. 102(g).   The Yorkey and Baker Declarations and exhibits, and particularly the Nellcor internal reports, are highly material to the patentability of the '154 patent, because they were both well known to Mr. Kiani and Mr. Diab, and attorneys at Knobbe Martens, including Mr. Jensen and Mr. Grover, and because they disclose the key limitation of the '154 patent that was added to secure allowance of that patent.  Masimo published the Yorkey and Baker Declarations and exhibits in connection with issuance of Masimo's U.S. Patent No. 7,469,157, which names Mr. Kiani, Mr. Diab and Mr. Weber as co-inventors.

182.   More specifically, the Yorkey and Baker Declarations and exhibits thereto disclose details of Nellcor's O4 pulse oximeter project, begun in 1992, to develop software algorithms that provided valid measurements in the presence of motion noise.  As described, e.g., Exhibit 2 to the Yorkey Declaration, that system was designed to process values for the red and infrared signals received from the oximeter sensor to reduce the impact of motion or other noise on the overall average computed value of blood oxygen saturation.  *See* O4 Summary dated August 5, 1994, Exhibit 2 to the Yorkey Declaration at page at 1 ("In the fall of 1992, the O4 project began researching oximetry algorithms with the goals of substantially reducing false alarms compared to the N200, and calculating saturation and rate ***through periods of motion***.")(emphasis added).

183.   As further described at page 3 of Exhibit 2 to the Yorkey Declaration, a Nellcor document dated August 5, 1994 and entitled "O4 Summary": "O4

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

calculates two saturations, one with the data that has been comb filtered with the current estimate of the heart rate, the other is the raw preprocessed data. ***O4 calculates saturation with an adaptive (Kalman) filter that continuously weighs all data by an estimate of the current noise and limits the rate of change to a defined limit (currently 1.3 saturation points per second). Data points which are obviously non-physiological, such as when IR and red values are moving in opposite directions, are deemed invalid and not used to adapt saturation***" (emphasis added).  The foregoing passage of Exhibit 2 to the Yorkey Declaration plainly discloses the "analysis" step (d) of claim 1 of the '154 patent by analyzing a composite signal using one or more physiologically-based rules.  But for Masimo's and its counsel's failure to cite the Yorkey and Baker Declarations and exhibits to the USPTO, the '154 patent would not have issued.

184.   As established above, Exhibit 2 to the Yorkey Declaration, in combination with the Corenman patent cited by the Patent Examiner, meets ***all*** of the limitations of claim 1 of the '154 patent, thus rendering claim 1 *prima facie* invalid.  The '154 patent would not have issued had the inventors, Messrs. Kiani and Diab, and Messrs. Jensen and Grover, the patent counsel, cited the Yorkey and Baker materials to the Patent Examiner for review.  Had the Examiner known about this prior art Nellcor work as described in Exhibit 2 to the Yorkey Declaration, at least claim 1 of the '154 patent would not have issued.

185.   The Yorkey and Baker declarations and exhibits were not cited to the Patent Examiner during prosecution of the '154 patent.  Given that Exhibit 2 to the Yorkey Declaration precedes the 1994 filing date for the application for the '154 patent by several months, Masimo would have had to try to "swear behind" the Nellcor documents had they been submitted by Masimo and cited by the Patent Examiner as prior art under 35 U.S.C. § 102(g).

186.   The Yorkey and Baker Declarations and exhibits are non-cumulative to the other prior art made of record during prosecution of the '154 patent because

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

the Examiner did not identify or cite any other prior art reference as disclosing "an analysis to determine which of the plurality of possible oxygen saturation values corresponds to the oxygen saturation of the pulsing blood."

187.   Masimo and its counsel knew about the contents of the Yorkey and Baker Declarations and exhibits since at least August 2000; Mr. Jensen was lead counsel for Masimo in the Masimo I case.  And by 2005, Masimo and its counsel had published the Yorkey and Baker Declarations and exhibits in connection with prosecution of Masimo's U.S. Patent No. 7,469,157.  By 2007 when the application for the '154 patent was filed, Masimo's inventors and its patent counsel were familiar with Yorkey and Baker Declarations and exhibits, and deliberately chose to withhold those highly material references from the Patent Examiner to prevent having that prior art cited against the '154 patent.

188.   Having had its inequitable conduct in connection with prosecution of the '154 patent exposed, Masimo and its litigation counsel (which also participated in procuring the '154 patent), now contend that the Yorkey and Baker Declarations were brought to the Patent Examiner's attention in connection with prosecution of the '986 patent.  Specifically, Masimo and its counsel now contend that in September 2008, more a year after the patent application for the '154 patent had been filed, and a month after Masimo's counsel met with the Patent Examiner to discuss proposed amendments to put the case in condition for allowance, Masimo's counsel submitted a transmittal letter to the Patent Examiner informing the Examiner that Masimo had submitted prior art in the files for 24 other Masimo issued patents and pending patent applications.  *See* Transmittal Letter dated September 18, 2008.  That transmittal letter did not identify the Yorkey and Baker Declarations, or even disclose in which of the other 24 files for the pending applications or issued patents relevant prior art could be found.  Masimo also did not provide the Information Disclosure Statements ("IDS's") filed in those 24 other patents and applications.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

189.   Even if Masimo had submitted the IDS's filed in those other cases (prior to issuance of the '154 patent in 2009), which Masimo did not, those IDS's collectively identify many thousands of references, corresponding to more than 100,000 pages of material.

190.   In connection with its September 18, 2008 IDS, Masimo and its counsel  submitted about 350 prior art references, which are actually listed on the IDS's filed for the '154 patent.  Examiner Winakur indicated in the file history that he reviewed almost all of references in a single day on October 24, 2008.  *See* List of References Cited by Applicant and Considered by Examiner, dated November 13, 2008.  Again, assuming a nominal patent length of only 20 pages per reference, Examiner Winakur purportedly read about 7000 pages of prior art on October 24, 2008.  To have reviewed 7000 pages of prior art in an 8-hour work day, assuming no interruption, Examiner Winakur would have spent less than 3 seconds, on average, on each page of prior art.  There is no indication in the file history for the '154 patent that he ever considered any of the prior art cited in the 24 other patents and applications mentioned in Masimo's transmittal letter, nor given the foregoing schedule, did he have time to do so.

191.   In view of the circumstances, the single most reasonable inference regarding the '154 patent is that Masimo's inventors and Messrs.  Jensen and Grover mentioned the 24 other patent and application files, fully expecting that Examiner Winakur could not review that mountain of prior art, and indeed purposely intended to discourage and prevent Examiner Winakur from reviewing any of the prior art contained in those other patent and application files.

192.   Masimo's inventors and its counsel had a duty to cross-cite all material information irrespective whether the same examiner previously receiving the information is responsible for the patent application at issue, but they deliberately chose not to do so to secure allowance of the '154 patent.  Examiner Winakur has examined and issued at least 173 patents to Masimo; he could not

1    possibly be expected to recall that any particular reference amongst the thousands

2    of references Masimo cited in those other applications might apply to the '154

3    patent years later.

4         193.   As set forth above, the Nellcor internal documents attached to the

5    Yorkey and Baker Declarations, and in particular Exhibit 2 to the Yorkey

6    Declaration, was highly material to patentability of at least claim 1 of the '154

7    patent.  Exhibit 2 to the Yorkey Declaration described exactly the type of analysis

8    that Masimo's inventors and its counsel argued was absent from the Corenman

9    reference; but for withholding that material, claim 1 of the '154 patent would not

10   have issued.  The content of the Yorkey and Baker Declarations was well known to

11   Masimo's inventors and patent/litigation counsel, and they had in fact cited these

12   materials in many other Masimo applications.  Had Masimo or its counsel cited the

13   Yorkey and Baker Declarations and exhibits to the Patent Examiner examining the

14   application for the '154 patent, however, they knew that they could not swear

15   behind the dates of the Nellcor internal reports, in the event the Patent Examiner

16   cited the Nellcor work as prior art.  Under the circumstances, the single most

17   reasonable inference regarding Masimo's and its counsel's failure to cite the

18   Yorkey and Baker Declarations and exhibits is that Masimo and its counsel

19   deliberately withheld that information from consideration by the Patent Examiner

20   during prosecution of the '154 patent.

21                **Deliberate Withholding Of The Masimo II Trial Materials**

22        194.   Additionally, Masimo and its counsel committed inequitable conduct

23   in connection with prosecution of the '154 patent, not only for failing to cite the

24   Yorkey and Baker Declarations and exhibits, but also by failing to submit to the

25   USPTO the trial testimony of Dr. Robert T. Stone presented during the Masimo II

26   trial.  Mr. Kiani attended the Masimo II trial, and upon information and belief, Mr.

27   Jensen was both litigation counsel in Masimo II and directly participated and/or

28   supervised prosecution of the '154 patent.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

195.   Dr. Stone's trial testimony and exhibits disclose a prototype fetal oximeter and methods developed by Nellcor in the late 1980s, which system also constitutes highly material prior art to the claims of the '154 patent, including claim 1, under 35 U.S.C. § 102(g).  But for Masimo's and its counsel's deliberate withholding of the fetal oximeter described in Dr. Stone's trial testimony and exhibits, at least claim 1 of the '154 patent would not have issued.

196.   As discussed *supra*, during prosecution of the '154 patent, Examiner Winakur identified Corenman, Nellcor's U.S. Patent No. 4,911,167 ("Corenman"), as prior art.  *See* Non-Final Rejection mailed June 16, 2008, p. 3.  Corenman discloses "a method and apparatus for improving ***the calculation of oxygen saturation and other blood constituents***….The processing may occur in the time domain or in the ***frequency domain***….In the preferred frequency domain embodiment, the input signals are ***Fourier transformed*** into its spectral components to form ***the composite information***."  *See* Corenman, Abstract.  The method disclosed in Corenman includes a photodetector that generates a current in response to the ***red and infrared light*** transmitted in sequence and is converted to a voltage signal.  *See* Corenman, col. 2, ll. 3-5.

197.   As alleged above, the Amendment dated September 18, 2008, filed in the application for the '154 patent amended application claim 1 require steps of (b') transforming the first and second signals into the frequency domain; (c') calculating a plurality of possible oxygen saturation values using a plurality of values of each of the transformed first and second signals that correspond to non-zero frequencies; (d') selecting one of the plurality of possible oxygen saturation values as an oxygen saturation measurement based upon an analysis to determine which of the plurality of possible oxygen saturation values corresponds to the oxygen saturation of the pulsing blood; and (e') outputting the oxygen saturation to a user.  *See* Amended application claim 1 issued as claim 1 of the '154 patent.

198.   As shown infra, steps (b'), (c') and (e') are fully disclosed in the cited Corenman patent, so the purported distinction over the prior art consists of "selecting one of the plurality of possible oxygen saturation values as an oxygen saturation measurement based upon an analysis to determine which of the plurality of possible oxygen saturation values corresponds to the oxygen saturation of the pulsing blood."  This claimed "analysis to determine which of the plurality of oxygen saturation values corresponds to oxygen saturation of the pulsing blood" may comprise, for example, applying physiologically-based rules to reject invalid values resulting from step (c').

199.   Corenman discloses a method of computing a blood parameter, in particular blood oxygen saturation, using red and infrared data transformed from the time domain to the frequency domain using a Fourier Transform.  *See, e.g.*, Corenman FIG. 10, which discloses practicing in a pulse oximeter each of the following limitations of claim 1 of the '958 patent:

(a) obtaining first and second signals that are representative of light of first and second wavelengths detected by a light sensitive detector over a period of time, the detected light of first and second wavelengths being attenuated by body tissue carrying pulsing blood (*See* Corenman FIG. 10, step 4000 "collect 512 data points on each of the Red and IR data");

(b) transforming the first and second signals into the frequency domain (*See* Corenman FIG. 10, step 4070 "Compute F.T. [Fourier Transform] of Red and IR data");

(c) calculating a plurality of possible oxygen saturation values using a plurality of values of each of the transformed first and second signals that correspond to non-zero frequencies (*See* Corenman FIG. 10, step 4080 "Locate peaks at Heart Rate" and step 4080 "Compute R" [the "ratio of ratios" which is determined by combining the transformed Red and Infrared signals to compute a composite signal of the two transformed signals"]);

103

(d) selecting one of the plurality of possible oxygen saturation values as an oxygen saturation measurement based upon an analysis to determine which of the plurality of possible oxygen saturation values corresponds to the oxygen saturation of the pulsing blood (*see infra*); and

(e) and outputting the oxygen saturation measurement to a user. (*See* Corenman FIG. 10, final step "Compute SAT (Usual Nellcor Form)" [in which R value of the "ratio of ratios" is used to look up or compute a value of blood oxygen saturation]).

200.   The only limitation of claim 1 that is missing from Corenman is the limitation (d) of claim 1 of the '154 patent – performing "an analysis" to determine which of the plurality of possible oxygen saturation values corresponds to the oxygen saturation of the pulsing blood.  That feature and more, however, is disclosed in Dr. Stone's trial testimony at Masimo II regarding Nellcor's fetal oximeter system, which Mr. Kiani, Mr. Diab and Masimo's counsel deliberately withheld from the Patent Office during prosecution of the '154 patent.

201.   Dr. Stone's testimony and the trial exhibits disclose that Nellcor's fetal oximeter computed blood oxygen saturation via two alternative methods:  a first method that used conventional time-based algorithms to compute saturation, and a second frequency domain method in which the red and infrared signals were transformed into the frequency domain and then used to form a composite signal, which in turn was used to compute oxygen saturation.  The Nellcor fetal oximeter output two values of oxygen saturation, from which a correct result was selected based on physiologically-based rules.  *See* Stone Masimo II testimony, pp. 1819-1820 and Slide 4905.

202.   Slide 4905 from the Masimo II trial, presented in conjunction with Dr. Stone's testimony shows Red and IR arrows directed to boxes labeled N-200 Signal Processing and Frequency-Domain Signal Process Techniques, thus meeting limitations (a) and (b) of claim 1 of the '154 patent.  The Frequency

104

Domain Processing meets limitation (c) of claim 1 of the '154 patent.  *See id.* at 1820-1821 and Slide 4905.  Dr. Stone further testified that the fetal oximeter arbitrates among the values computed by different approaches by selecting the "best result" from those displayed in the fetal oximetry program, and the selection is based on the characteristics of the physiological signal.  *See id.* at 1821.  This feature of the Nellcor fetal oximeter satisfies limitations (d) and (e) of claim 1 of the '154 patent.  Accordingly, but for the failure by Masimo's inventors and its patent counsel to disclose Dr. Stone's trial testimony and exhibits at the Masimo II trial, at least claim 1 of the '154 patent would not have issued.

203.   In addition to anticipating at least claim 1 of the '154 patent, the Nellcor fetal oximeter disclosed in Dr. Stone's testimony supplied that which was missing from Corenman, and in combination with Corenman renders at least claim 1 of the '154 patent invalid as obvious.  Dr. Stone's trial testimony and trial exhibits are non-cumulative to the prior art cited to and considered by Examiner Winakur during prosecution of the '154 patent because they describe each and every limitation of claim 1, including the purportedly inventive limitation.

204.   Mr. Kiani and Mr. Diab, who upon information and belief attended the Masimo II trial, and Mr. Jensen, who was both litigation counsel at the Masimo II trial and upon information and belief participated in prosecuting the '154 patent, were aware of Dr. Stone's trial testimony and exhibits.  Masimo and its counsel did not provide Dr. Stone's Masimo II trial testimony or exhibits to the Patent Examiner during prosecution of the '154 patent.

205.   Masimo contends that it brought Dr. Stone's testimony at the Masimo II trial to the Patent Examiner's attention during prosecution of the '154 patent by listing the application file, App. No. 11/154,093, that matured as the '986 patent along with 24 other patent and application files mentioned in a transmittal letter accompanying an IDS filed for the '154 patent.  *See* Transmittal Letter dated September 18, 2008.  However, that application file does not appear amongst the

105

items actually listed on Masimo's IDS, and Masimo has no reason to believe that the Patent Examiner ever looked beyond the prior art actually submitted during prosecution of the '154 patent.  There is no indication in the file history of the '154 patent that the Stone trial testimony from Masimo II was ever considered in connection with examination of the '154 patent.  Moreover, the exhibits that accompanied Dr. Stone's Masimo II trial testimony were not even submitted during prosecution in the '986 patent, ensuring that Dr. Stone's Masimo II trial testimony was not even considered during prosecution of that patent.

206.   As for the Yorkey and Baker Declarations and exhibits, the Nellcor fetal oximeter described in Dr. Stone's Masimo II trial testimony predates the filing date of the '154 patent by many years, and constitutes prior art under 35 U.S.C. § 102(g).  Accordingly, Masimo could not have overcome a rejection by the Patent Examiner citing the Nellcor fetal oximeter, and Masimo could not have filed a declaration "swearing behind" that prior art.

207.   Mr. Kiani, Mr. Diab and Masimo's patent counsel deliberately and intentionally withheld Dr. Stone's Masimo II trial testimony and exhibits regarding Nellcor's fetal oximeter so that it could not be cited by the Patent Examiner as rendering unpatentable the claims that Masimo sought to obtain in the '154 patent. In view of the foregoing, the single most reasonable inference is that Masimo and its patent counsel deliberately withheld Dr. Stone's Masimo II trial testimony and exhibits to induce the Patent Examiner to allow the claims of the '154 patent. Accordingly, all claims of the '154 patent are unenforceable due for inequitable conduct.

208.   As alleged above, Masimo and its patent counsel committed inequitable conduct during prosecution of the '154 patent by misleading the Patent Examiner regarding the applicability of his obviousness-type double patenting rejection, improperly extending the term of the '154 Patent.  Masimo and its patent counsel also committed inequitable conduct by failing to disclose to the USPTO

106

4836-1853-1610.4

the Yorkey and Baker materials and by failing to submit to the USPTO Dr. Stone's

trial testimony presented during the Masimo II trial, each of which information is

both highly material to patentability of the claims of the '154 patent and would

have precluded issuance of at least claim 1 of the '154 patent.

209.   The foregoing allegations regarding commission of inequitable

conduct regarding the prosecution of the '154 patent are summarized in the

following allegations:

210.   **WHO**:  As alleged above, but for Mr. Kiani's, Mr. Diab's, Mr.

Jensen's and Mr. Grover's decision to deliberately and intentionally withhold

during prosecution of the '154 patent (1) the Yorkey and Baker Declarations and

exhibits and (2) Dr. Stone's Masimo II trial testimony and exhibits, the claims of

the '154 patent would not have issued.  At least Mr. Grover also committed

inequitable conduct in the September 18, 2008, Amendment by misleading the

Examiner regarding the applicability of the obviousness-type double patenting

rejection set forth in the June 16, 2008 Office action and by improperly extending

the term of the '154 patent to extend beyond the term of the '060 Patent.

211.   **WHAT**:  As alleged above, Masimo and its counsel withheld the

Yorkey and Baker Declarations and exhibits, and in particular Exhibit 2 to the

Yorkey Declaration, which discloses at page 3 the use of physiologically based

rules to analyze a composite signal based on red and infrared signals, which

corresponds to the allegedly inventive "analysis" step (d) of the claim 1 of the '154

patent.  This was the only element missing from Corenman, which otherwise

anticipated claim 1 of the '154 patent.  And separately, as alleged above, Masimo

and its counsel withheld Dr. Stone's Masimo II trial testimony and exhibits, which

disclosed at pages 1819-1821 and in Slide 4905 a fetal oximeter that generated

oxygen saturation values using two different algorithms, including a frequency-

based analysis, and then arbitrated between those results using physiologically-

based rules to determine a valid output.  That testimony and exhibit anticipates at

107

least claim 1 of the '154 patent, or alternatively renders claim 1 unpatentable in combination with Corenman.  In addition, Masimo and its patent counsel misled the Patent Examiner that the amendments to claim 1 of the '154 patent obviated the obviousness-type double patenting rejection set forth in the June 16, 2008 Office action, when they did not, and further by withdrawing priority claims so that the term of the '154 patent extends more than three and one-half years beyond expiration of the '060 patent.

212.  **WHERE**:  Page 3 of Yorkey Declaration Exhibit 2 describes in detail at least one physiologically based rule applied to the composite of the red and infrared signals, which corresponds to the analysis step (d) of claim 1 of the '154 patent.  Pages 1819 to 1821 of the Masimo II trial transcript and Slide 4905 used in conjunction with that testimony describe the details of the Nellcor fetal oximeter, which similarly discloses step (d) of claim 1 of the '154 patent.   Nellcor technology having the features later claimed by Masimo in the '154 patent was developed well before the 1994 filing date for the application that matured as the '154 patent.  As to Masimo's misconduct with respect to the double patenting rejection and priority claims, *see*, the Office action dated June 16, 2008 at pp. 3-4 and Amendment dated September 18, 2008 at pp. 2, and 7-8.

213.  **WHY**:  As alleged above, the description of the application of physiologically-based rules at page 3 of the withheld Exhibit 2 to the Yorkey Declaration, dated August 1994, supplies the sole claim limitation missing from Corenman.  More specifically, Corenman disclosed all limitations of claim 1 of the '154 patent except analysis step (d).  Exhibit 2 to the Yorkey Declaration provides that missing limitation, rendering claim 1 of the '154 patent unpatentable.  Likewise, Dr. Stone's Masimo II trial testimony and exhibits describe a fetal oximeter developed by Nellcor during Dr. Stone's tenure, prior to 1989, that computed oxygen saturation using alternative calculation methods, one of which was a frequency-based analysis.  If the results of these calculations differed,

108

physiologically-based rules were applied to decide whether to select Saturation 1 resulting from the N-200 Signal Processing Branch or Saturation 2 resulting from the Frequency Domain analysis.  Nellcor's prior art fetal oximeter therefore provides the sole missing element of at least claim 1 of the '154 patent that was not disclosed in Corenman.  As to the Masimo's misconduct with respect to the double patenting rejection and priority claims, no Terminal Disclaimer was ever filed in for the '154 patent, and by improperly withdrawing its earliest priority claims, Masimo has obtained in the '154 patent claims that are insubstantially different than those in the '060 patent (which has the identical disclosure), but do not expire for an additional three and one-half years, improperly extending Masimo's monopoly.

214.  **HOW**:  But for the deliberate withholding of the Yorkey and Baker Declarations and exhibits, and separately, withholding of Dr. Stone's Masimo II trial testimony and exhibits, including Slide 4905, Examiner Winakur would have rejected at least claim 1 of the '154 patent, as obvious under 35 U.S.C. § 103 based on Corenman in view of Exhibit 2 to the Yorkey Declaration, under 35 U.S.C. § 102(g) as anticipated by Nellcor's fetal oximeter, or obvious over Nellcor's fetal oximeter in view of Corenman.  Nellcor's prior art materials establish that it first invented limitation (d) that Examiner Winakur found to be absent in the other prior art of record.  The Yorkey and Baker Declarations and exhibits and Dr. Stone's Masimo II trial testimony was not inadvertently omitted by Masimo and its counsel, but rather deliberately withheld to ensure that Examiner Winakur issued the '154 patent.  As to the inequitable conduct relating to misrepresentation to the Patent Examiner, at least Mr. Grover violated his duty of candor in the September 18, 2008, Amendment by misleading the Examiner regarding continued applicability of the obviousness-type double patenting rejection set forth in the June 16, 2008 Office action, failing to submit a Terminal Disclaimer, and improperly extending the term of the '154 patent.

4836-1853-1610.4

## F.       Unenforceability of the '222 Patent

215.   In or about October 1992, at a meeting of the American Society of Anesthesiologists, Mr. Kiani met with several representatives of Nellcor, including Dr. Thomas Yorkey, to give Nellcor a private showing of Masimo's adaptive noise canceller implementation of its pulse oximeter monitor.  Subsequently, Nellcor and Masimo entered into an agreement under which Nellcor provided Masimo with raw plethysmographic data for Masimo to run through its adaptive noise canceller algorithm.

216.   Masimo had further confidential meetings and telephone communications with Nellcor and Dr. Yorkey about Masimo's adaptive noise canceller technology, resulting in further meetings between Nellcor and Masimo in November 1992, and at Nellcor's Hayward office in February, October, and November 1993, all of which Dr. Yorkey attended.  Beginning in about November 1992, Masimo and Nellcor began confidentially exchanging "breath-down" test data that had been processed with Masimo's technology; that data was analyzed by Dr. Yorkey and multiple telephone communications took place during this exchange.

217.   Dr. Yorkey's computation book, for the period March 12, 1993 to November 5, 1994, Masimo II trial exhibit JTX-2721, which was published by Masimo in connection with prosecution of its U.S. Patent No. 7,469,157, shows at page 15 an entry dated March 24, 1993 in which Dr. Yorkey specifically discussed a "Kalman filter for SAT", i.e., calculating blood oxygen saturation.  Other Masimo II trial exhibits, such as Joint Exhibit JTX-1004 (which Masimo published in connection with U.S. Patent No. 7,469,157) show that Nellcor invented the use of estimation techniques as early as December 1992.

218.   In the context of their confidential communications regarding Dr. Yorkey's analysis of the Masimo data, prior to October 1993, Dr. Yorkey informed Mr. Kiani that Nellcor had invented an estimation technique for removing motion

110

artifact noise from a pulse oximeter sensor signal.  Upon information and belief, that communication between Dr. Yorkey and Mr. Kiani occurred in September 1993, although the precise date likely is reflected in Mr. Kiani's invention disclosure for the '812 application, discussed *infra*.  An advantage of estimation techniques is that they do not require a noise reference signal as required by the adaptive noise canceller implemented by Masimo.

219.   A Kalman filter is an adaptive filter that applies a variable amount of filtering based on the input signal and the statistical properties of the signal.  By contrast, Masimo's earliest U.S. patent filing, U.S. patent application Serial No. 07/666,060, filed March 7, 1991 ("the '060 application"), only discloses that "the processor (26) of the present invention generates a noise reference signal (n'(t)) which is a combination of only the undesired signal portions and is correlated to both the first and second undesired signal portions.  The noise reference signal (n'(t)) is then used to remove the undesired portion of each of the first and second measured signals via an adaptive noise canceler (27)."  Masimo's adaptive noise canceller technology, as disclosed in the '060 application, is directed to the generation of a noise reference that is correlated to both the first and second undesired signal portions.  In 1993, Kalman filters were viewed by persons of ordinary skill as a distinct class of filters from adaptive noise cancellers.

220.   The only adaptive noise canceller disclosed in the '060 application is a least squares lattice predictor with a regression filter.  Nowhere does the '060 application disclose the use of a Kalman filter, much less even use of a broad class of adaptive noise cancellers for pulse oximetry.  In 1992, a Kalman filter would not have been recognized by a person of ordinary skill as an adaptive filter because a Kalman filter does not use a noise reference signal as described in '060 application. Not surprisingly, the '060 application does not contain a single reference to Kalman filters nor does it equate Kalman filters with adaptive noise cancellation.  U.S. patent application Serial No. 07/666,060, filed March 7, 1991, does not disclose or

111

1    suggest that Masimo had invented use of Kalman filtering techniques for pulse
2    oximetry at the time that application was filed.

3        221.   After Dr. Yorkey's disclosure to Mr. Kiani of Nellcor's intended use
4    of estimation techniques, Mr. Kiani directed Masimo's patent counsel, Mr. Jensen,
5    to prepare and file a continuation-in-part (CIP) application of the '060 application
6    with the United States Patent and Trademark Office that disclosed use of various
7    types of adaptive filters that use estimation techniques.  Mr. Jensen did so, filing
8    U.S. patent application Serial No. 08/132,812 ("the '812 application") on October
9    6, 1993.  The '222 patent was filed as U.S. patent application Serial No. 08/843,511
10   ("the '511 application"), on October 6, 1997, as a continuation of the '812
11   application, and shares a common disclosure with the '812 application.  Upon
12   information and belief, Masimo has never revealed the invention disclosure record
13   on which the '812 application was based.

14       222.   Like the '060 application, the only adaptive filter disclosed in the '812
15   application and '222 patent is the adaptive noise canceler embodiment disclosed in
16   the '060 application.  However, the '812 application included a single paragraph,
17   which appears at column 49, lines 35-44 of the '222 patent, that states:
18   "Furthermore, it will be understood that correlation cancellation techniques other
19   than joint process estimation may be used together with the reference signals of the
20   present invention.  These may include but are not limited to least mean square
21   algorithms, wavelet transforms, spectral estimation techniques, neural networks,
22   Weiner filters, Kalman filters, QR-decomposition based algorithms among others."
23   Spectral estimation techniques, Weiner filters and Kalman filters are all varieties of
24   "estimation techniques."

25       223.   Notably, the above passage of the '812 application (and '222 patent)
26   refers to use of the *reference signals of the present invention with* a Kalman filter,
27   and not the use of a Kalman filter, as proposed by Dr. Yorkey by at least March
28   1993, that does not generate or use reference signals.  None of the Kalman filter

112

4836-1853-1610.4

claims in the '222 patent require a pulse oximeter method in which the reference signals disclosed in the '222 patent are used as inputs to a Kalman filter, even though the generation of a reference signal was part of "the present invention."  *See* '222 patent, claims 20, 22-23; col. 49, ll. 36-41.  That is because, by the time the '222 patent issued in July 2001, Masimo and its patent counsel had already learned during the course of Masimo I that Nellcor's N395 pulse oximeter used Kalman filters, but without a reference signal.  There is no evidence (even today) that Masimo *ever* invented a pulse oximeter algorithm that used a Kalman filter that does not also require a reference signal generated as disclosed in the '222 patent.

224.   As explained at pp. 14-18 of the Baker Declaration, Kalman filtering as implemented in the Nellcor N395 oximeter did not generate a reference signal, did not require the first and second undesired signal portions to be correlated, and did not attempt to cancel out the correlated noise from an input signal as disclosed in the '222 patent.  However, such correlation is a fundamental requirement of the invention disclosed in the '060 and '812 applications and '222 patent.  The '812 application and the '222 patent share a specification, which discloses that the secondary (noise) reference is correlated to the secondary (noise) portion of each of the first (red) and second (infrared) measured signals; the secondary (noise) reference is then used to remove the secondary (noise) portion of each of the first (red) and second (infrared) measured signals via a correlation canceler, such as an adaptive noise canceler.  *See* '222 patent, col. 4, ll. 4-10.  This correlation requirement and method of noise cancelation are repeated throughout the specification (*see id*. at col. 5, ll. 33-38; col. 5, ll. 47-51; col. 9, ll. 17-27; col. 14, ll. 5-8; col. 14, ll. 26-28), but are entirely inconsistent with Kalman filtering as recited in the claims of the '222 patent.  One of ordinary skill in the art of adaptive filters in 1993 would not have understood the adaptive noise canceller disclosed in the '060 and '812 applications to include a Kalman filter solution.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

225.   The Kalman filter claims of the '222 patent accordingly lack any written description or enablement, and were inserted by Mr. Kiani and Masimo's patent counsel, Mr. Jensen, based entirely on confidential information learned Dr. Yorkey in 1993 and from the confidential information disclosed by Nellcor during Masimo I.

226.   For example, claim 16 of the '222 patent recites:  A pulse oximeter comprising: (a) an input configured to receive at least two measured intensity signals generated by the detection of at least two wavelengths of light transmitted through body tissue having flowing blood, said intensity signals each having a first portion substantially dependent upon attenuation of said light due to arterial blood, and during motion, a second portion substantially dependent upon the attenuation of said light due to motion induced noise; and (b) a processor responsive to the at least two intensity signals to determine an approximation of arterial oxygen saturation in the presence of motion induced noise, (c) wherein the processor comprises a Kalman filter. (Reference letters added).

227.   Claim 16 comes from application pending claim 65 which recited: "The pulse oximeter of Claim 39, *wherein the processor comprises a Kalman filter*."  *See* Amendment dated March 20, 2000, p. 5.  The Examiner objected to pending claim 65, but noted that the claim would be allowable if rewritten in independent form.  *See* Final Rejection dated June 6, 2000, p. 3.  That is because pending claim 39, from which pending claim 65 depended, was rejected as anticipated by Frick, U.S. Pat. No. 4,824,242, under 35 U.S.C. § 102(b).  *See id.*

228.   Application claim 39 originally recited: A pulse oximeter comprising: (a) an input configured to receive at least two measured intensity signals generated by the detection of at least two wavelengths of light transmitted through body tissue having flowing blood, said intensity signals each having a first portion substantially dependent upon attenuation of said light due to arterial blood, and during motion, a second portion substantially dependent upon the attenuation of

114

4836-1853-1610.4

said light due to motion induced noise; and (b) a processor responsive to the at least two intensity signals to determine an approximation of arterial oxygen saturation in the presence of motion induced noise.  (Reference letters added.)  *See* Amendment dated March 20, 2000, pp. 1-2.

229.   The Examiner noted that Frick teaches a pulse oximeter system that includes LEDs emitting two wavelengths, a detector, and processing elements for receiving detector signals, calculating a ratio, and determining the oxygen saturation from the ratio; thereby meeting limitation (a).  *See* Final Rejection dated June 6, 2000, p. 3.  The Examiner further noted that it is inherent that the signals recorded by the detector would include a first portion related to attenuation and a second portion, during motion, related to motion induced noise; thus meeting limitation (b).

230.   Examiner Winakur allowed claim 16 of the '222 patent after application claim 65 was rewritten in independent form to include all of the limitations of application claim 39.  *See* Amendment dated August 18, 2000, pp. 2-3; Notice of Allowance dated August 28, 2000.  Patentability of claim 16 therefore is based entirely upon the processor comprising a Kalman filter.  As alleged above, Mr. Kiani and his counsel, Mr. Jensen, knew that this had been first invented by Nellcor, and in particular, Dr. Yorkey.

231.   The single most reasonable inference that can be drawn from the circumstances described above is that the inclusion of the term "Kalman filter," along with other estimation techniques, was the result of communications prior to October 1993 between Dr. Yorkey and Mr. Kiani.  Dr. Yorkey's notebook, Masimo II trial Exhibit JTX-2721, shows that at page 15 Dr. Yorkey had conceived of that invention at least by March 1993.  There is no evidence that Mr. Kiani, or anyone at Masimo, ever invented the use of a Kalman filter that did not require the reference signal disclosed as "the present invention" in the '222 patent. Mr. Kiani derived the claimed invention of the Kalman filter claims of the '222

115

patent from Dr. Yorkey, the first and true inventor. Masimo's and its patent counsel's deliberately and intentionally claimed in the '222 patent inventions that Masimo did not invent, rendering the '222 patent invalid and unenforceable.

232.   Further, the single most reasonable inference for the appearance in the '222 Patent of claims directed to pulse oximeters using Kalman filters that do not require use of the reference signal generated as disclosed in the '222 patent, is that those claims were introduced into the '511 application based on the confidential information disclosed during Masimo I, *i.e.*, that Nellcor's N395 pulse oximeter used various Kalman filters that did not require as an input a reference signal generated as disclosed by Masimo.

233.   As conclusively established in Masimo I, the '060 application, which shared an identical disclosure with U.S. Patent No. 6,036,642 ("the '642 patent") at issue in Masimo I, does not suggest or disclosed a Kalman filter. This is why in Masimo I the District Court concluded that an "adaptive filter" as disclosed in the '642 patent could not be construed to read on a Kalman filter. That decision was affirmed on appeal to the Federal Circuit. *See Masimo Corp. v. Mallinckrodt Inc.*, 18 Fed. Appx. 852, 855 (Fed. Cir. 2001). The District Court's dicta in its rulings on the post-verdict motions in Masimo II cannot have "established" that the '060 application disclosed Kalman filters because Masimo I established that it did not.

234.   **WHO**: As alleged above, Mr. Kiani, Mr. Diab and Mr. Jensen deliberately and intentionally withheld from the USPTO (1) that Nellcor had first invented the use of estimation techniques to reduce motion noise in pulse oximetry, and that Masimo had derived that invention from Nellcor based upon Mr. Kiani's confidential communications with Nellcor prior to October 1993 and (2) that the claims sought in the '222 patent were based on confidential information learned during discovery from Nellcor in Masimo I, were not invented by Masimo, and have no support in the '222 patent. But for this conduct, the claims of the '222 patent would not have issued.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

235.   **WHAT**:  Masimo derived the invention of using a Kalman filter in a pulse oximeter from Nellcor, whose Dr. Yorkey invented that concept first. The use of Kalman filtering is relevant to many claims of the '222 patent, including at least claim 16; where inclusion of the phrase "wherein the processor comprises a Kalman filter" was the sole basis for allowance.  Dr. Yorkey invented the use of estimation techniques, and more specifically, Kalman filters in pulse oximeters no later than March 1993.  Dr. Yorkey's communications with Mr. Kiani between November 1992 and prior to October 1993, prompted Mr. Kiani to include a reference to Kalman filters in the '812 application.  All other elements of claim 16 are present in the prior art, such as Frick U.S. Pat. No. 4,824,242, discussed in the Examiner's Final Rejection dated June 6, 2000, p. 3.  Separately, Mr. Kiani and Mr. Jensen crafted the claims of the '222 patent specifically to exclude requirement in the claims of the '222 patent that the Kalman filter use the reference signal identified as "the present invention" in the '222 patent.

236.   **WHERE**:  Oral disclosure by Dr. Yorkey to Mr. Kiani during the course of communications and meeting occurring between November 1992 and prior to October 1993, during their collaboration to evaluate Masimo's adaptive noise canceler technology.  Based on his communications with Dr. Yorkey, Mr. Kiani instructed Mr. Jensen to file the '812 application, which refers in a single paragraph (col. 49, ll. 35-44) to using Kalman filters and other estimation techniques with the reference signal generated for use with Masimo's adaptive noise canceler.  Dr. Yorkey's prior invention of this technology at least by March 1993, is recorded in Masimo II trial exhibit JTX-2721.

237.   **WHY**:  As alleged above for claim 16, all of the limitations of claim are disclosed in the prior art, such as in Frick U.S. Pat. No. 4,824,242, discussed in the Examiner's Final Rejection dated June 6, 2000, p. 3.  The sole missing limitation in claim 16, was the use of a Kalman filter, invented by Dr. Yorkey, but patented by Mr. Kiani and Mr. Jensen with full knowledge that Masimo had not

117

first invented that technology.  Separately and in addition, because the '222 patent only discloses use of a Kalman filter with the noise reference signal as disclosed in the '060 patent, Mr. Kiani and Mr. Jensen knew that there was no support in the '222 patent for claims that did not require the use of that reference signal.

238.  **HOW**:  But for the deliberate withholding of that the invention of using Kalman filters was derived from Nellcor, which had invented it first, Mr. Kiani and Mr. Jensen could not have obtained claims of the '222 patent, including claim 16, directed to Kalman filters.  Had they disclosed Nellcor's prior invention to the Patent Office, the Kalman filter claims of the '222 patent would have been rejected as unpatentable under at least 35 U.S.C. § 102(f) as the claimed invention was invented by another (employees at Nellcor including Dr. Yorkey).

## G.  Masimo Knows the '194 and '952 Patents Are Invalid

239.  Upon information and belief, Masimo and its patent counsel did not confine their attempts to improperly claim inventorship and patent inventions made only by Nellcor.  Upon information and belief, Mr. Kiani also met with other potential competitors in the field of pulse oximetry, and attempted to obtain patents covering aspects of pulse oximetry algorithms disclosed by those other competitors to Mr. Kiani.

240.  Upon information and belief, Mr. Kiani also met with engineers from Philips in 2001 regarding a potential license of his technology to that company.  Upon information and belief, Philips described the algorithms used in its FAST® pulse oximetry technology, and according to Philips, Masimo drafted and filed the claims in U.S. Patent No. 6,699,194 ("the '194 patent"), asserted in this litigation, in an attempt to cover Philips' FAST® pulse oximetry technology.  In doing so, Masimo impermissibly broadened its claims far beyond what it invented and described in its parent application, filed in 1997.  *See* Opening Brief In Support Of Defendants' Motion For Summary Judgment Of Invalidity Of U.S. Patent No. 6,699,194 (public version, Dkt. No. 445), filed in *Masimo Corp. v. Philips Elecs.*

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

*N. Am. Corp. and Philips Medizin Systeme Boblingen GmbH, C.A.* No. 09-80-LPS-MPT (D. Del.) ("the *Philips* litigation").

241.   In the *Philips* litigation, the defendants moved for summary judgment, *inter alia*, of invalidity of the '222 and '194 patents.  On April 2, 2013, Magistrate Judge Mary Pat Thynge in the *Philips* litigation issued a Report and Recommendation that the defendants' motion for summary judgment be granted that claims 17 and 18 of the '222 patent are invalid as failing to provide adequate written description under 35 U.S.C. § 112, first paragraph.  *See* Dkt. No. 662, the Philips litigation ("the Report and Recommendation").  The Report and Recommendation further found that all asserted claims of the '194 patent are invalid for lack of written description, more specifically for failing to disclose how to estimate a pulse rate utilizing a signal determined to contain motion artifact.  On March 31, 2014, District Court Judge Stark adopted the Magistrate Judge's recommendation as to the '194 patent, ruling the claims asserted against Philips invalid as lacking written description for a method of estimating pulserate where the input signal contained motion artifacts above a threshold.

242.   The '194 patent issued from a grandchild continuation application of U.S. patent application Serial No. 08/834,194, which issued as U.S. Patent No. 6,002,952 ("the '952 patent").  The '952 patent is asserted in this litigation, and has an identical disclosure to the '194 patent.  Like the claims of the '194 patent, all claims of the '952 patent require apparatus or method steps for estimating a pulserate.  Because the Delaware District Court found lack of written description for "estimating a pulserate" as recited in the claims of the '194 patent, then the claims of the '952 patent must necessarily also be invalid for lack of written description because the same limitation appears in the claims of the '952 patent.

243.   At least as of the time of filing of the Report and Recommendation, and since the District Court's adoption of those conclusions, Masimo knows that the claims of the '194 and '952 patents are invalid as lacking written description

119

1  under 35 U.S.C. § 112, first paragraph, but nonetheless continues to assert these

2  known invalid patents against Shenzhen Mindray.

3  **CAUSATION, INJURY, DAMAGES AND INJUNCTIVE RELIEF**

4  244.   As a result of Masimo's anticompetitive conduct and exclusionary

5  practices, the United States market for pulse oximetry products has been

6  unlawfully affected, leading to supracompetitive prices for pulse oximetry products

7  and the exclusion of competitors.

8  245.   As a result of Masimo's anticompetitive conduct and exclusionary

9  practices, Shenzhen Mindray has suffered threatened and actual antitrust injury by

10  being excluded from the United States market for pulse oximetry products, thereby

11  suffering actual losses and lost sales and profits.

12  246.   In the alternative, Masimo alleges at Paragraph 22 of the First

13  Amended Complaint that Shenzhen Mindray has conducted substantial business in

14  the United States by importing, marketing, selling and distributing pulse oximetry

15  products into the United States market. On that basis, Shenzhen Mindray has been

16  injured in the United States by the impact of Masimo's unlawful exclusionary

17  practices, which continue to the present.

18  247.   As a result, Shenzhen seeks an award of damages in an amount to be

19  proven at trial as well as injunctive relief precluding Masimo from continuing its

20  exclusionary practices.

21  **COUNTERCLAIM 1:**

22  **MONOPOLIZATION IN VIOLATION OF THE SHERMAN ACT**

23  248.   Shenzhen Mindray repeats and realleges Paragraphs 1-247 of its

24  Counterclaims above as if fully set forth herein.

25  249.   Masimo has monopoly power in the relevant market for pulse

26  oximeter monitors in the United States.  Masimo also has monopoly power in the

27  relevant submarkets for stand-alone pulse oximeter monitors, MPPMs, and OEM

28  circuit boards, and in the markets for pulse oximeter sensors and patient cables.

120

Through its exclusionary conduct in the United States, Masimo has unlawfully acquired and maintained its monopoly power in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

250.   Masimo could not maintain its substantial monopoly power in the pulse oximeter market, including the relevant submarkets, but for its tying arrangements, exclusionary agreements, and other anti-competitive conduct. Masimo's monopolization has not been due to growth or development as a consequence of a superior product, business acumen, or historic accident.

251.   Masimo's monopolization has injured consumers and had a direct, substantial and foreseeable effect on domestic commerce in, and import trade to, the United States market by causing supracompetitive prices for pulse oximetry products and exclusion of competitors.  Among other things, Masimo's conduct has harmed domestic commerce and import trade by reducing customer choice, restraining output, raising prices and curtailing and/or blocking introduction by Shenzhen Mindray of safe, effective, low-cost and durable pulse oximetry products in the United States.

252.   Masimo's First Amended Complaint alleges that Shenzhen Mindray has conducted substantial business in the United States, including without limitation importing, marketing, selling and distributing patient monitoring devices that include Mindray SpO2 Technology, which alleged business was and is directly harmed by Masimo's illegal and anti-competitive conduct in the United States. Masimo's acts of monopolization and monopoly maintenance, and the effects of that conduct in the United States, have directly caused antitrust injury and damage, and continues to cause antitrust injury injury and damage Shenzhen Mindray's business and property by, among other things, hurting sales and imports of Shenzhen Mindray, and other non-Masimo pulse oximetry products, in and to the United States. Shenzhen Mindray will suffer additional damage in the future if Masimo is permitted to continue its monopolistic conduct. Shenzhen Mindray has

thereby lost sales and profits in the United States market. The conduct continues to threaten injury to Shenzhen Mindray's business and property, thereby justifying permanent injunctive relief.

253.    There is no legitimate business justification for Masimo's exclusionary and anti-competitive conduct that has caused antitrust injury, and continues to cause antitrust injury Shenzhen Mindray, and no purported justification would outweigh the considerable harm to competition in the United States.

## COUNTERCLAIM 2: ATTEMPTED MONOPOLIZATION
## IN VIOLATION OF THE SHERMAN ACT

254.    Shenzhen Mindray repeats and realleges Paragraphs 1-253 of its Counterclaims above as if fully set forth herein.

255.    Through its exclusionary conduct, Masimo has unlawfully attempted to acquire a monopoly in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, in the relevant market for pulse oximeter monitors in the United States, including the relevant submarkets for stand-alone pulse oximeter monitors, MPPMs, and OEM circuit boards, and in the markets for pulse oximeter sensors and patient cables.

256.    Masimo's conduct evidences a specific intent to acquire and maintain monopoly power in the relevant market for pulse oximeters, including the relevant submarkets for stand-alone pulse oximeter monitors, MPPMs, and OEM circuit boards, and in the markets for pulse oximeter sensors and patient cables.

257.    Masimo's exclusionary conduct creates a dangerous probability that Masimo will obtain monopoly power in the relevant markets and submarkets, including the power to unilaterally exclude competition, eliminate innovation, and/or raise prices.

258.    Masimo's attempted monopolization has injured consumers and had a direct, substantial and foreseeable effect on domestic commerce in, and import trade to,   the United States market by causing supracompetitive prices for pulse

oximeter products and exclusion of competitors.  Among other things, Masimo's conduct has harmed domestic commerce and import trade by reducing customer choice, restraining output, raising prices and curtailing and/or blocking introduction by Shenzhen Mindray of safe, effective, low-cost and durable pulse oximetry products in the United States.

259.   Masimo's First Amended Complaint alleges that Shenzhen Mindray has conducted substantial business in the United States, including without limitation importing, marketing, selling and distributing patient monitoring devices that include Mindray SpO2 Technology, which alleged business was and is directly harmed by Masimo's illegal and anti-competitive conduct in the United States.

260.   There is no legitimate business justification for Masimo's exclusionary and anti-competitive conduct that has injured, and continues to injure Shenzhen Mindray, and no purported justification would outweigh the considerable harm to competition.

261.   Masimo's attempted monopolization, and the effects of that conduct in the United States, has directly caused antitrust injured and damage, and continues to cause antitrust injury and damage to Shenzhen Mindray's business and property by, among other things, hurting sales and imports of Shenzhen Mindray, and other non-Masimo pulse oximetry products, in and to the United States. Shenzhen Mindray will suffer additional damage in the future if Masimo is permitted to continue its monopolistic conduct. Shenzhen Mindray has thereby lost sales and profits in the United States market. The conduct continues to threaten injury to Shenzhen Mindray's business and property, thereby justifying permanent injunctive relief.

## COUNTERCLAIM 3: ATTEMPTED MONOPOLIZATION
## IN VIOLATION OF THE SHERMAN ACT

262.   Shenzhen Mindray repeats and realleges Paragraphs 1-261 of its Counterclaims above as if fully set forth herein.

263.   Through its exclusionary technological ties and contract arrangements, Masimo has unlawfully attempted to acquire a monopoly in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, in the relevant markets for sensors and patient cables.

264.   Masimo has developed and used the ProCal and X-Cal interfaces with the specific intent of monopolizing the markets for sensors and patient cables. Because of Masimo's significant market power in the market for pulse oximeter monitors, including the corresponding submarkets for standalone pulse oximeters, MPPMs, and OEM circuit boards, there is a dangerous probability that Masimo will be able to leverage this position to gain monopoly power in the markets for sensors and patient cables.

265.   Masimo's attempted monopolization has injured consumers and had a direct, substantial and foreseeable effect on domestic commerce in, and import trade to, in the United States by causing supracompetitive prices and exclusion of competitors.  Among other things, Masimo's conduct has harmed domestic commerce and import trade by reducing customer choice, restraining output, raising prices and curtailing and/or blocking introduction by Shenzhen Mindray of safe, effective, low-cost and durable pulse oximetry products in the United States.

266.   Masimo's First Amended Complaint alleges that Shenzhen Mindray has conducted substantial business in the United States, including without limitation importing, marketing, selling and distributing patient monitoring devices that include Mindray SpO2 Technology, which alleged business was and is directly harmed by Masimo's illegal and anti-competitive conduct in the United States.

267.   There is no legitimate business justification for Masimo's exclusionary and anti-competitive conduct that has injured, and continues to injure Shenzhen Mindray, and no purported justification would outweigh the considerable harm to competition.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

268.   Masimo's attempted monopolization, and the effects of that conduct in the United States, has directly caused antitrust injury and damage, and continues to cause antitrust injury and damage to Shenzhen Mindray's business and property by, among other things, hurting sales and imports of Shenzhen Mindray, and other non-Masimo pulse oximetry products, in and to the United States.  Shenzhen Mindray will suffer additional damage in the future if Masimo is permitted to continue its monopolistic conduct. Shenzhen Mindray has thereby lost sales and profits in the United States market. The conduct continues to threaten injury to Shenzhen Mindray's business and property, thereby justifying permanent injunctive relief.

## COUNTERCLAIM 4: CONSPIRACY TO MONOPOLIZE
## IN VIOLATION OF THE SHERMAN ACT

269.   Shenzhen Mindray repeats and realleges Paragraphs 1-268 of its Counterclaims as if fully set forth herein.

270.   Masimo's 2006 Settlement Agreement with Nellcor and subsequent amendments to that Agreement, including the 2011 Second Amendment, constitute an illegal conspiracy to monopolize the market for pulse oximeters in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

271.   Masimo's 2006 Settlement Agreement with Nellcor and subsequent amendments to that Agreement, were entered into with specific intent to create and maintain Masimo's monopoly power in the market for pulse oximeter monitors, including the corresponding submarkets standalone pulse oximeters, MPPMs, and OEM circuit boards.  In exchange for cooperation, Masimo granted Nellcor the right to continue selling an infringing pulse oximeter and to collect anti-competitive profits from tied sensor and patient cable sales.  Masimo has taken acts in furtherance of its conspiracy with respect to the 2006 Settlement Agreement and subsequent amendments in the past four years and continues to do so.  Such acts have and continue to inflict new and accumulating injury to Shenzhen Mindray.

125

272.   Masimo has taken overt acts in furtherance of this conspiracy within the last four years, including tying sensors and patient cables to pulse oximeter monitors, forcing distributors to accept exclusionary contractual terms, and boycotting manufacturers of third-party sensors and patient cables through the use of the ProCal, X-Cal and DigiCal technologies.

273.   Masimo's Settlement Agreement with Nellcor and the subsequent amendments to that Agreement, have had a direct, substantial and foreseeable effect on domestic commerce in, and import trade to, in the United States, and continues to do so by causing supracompetitive prices and exclusion of competitors.  Among other things, Masimo's conduct has harmed domestic commerce and import trade by reducing customer choice, restraining output, raising prices and curtailing and/or blocking introduction by Shenzhen Mindray of safe, effective, low-cost and durable pulse oximetry products in the United States.

274.   Masimo's First Amended Complaint alleges that Shenzhen Mindray has conducted substantial business in the United States, including without limitation importing, marketing, selling and distributing patient monitoring devices that include Mindray SpO2 Technology, which alleged business was and is directly harmed by Masimo's illegal and anti-competitive conduct in the United States.

275.   There is no legitimate business justification for Masimo's exclusionary and anti-competitive conduct that has injured, and continues to injure Shenzhen Mindray, and no purported justification would outweigh the considerable harm to competition.

276.   Masimo's exclusionary and anti-competitive acts, and the effects of those acts in the United States, have directly caused antitrust injury and damage, and continues to cause antitrust injury and damage to Shenzhen Mindray's business and property by, among other things, hurting sales and imports of Shenzhen Mindray, and other non-Masimo pulse oximetry products, in and to the United States.  Shenzhen Mindray will suffer additional damage in the future if

126

1   Masimo is permitted to continue its anti-competitive conduct. Shenzhen Mindray
2   has thereby lost sales and profits in the United States market. The conduct
3   continues to threaten injury to Shenzhen Mindray's business and property, thereby
4   justifying permanent injunctive relief.

### COUNTERCLAIM 5:  TYING IN VIOLATION
### OF THE SHERMAN ACT AND THE CLAYTON ACT

7       277.   Shenzhen Mindray repeats and realleges Paragraphs 1-276 of its
8   Counterclaims as if fully set forth herein.

9       278.   Masimo's anti-competitive tying of pulse oximeters to patient cables
10  and sensors violates Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§
11  1-2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.  This conduct has
12  suppressed competition in the relevant markets for sensors and patient cables.

13      279.   Pulse oximeter monitors, patient cables, and sensors used in pulse
14  oximetry are separate relevant markets.

15      280.   Masimo controls, either directly or through its control of Nellcor,
16  approximately 80% of the market for pulse oximeter monitors.  This dominant
17  position allows Masimo to control prices and exclude competition.

18      281.   Masimo has forced customers to purchase Masimo sensors by
19  conditioning the sale of Masimo patented pulse oximeter monitors on the sale of
20  Masimo sensors.  It has done so through technological ties, which makes non-
21  Masimo sensors incompatible with Masimo pulse oximeter monitors.  It has also
22  enforced the unlawful tie through contractual provisions with distributors.

23      282.   Masimo has forced customers to purchase Masimo patient cables by
24  conditioning the sale of Masimo patented pulse oximeter monitors on the sale of
25  Masimo patient cables.  It has enforced the unlawful tie through contractual
26  provisions with distributors and its ProCal and X-Cal interface technologies.

27      283.   Masimo's 2006 Settlement Agreement with Nellcor and subsequent
28  amendments to that Agreement, has caused, and continues to cause, Nellcor to

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

force customers to purchase Nellcor sensors and patient cables by conditioning the sale of Nellcor pulse oximeter monitors on the sale of Nellcor sensors.  Masimo has threatened to sue Nellcor for infringement of its pulse oximeter patents if it allows competition from third-party sensor manufacturers.

284.   Through its license agreements with other licensees, Masimo has caused, and continues to cause, such licensees to force customers to purchase Masimo sensors and patient cables by conditioning the sale of Masimo patented pulse oximeter monitors on the sale of Masimo sensors.

285.   Masimo's illegal conduct allows it to extend Masimo's control of the pulse oximeter monitor market into corresponding submarkets for standalone pulse oximeters, MPPMs, and OEM circuit boards.  Absent Masimo's illegal conduct, consumers in the United States would purchase sensors and patient cables from third-party suppliers, including Shenzhen Mindray.  Consumers have been harmed, and continued to be harmed, by Masimo's tying because they have been forced to pay higher prices for sensors and patient cables and have been unable to choose the sensors and patient cables that best suit their needs.

286.   Masimo's tying scheme has resulted in foreclosure of a substantial amount of commerce in the United States markets for sensors and patient cables, including domestic commerce and import trade involving sensors and patient cables of competitors, including Shenzhen Mindray.  By forcing customers to purchase particular sensors and patient cables, Masimo is likely to achieve market power in those markets.

287.   Masimo's tying scheme has injured consumers and harmed competition in the  domestic commerce and import trade by reducing customer choice, restraining output, raising prices and excluding competitors and curtailing and/or blocking introduction by competitors, including Shenzhen Mindray of safe, effective, low-cost and durable pulse oximetry products in the United States.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

288.   There are no legitimate business justifications for Masimo's requirement that its pulse oximeter monitors be used only with Masimo-branded sensors and patient cables, and no purported justification would outweigh the considerable harm to competition.  Similarly, there is no justification for Masimo to cause Nellcor to require that its pulse oximeter monitors be used only with Nellcor-branded sensors, and no purported justification would outweigh the considerable harm to competition

289.   Masimo's unlawful tying, and the effects of that conduct in the United States, has directly caused antitrust  injury and damage, and continues to cause antitrust injury and damage to Shenzhen Mindray's business and property by, among other things, hurting sales and imports of Shenzhen Mindray, and other non-Masimo pulse oximetry products, in and to the United States.  Shenzhen Mindray will suffer additional damage in the future if Masimo is permitted to continue its anti-competitive conduct. Shenzhen Mindray has thereby lost sales and profits in the United States market. The conduct continues to threaten injury to Shenzhen Mindray's business and property, thereby justifying permanent injunctive relief.

## COUNTERCLAIM 6:  GROUP BOYCOTT IN VIOLATION OF THE SHERMAN ACT

290.   Shenzhen Mindray repeats and realleges Paragraphs 1-289 of its Counterclaims as if fully set forth herein.

291.   Masimo's exclusion of third parties constitutes a group boycott or concerted refusal to deal, and is illegal *per se* under Section 1 of the Sherman Act. 15 U.S.C. § 1.

292.   Masimo possesses a dominant position in the relevant market for pulse oximeter monitors, as well as the corresponding submarkets standalone pulse oximeters, MPPMs, and OEM circuit boards.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS OF SHENZHEN MINDRAY

4836-1853-1610.4

293.   Through its agreements with licensees and distributors, Masimo has excluded third-party patient cable and sensor manufacturers from the United States markets for these products by prohibiting licensees and distributors from selling or marketing third-party sensors or patient cables for use with Masimo SET®.

294.   Masimo has further enforced this exclusive scheme by entering into an agreement with Nellcor, including subsequent amendments within the limitations period, whereby Nellcor must configure its products to exclude third-party sensor and patient cable manufacturers in the United States.

295.   Because of Masimo's contracts referenced herein, third-party sensor and patient cable manufacturers are excluded from approximately 80% of the market.

296.   Masimo's contracts referenced herein have injured consumers and had a direct, substantial and foreseeable effect on domestic commerce in, and import trade to,  in the United States market by causing supracompetitive prices and exclusion of competitors Among other things, Masimo's conduct has harmed domestic commerce and import trade by reducing customer choice, restraining output, raising prices and curtailing and/or blocking introduction by Shenzhen Mindray of safe, effective, low-cost and durable pulse oximetry products in the United States.

297.   Masimo's First Amended Complaint alleges that Shenzhen Mindray has conducted substantial business in the United States, including without limitation importing, marketing, selling and distributing patient monitoring devices that include Mindray SpO2 Technology, which alleged business was and is directly harmed by Masimo's illegal and anti-competitive conduct in the United States.

298.   There is no legitimate business justification for Masimo's exclusionary and anti-competitive conduct that has caused antitrust injury to, and continues to antitrust injury to,   Shenzhen Mindray's business and property, and no purported justification would outweigh the considerable harm to competition.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

299.   Masimo's exclusionary and anti-competitive acts, and the effects of those acts in the United States, have directly caused antitrust injury and damage, and continues to cause antitrust injury and damage to Shenzhen Mindray's business and property by, among other things, hurting sales and imports of Shenzhen Mindray, and other non-Masimo pulse oximetry products, in and to the United States.  Shenzhen Mindray will suffer additional damage in the future if Masimo is permitted to continue its anti-competitive conduct. Shenzhen Mindray has thereby lost sales and profits in the United States market. The conduct continues to threaten injury to Shenzhen Mindray's business and property, thereby justifying permanent injunctive relief.

## COUNTERCLAIM 7:  AGREEMENT IN RESTRAINT OF TRADE IN VIOLATION OF THE SHERMAN ACT

300.   Shenzhen Mindray repeats and realleges Paragraphs 1-299 of its Counterclaims as if fully set forth herein.

301.   As alleged above, Masimo has entered into exclusionary agreements with Nellcor, OEMs, distributors, and hospitals that have unreasonably restrained trade and competition in the relevant United States markets for pulse oximeter monitors, patient cables, and sensors in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

302.   Masimo's exclusionary agreements affect a substantial amount of commerce in the relevant United States markets for pulse oximeter monitors, patient cables, and sensors.

303.   Masimo's exclusionary agreements have injured consumers and had a direct, substantial and foreseeable effect on domestic commerce in, and import trade to, in the United States by causing supracompetitive prices and excluding competitors.  Among other things, Masimo's conduct has harmed domestic commerce and import trade by reducing customer choice, restraining output, raising prices and curtailing and/or blocking introduction by competitors, including

131

4836-1853-1610.4

Shenzhen Mindray of safe, effective, low-cost and durable pulse oximetry products in the United States.

304.   Masimo's First Amended Complaint alleges that Shenzhen Mindray has conducted substantial business in the United States, including without limitation importing, marketing, selling and distributing patient monitoring devices that include Mindray SpO2 Technology, which alleged business was and is directly harmed by Masimo's illegal and anti-competitive conduct in the United States.

305.   There is no legitimate business justification for Masimo's exclusionary and anti-competitive conduct that has caused antitrust injury and damage, and continues to cause antitrust injury and damage, to Shenzhen Mindray's business and property, and no purported justification would outweigh the considerable harm to competition.

306.   Masimo's exclusionary and anti-competitive acts, and the effects of those acts in the United States, have directly caused antitrust injury and damage, and continues to cause antitrust injury and damage to Shenzhen Mindray's business and property by, among other things, hurting sales and imports of Shenzhen Mindray, and other non-Masimo pulse oximetry products, in and to the United States.  Shenzhen Mindray will suffer additional damage in the future if Masimo is permitted to continue its anti-competitive conduct.  Shenzhen Mindray has thereby lost sales and profits in the United States market. The conduct continues to threaten injury to Shenzhen Mindray's business and property, thereby justifying permanent injunctive relief.

## COUNTERCLAIM 8: VIOLATION OF SECTION 2 OF THE SHERMAN ACT – WALKER PROCESS MONOPOLIZATION CLAIM

307.   Shenzhen Mindray repeats and realleges Paragraphs 1-306 of its Counterclaims as if fully set forth herein.

308.   Masimo possesses monopoly power in the relevant United States markets, maintaining a dominant share of a market with high entry barriers.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

309.   As alleged above, the allowance of at least the '222, '986, '958 and '154 patents by the USPTO was procured by Masimo's failure to disclose highly relevant aspects of Nellcor's prior art pulse oximetry algorithms, including prior invention of the use of Kalman filters, the Yorkey and Baker documents, and fetal oximeter  prior art systems material to those patents.

310.   As alleged above, Masimo failed to disclose highly material prior art during the prosecution of the '222, '986, '958 and '154 patents with the intention of deceiving the USPTO into issuing those patents.

311.   As alleged above, the USPTO would not have issued the '222, '986, '958 and '154 patents with the claims asserted in this litigation if Masimo and its patent counsel had not intentionally concealed the existence of the material Nellcor prior art materials.

312.   As alleged above, at the time Masimo brought this action, it knew about the Nellcor prior art, and that the Nellcor prior art anticipates and renders the claims of '222, '986, '958 and '154 patents invalid.  As of the date of this filing, Masimo further knows that the '194 patent, and consequently, the '952 patent as well, are invalid for lack of written description, as determined by District Court in the *Philips* litigation.

313.   By asserting the '222, '986, '958, '154, '194 and '952 patents that Masimo knows are invalid and/or unenforceable, Masimo has engaged in willful exclusionary conduct that has caused Masimo's monopoly power in the relevant pulse oximetry United States markets to be maintained, enhanced or acquired, and has significantly diminished the ability of competitors, including Shenzhen Mindray to compete fairly in those markets.

314.   Masimo's actions have caused, and will continue to cause, injury competition in the relevant United States markets and to competitors, including Shenzhen Mindray  by: (1) creating illegal and artificial barriers to entry into the relevant markets by seeking to enforce invalid and/or fraudulently obtained

patents; (2) subjecting competitors, including Shenzhen Mindray to the high costs and other substantial burdens of defending themselves against baseless patent infringement actions predicated on invalid and unenforceable patents Masimo knows that competitors, including Shenzhen Mindray do not, in any event, infringe; and (3) creating meritless doubt in the minds of the competitors' customers and potential customers, including Shenzhen Mindray's customers and potential customers, causing them to forgo purchases of the competitors' products, including Shenzhen Mindray's products.

315.   There is no legitimate business justification for Masimo's exclusionary and anti-competitive conduct that has injured, and continues to injure Shenzhen Mindray, and no purported justification would outweigh the considerable harm to competition.

316.   As a result of Masimo's unlawful conduct in violation of 15 U.S.C. § 2, Shenzhen Mindray has suffered and will continue to suffer antitrust injury and damages to its business and property. Shenzhen Mindray has lost sales and profits in the United States market. The conduct continues to threaten injury to Shenzhen Mindray's business and property, thereby justifying permanent injunctive relief

**COUNTERCLAIM 9:  VIOLATION OF SECTION 2 OF THE SHERMAN ACT *WALKER PROCESS* ATTEMPTED MONOPOLIZATION CLAIM**

317.   Shenzhen Mindray repeats and realleges Paragraphs 1-316 of its Counterclaims as if fully set forth herein.

318.   Masimo's conduct, as alleged above, violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

319.   By attempting to enforce the '222, '986, '958, '154, '194 and '952 patents that it knows are invalid and unenforceable, Masimo intends to acquire monopoly power in the relevant United States pulse oximetry markets.

320.   Masimo's attempted monopolization has injured consumers and had a direct, substantial and foreseeable effect on domestic commerce in, and import

134

trade to, in the United States by causing supracompetitive prices and exclusion of competitors.  Among other things, Masimo's conduct has harmed domestic commerce and import trade by reducing customer choice, restraining output, raising prices and curtailing and/or blocking introduction by competitors, including Shenzhen Mindray of safe, effective, low-cost and durable pulse oximetry products in the United States.

321.   Masimo's actions have caused, and will continue to cause, injury competition in the relevant United States markets and to competitors, including Shenzhen Mindray  by: (1) creating illegal and artificial barriers to entry into the relevant markets by seeking to enforce invalid and/or fraudulently obtained patents; (2) subjecting competitors, including Shenzhen Mindray to the high costs and other substantial burdens of defending themselves against  baseless patent infringement actions predicated on invalid and unenforceable patents Masimo knows that competitors, including  Shenzhen Mindray do not, in any event, infringe; and (3) creating meritless doubt in the minds of the competitors' customers and potential customers, including Shenzhen Mindray's  customers and potential customers, causing them to forgo purchases of the competitors' products, including Shenzhen Mindray's products.

322.   Unless Masimo's baseless patent infringement actions, including its case against Shenzhen Mindray, are dismissed and the asserted patents are declared invalid and unenforceable, Masimo is likely to succeed in acquiring monopoly power because of its dominant position in the relevant markets, the high entry barriers in the market, and the absence of other competitors.  Such conduct imposes direct harm to competition in the United States.

323.   There is no legitimate business justification for Masimo's exclusionary and anti-competitive conduct that has injured, and continues to injure Shenzhen Mindray, and no purported justification would outweigh the considerable harm to competition.

324.   Masimo's attempted monopolization, and the effects of that conduct in the United States, has directly caused antitrust injured and damage, and continues to cause antitrust injury and damage to Shenzhen Mindray's business and property by, among other things, hurting sales and imports of Shenzhen Mindray, and other non-Masimo pulse oximetry products, in and to the United States. Shenzhen Mindray will suffer additional damage in the future if Masimo is permitted to continue its monopolistic conduct. Shenzhen Mindray has thereby lost sales and profits in the United States market. The conduct continues to threaten injury to Shenzhen Mindray's business and property, thereby justifying permanent injunctive relief.

## COUNTERCLAIM 10:  TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

325.   Shenzhen Mindray repeats and realleges Paragraphs 10-62, 64-80 and 248-324 of its Counterclaims as if fully set forth herein.

326.   Since 2008, Shenzhen Mindray has had a commercial relationship with Mindray USA.  Among other things, Mindray USA uses Shenzhen Mindray as its manufacturer of the pulse oximetry products Mindray USA offers for sale and sells in the United States.  Mindray USA purchases its supply of manufactured product in from Shenzhen Mindray, and then Mindray USA imports that product into the United States.  Shenzhen Mindray has enjoyed a positive commercial relationship with its U.S.-based customer, Mindray USA, with a probability of future economic benefit to Shenzhen Mindray.

327.   At all relevant times, and at least since 2008, Masimo has been aware of the commercial relationship between Shenzhen Mindray and Mindray USA, including, without limitation, Shenzhen Mindray's manufacturing of pulse oximetry products for Mindray USA.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

328.   At least since 2008, and leading up through July 11, 2012, Masimo has engaged in acts designed to disrupt, and interfere with, the relationship between Shenzhen Mindray and Mindray USA.

329.   For example, Masimo threatened to disrupt supply of its SET® boards necessary for Shenzhen Mindray's manufacture of pulse oximetry products for Mindray USA, unless Shenzhen Mindray agreed to onerous amendments to the operative contract between Shenzhen Mindray and Masimo.  On several occasions between 2008 and July 11, 2012, Masimo carried through on its threat, and either slowed or ceased supply altogether.  These acts by Masimo disrupted the relationship between Shenzhen Mindray and Mindray USA.

330.   In addition, and by way of further example, Masimo resorted to threatening abuse of contractual rights to pressure Shenzhen Mindray to extend and/or modify its operative contract with Masimo.  When Shenzhen Mindray resisted further amending its agreement in 2011, Masimo formally instituted an audit, and declared its intent to delve into business activities beyond those within the scope of the parties' agreement, including activities with competitors to Masimo that Shenzhen Mindray's and Mindray USA's contracts with Masimo allowed Shenzhen Mindray and Mindray USA to pursue.  These acts by Masimo disrupted the relationship between Shenzhen Mindray and Mindray USA.

331.   But for Masimo's disruption and interference, Mindray USA would purchase, import and sell Shenzhen Mindray pulse oximeter monitors that employ Shenzhen Mindray-based pulse oximetry technology, as well as pulse oximeter sensors and patient cables for use with such pulse oximeter monitors.

332.   But for Masimo's disruption and interference, Shenzhen Mindray would have realized additional sales of its products to Mindray USA, as well as to U.S. distributors and importers, which products would have been sold throughout the United States, including within the State of California.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

333.   Shenzhen Mindray is informed and believes that Masimo's conduct was undertaken with the intent to disrupt and to interfere with Shenzhen Mindray's business relationship with Mindray USA.

334.   As a result of Masimo's disruption and interference, Shenzhen Mindray has been injured in its business and property through the loss of present and future profits, by loss of sales of pulse oximeter monitors that employ Shenzhen Mindray-based pulse oximetry technology, as well as pulse oximeter sensors and patient cables compatible with those pulse oximeter monitors.

335.   Shenzhen Mindray has suffered and continues to suffer actual damages as a direct result of Masimo's interference.

336.   Shenzhen Mindray is informed and believes that Masimo's acts were willful, malicious, oppressive and undertaken with the intent of harming Shenzhen Mindray, thereby subjecting Masimo to punitive damages.

337.   Unless restrained, Masimo will continue to disrupt Shenzhen Mindray's relationship with Mindray USA, all to Shenzhen Mindray's great and irreparable injury, for which damages would not afford an adequate remedy nor completely compensate the injury to Shenzhen Mindray's business, reputation and good will.

## COUNTERCLAIM 11:  STATUTORY UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200

338.   Shenzhen Mindray repeats and realleges Paragraphs 1-337 of its Counterclaims as if fully set forth herein.

339.   This is a cause of action for statutory unfair competition under § 17200, et seq., of the California Business & Professions Code.

340.   Masimo's wrongful acts alleged herein, including its exclusionary licensing and distribution practices, illegal tying practices, exclusionary pricing and bundling practices, and interference with Shenzhen Mindray's business relationship with Mindray USA, have harmed competition and restrained trade in

138

4836-1853-1610.4

the State of California, and constitute unlawful, unfair and fraudulent business practices in violation of California Business & Professions Code § 17200, et seq.

341.   As a result of Masimo's wrongful acts, Shenzhen Mindray has been injured in its business and property through the loss of present and future profits, by loss of sales of pulse oximeter monitors that employ Shenzhen Mindray-based pulse oximetry technology, as well as pulse oximeter sensors and patient cables compatible with those pulse oximeter monitors.

342.   Shenzhen Mindray has suffered and continues to suffer actual damages as a result of Masimo's conduct.

343.   Shenzhen Mindray is informed and believes that Masimo's acts were willful, malicious, oppressive and undertaken with the intent of monopolizing the markets for pulse oximeter monitors, sensors and patient cables, and restraining trade and reaping super-competitive profits in those markets.  Masimo's acts have harmed Shenzhen Mindray. For those reasons, Masimo is subject to punitive damages.

344.   Unless restrained, Masimo will continue to engage in the acts complained of, all to Shenzhen Mindray's great and irreparable injury.

## COUNTERCLAIM 12: DECLARATORY JUDGMENT
## OF NON-INFRINGEMENT OF THE '952 PATENT

345.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

346.   By its Complaint, Masimo asserts that Shenzhen Mindray has infringed the '952 patent.

347.   Shenzhen Mindray has denied Masimo's claim of infringement of the '952 patent, and contends that it does not infringe the '952 patent or any valid or enforceable asserted claim thereof.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

348.   An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the alleged infringement of the '952 patent.

349.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Shenzhen Mindray is entitled to judgment from this Court finding that the '952 patent is not infringed, directly or indirectly, by Shenzhen Mindray.

## COUNTERCLAIM 13:  DECLARATORY JUDGMENT
## OF NON-INFRINGEMENT OF THE  '222 PATENT

350.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

351.   By its Complaint, Masimo asserts that Shenzhen Mindray has infringed the '222 patent.

352.   Shenzhen Mindray has denied Masimo's claim of infringement of the '222 patent, and contends that it does not infringe the '222 patent or any valid or enforceable asserted claim thereof.

353.   An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the alleged infringement of the '222 patent.

354.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Shenzhen Mindray is entitled to judgment from this Court finding that the '222 patent is not infringed, directly or indirectly, by Shenzhen Mindray.

## COUNTERCLAIM 14: DECLARATORY JUDGMENT
## OF NON-INFRINGEMENT OF THE '086 PATENT

355.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

356.   By its Complaint, Masimo asserts that Shenzhen Mindray has infringed the '086 patent.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

357.   Shenzhen Mindray has denied Masimo's claim of infringement of the '086 patent, and contends that it does not infringe the '086 patent or any valid or enforceable asserted claim thereof.

358.   An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the alleged infringement of the '086 patent.

359.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Shenzhen Mindray is entitled to judgment from this Court finding that the '086 patent is not infringed, directly or indirectly, by Shenzhen Mindray.

## COUNTERCLAIM 15:  DECLARATORY JUDGMENT
## OF NON-INFRINGEMENT OF THE '194 PATENT

360.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

361.   By its Complaint, Masimo asserts that Shenzhen Mindray has infringed the '194 patent.

362.   Shenzhen Mindray has denied Masimo's claim of infringement of the '194 patent, and contends that it does not infringe the '194 patent or any valid or enforceable asserted claim thereof.

363.   An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the alleged infringement of the '194 patent.

364.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Shenzhen Mindray is entitled to judgment from this Court finding that the '194 patent is not infringed, directly or indirectly, by Shenzhen Mindray.

## COUNTERCLAIM 16:  DECLARATORY JUDGMENT
## OF NON-INFRINGEMENT OF THE '060 PATENT

365.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

4836-1853-1610.4

366.   By its Complaint, Masimo asserts that Shenzhen Mindray has infringed the '060 patent.

367.   Shenzhen Mindray has denied Masimo's claim of infringement of the '060 patent, and contends that it does not infringe the '060 patent or any valid or enforceable asserted claim thereof.

368.   An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the alleged infringement of the '060 patent.

369.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Shenzhen Mindray is entitled to judgment from this Court finding that the '060 patent is not infringed, directly or indirectly, by Shenzhen Mindray.

## COUNTERCLAIM 17:  DECLARATORY JUDGMENT
## OF NON-INFRINGEMENT OF THE '986 PATENT

370.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

371.   By its Complaint, Masimo asserts that Shenzhen Mindray has infringed the '986 patent.

372.   Shenzhen Mindray has denied Masimo's claim of infringement of the '986 patent, and contends that it does not infringe the '986 patent or any valid or enforceable asserted claim thereof.

373.   An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the alleged infringement of the '986 patent.

374.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Shenzhen Mindray is entitled to judgment from this Court finding that the '986 patent is not infringed, directly or indirectly, by Shenzhen Mindray.

## COUNTERCLAIM 18:  DECLARATORY JUDGMENT
## OF NON-INFRINGEMENT OF THE '958 PATENT

375.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

376.   By its Complaint, Masimo asserts that Shenzhen Mindray has infringed the '958 patent.

377.   Shenzhen Mindray has denied Masimo's claim of infringement of the '958 patent, and contends that it does not infringe the '958 patent or any valid or enforceable asserted claim thereof.

378.   An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the alleged infringement of the '958 patent.

379.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Shenzhen Mindray is entitled to judgment from this Court finding that the '958 patent is not infringed, directly or indirectly, by Shenzhen Mindray.

## COUNTERCLAIM 19:  DECLARATORY JUDGMENT
## OF NON-INFRINGEMENT OF THE '154 PATENT

380.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

381.   By its Complaint, Masimo asserts that Shenzhen Mindray has infringed the '154 patent.

382.   Shenzhen Mindray has denied Masimo's claim of infringement of the '154 patent, and contends that it does not infringe the '154 patent or any valid or enforceable asserted claim thereof.

383.   An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the alleged infringement of the '154 patent.

384.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Shenzhen Mindray is entitled to judgment from this Court finding that the '154 patent is not infringed, directly or indirectly, by Shenzhen Mindray.

## COUNTERCLAIM 20:  DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '533 PATENT

385.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

386.   By its Complaint, Masimo asserts that Shenzhen Mindray has infringed the '533 patent.

387.   Shenzhen Mindray has denied Masimo's claim of infringement of the '533 patent, and contends that it does not infringe the '533 patent or any valid or enforceable asserted claim thereof.

388.   An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the alleged infringement of the '533 patent.

389.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Shenzhen Mindray is entitled to judgment from this Court finding that the '533 patent is not infringed, directly or indirectly, by Shenzhen Mindray.

## COUNTERCLAIM 21:  DECLARATORY JUDGMENT OF INVALIDITY OF THE '952 PATENT

390.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

391.   By its Complaint, Masimo asserts that the '952 patent is valid. Shenzhen Mindray has denied this allegation and contends that the '952 patent is invalid under 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

392.   An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the validity of the '952 patent.

144

393.   As alleged above, the '952 patent shares an identical disclosure with the '194 patent, and all claims of the '952 patent include the identical limitation determined by the District Court in the *Philips* litigation to lack written description. Accordingly, all claims of the '952 patent likewise are invalid for lack of written description.

394.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Shenzhen Mindray is entitled to judgment from this Court finding that the '952 patent is invalid pursuant to 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

## COUNTERCLAIM 22: DECLARATORY JUDGMENT
## OF INVALIDITY OF THE '222 PATENT

395.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

396.   By its Complaint, Masimo asserts that the '222 patent is valid. Shenzhen Mindray has denied this allegation and contends that the '222 patent is invalid under 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

397.   As alleged above, all claims of the '222 patent are invalid as lacking written description and having been derived from Nellcor; and in addition, claims 17 and 18 are invalid for the reasons expressed by Magistrate Judge Thynge in the *Philips* litigation.

398.   An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the validity of the '222 patent.

399.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Shenzhen Mindray is entitled to judgment from this Court finding that the '222 patent is invalid pursuant to 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

## COUNTERCLAIM 23: DECLARATORY JUDGMENT
## OF INVALIDITY OF THE '086 PATENT

400.    Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

401.    By its Complaint, Masimo asserts that the '086 patent is valid. Shenzhen Mindray has denied this allegation and contends that the '086 patent is invalid under 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

402.    An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the validity of the '086 patent.

403.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Shenzhen Mindray is entitled to judgment from this Court finding that the '086 patent is invalid pursuant to 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

## COUNTERCLAIM 24: DECLARATORY JUDGMENT
## OF INVALIDITY OF THE '194 PATENT

404.    Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

405.    By its Complaint, Masimo asserts that the '194 patent is valid. Shenzhen Mindray has denied this allegation and contends that the '194 patent is invalid under 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

406.    An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the validity of the '194 patent.

407.    As alleged above, all claims of the '194 patent have been determined to be invalid by the District Court in the *Philips* litigation as lacking written description.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

408.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Shenzhen Mindray is entitled to judgment from this Court finding that the '194 patent is invalid pursuant to 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

## COUNTERCLAIM 25: DECLARATORY JUDGMENT
## OF INVALIDITY OF THE '060 PATENT

409.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

410.   By its Complaint, Masimo asserts that the '060 patent is valid. Shenzhen Mindray has denied this allegation and contends that the '060 patent is invalid under 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

411.   An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the validity of the '060 patent.

412.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Shenzhen Mindray is entitled to judgment from this Court finding that the '060 patent is invalid pursuant to 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

## COUNTERCLAIM 26:  DECLARATORY JUDGMENT
## OF INVALIDITY OF THE '986 PATENT

413.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

414.   By its Complaint, Masimo asserts that the '986 patent is valid. Shenzhen Mindray has denied this allegation and contends that the '986 patent is invalid under 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

415.   An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the validity of the '986 patent.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

416.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*., Shenzhen Mindray is entitled to judgment from this Court finding that the '986 patent is invalid pursuant to 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

### COUNTERCLAIM 27: DECLARATORY JUDGMENT
### OF INVALIDITY OF THE '958 PATENT

417.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

418.   By its Complaint, Masimo asserts that the '958 patent is valid. Shenzhen Mindray has denied this allegation and contends that the '958 patent is invalid under 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

419.   An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the validity of the '958 patent.

420.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*., Shenzhen Mindray is entitled to judgment from this Court finding that the '958 patent is invalid pursuant to 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

### COUNTERCLAIM 28: DECLARATORY JUDGMENT
### OF INVALIDITY OF THE '154 PATENT

421.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

422.   By its Complaint, Masimo asserts that the '154 patent is valid. Shenzhen Mindray has denied this allegation and contends that the '154 patent is invalid under 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

423.   An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the validity of the '154 patent.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

424.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Shenzhen Mindray is entitled to judgment from this Court finding that the '154 patent is invalid pursuant to 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

## COUNTERCLAIM 29: DECLARATORY JUDGMENT
## OF INVALIDITY OF THE '533 PATENT

425.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

426.   By its Complaint, Masimo asserts that the '533 patent is valid. Shenzhen Mindray has denied this allegation and contends that the '533 patent is invalid under 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

427.   An actual and justiciable controversy has thus arisen between Masimo and Shenzhen Mindray concerning the validity of the '533 patent.

428.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Shenzhen Mindray is entitled to judgment from this Court finding that the '533 patent is invalid pursuant to 35 U.S.C. §§ 101, 102, 103, 112 and/or 116.

## COUNTERCLAIM 30: DECLARATORY JUDGMENT
## OF UNENFORCEABILITY BASED ON PATENT MISUSE AND
## PROSECUTION LACHES

429.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 1-344 of its Counterclaims as if fully set forth herein.

430.   Masimo has hundreds of issued U.S. patents, but few patents outside the U.S.

431.   Masimo has engaged in systematic abuse of U.S. patent continuation practice by filing continuation applications resulting in U.S. patents, including several patents asserted herein, more than a decade after the original application in

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

the chain of priority applications, rendering those patents unenforceable under the doctrine of prosecution laches.

432.   Masimo has impermissibly broadened the physical and/or temporal scope of its patents by means of its abuse of U.S. continuation application practice, and by its anti-competitive and commercially unreasonable demands in connection with licensing such patents.

433.   Masimo's anti-competitive and commercially unreasonable activities in connection with obtaining and enforcing its '952, '222, '086, '194, '060, '986, '958, '154 and '533 patents, among others, constitutes patent misuse, rendering those patents unenforceable against Shenzhen Mindray.

## COUNTERCLAIM 31: DECLARATORY JUDGMENT
## OF UNENFORCEABILITY OF THE '222 PATENT

434.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 75-98 and 215-238 of its Counterclaims as if fully set forth herein.

435.   As alleged above, Masimo committed inequitable conduct during prosecution of the '222 patent by attempting to the use of Kalman filters in pulse oximeters, an invention first invented by Nellcor, not Masimo.

436.   As alleged above, Masimo did not itself invent the use of Kalman filters in pulse oximetry, but learned of that invention from Nellcor through its communications with Dr. Yorkey prior to October 1993, and in further detail in connection with the Masimo I litigation.  As alleged above, but for Mr. Kiani's, Mr. Diab's and Mr. Jensen's decision to deliberately and intentionally conceal the true inventorship of the use of Kalman filters from the USPTO, the claims of the '222 patent would not have issued.

437.   An actual case or controversy exists between Masimo and Shenzhen Mindray based on Masimo having filed a Complaint against Shenzhen Mindray alleging infringement of the '222 patent.

150

438.   Shenzhen Mindray has been injured and damaged by Masimo filing a Complaint asserting the '222 patent.

439.   Declaratory relief is both appropriate and necessary to establish that the '222 patent is unenforceable and thus cannot be asserted against Shenzhen Mindray.

## COUNTERCLAIM 32: DECLARATORY JUDGMENT
## OF UNENFORCEABILITY OF THE '958 PATENT

440.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its Answer, each of its Affirmative Defenses, and Paragraphs 75-140 of its Counterclaims as if fully set forth herein.

441.   As alleged above, Masimo committed inequitable conduct during prosecution of the '958 patent by failing to disclose to the USPTO the Yorkey and Baker Declarations and exhibits, and by failing to submit to the USPTO Dr. Stone's Masimo II trial testimony and exhibits, which information is highly material to patentability of the claims of the '958 patent.

442.   As alleged above, but for Mr. Kiani's, Mr. Jensen's and Mr. Grover's decision to deliberately and intentionally withhold that information from the USPTO, the claims of the '958 patent would not have issued.

443.   An actual case or controversy exists between Masimo and Shenzhen Mindray based on Masimo having filed a Complaint against Shenzhen Mindray alleging infringement of the '958 patent.

444.   Shenzhen Mindray has been injured and damaged by Masimo filing a Complaint asserting the '958 patent.

445.   Declaratory relief is both appropriate and necessary to establish that the '958 patent is unenforceable and thus cannot be asserted against Shenzhen Mindray.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

## COUNTERCLAIM 33: DECLARATORY JUDGMENT
## OF UNENFORCEABILITY OF THE '986 PATENT

446.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its
Answer, each of its Affirmative Defenses, and Paragraphs 75-98 and 141-163 of its
Counterclaims as if fully set forth herein.

447.   As alleged above, Masimo committed inequitable conduct during
prosecution of the '986 patent by failing to submit to USPTO the trial exhibits, and
in particular Slide 4905, which is required both to locate and to understand Dr.
Stone's Masimo II trial testimony.  That information is highly material to
patentability of the claims of the '986 patent.

448.   As alleged above, but for Mr. Kiani's and Masimo's patent counsel's
decision to deliberately and intentionally withhold that information from the
USPTO, the claims of the '986 patent would not have issued.

449.   An actual case or controversy exists between Masimo and Shenzhen
Mindray based on Masimo having filed a Complaint against Shenzhen Mindray
alleging infringement of the '986 patent.

450.   Shenzhen Mindray has been injured and damaged by Masimo filing a
Complaint asserting the '986 patent.

451.   Declaratory relief is both appropriate and necessary to establish that
the '986 patent is unenforceable and thus cannot be asserted against Shenzhen
Mindray.

## COUNTERCLAIM 34: DECLARATORY JUDGMENT
## OF UNENFORCEABILITY OF THE '154 PATENT

452.   Shenzhen Mindray repeats and realleges Paragraphs 1-144 of its
Answer, each of its Affirmative Defenses, and Paragraphs 75-98 and 164-214 of its
Counterclaims as if fully set forth herein.

453.   As alleged above, Masimo committed inequitable conduct during
prosecution of the '154 patent by misleading the Examiner regarding the continued

152

applicability of the obvious-type double patenting rejection against the claims of the application for the '154 patent, for improperly extending the term of the '154 patent, for failing to disclose to the USPTO the Yorkey and Baker Declarations and exhibits, and by failing to submit to the USPTO Dr. Stone's Masimo II trial testimony and exhibits,  which information is highly material to patentability of the claims of the '154 patent.

454.   As alleged above, but for Mr. Kiani's and Masimo's patent counsel's decision to deliberately and intentionally withhold that information from the USPTO, the claims of the '154 patent would not have issued.

455.   An actual case or controversy exists between Masimo and Shenzhen Mindray based on Masimo having filed a Complaint against Shenzhen Mindray alleging infringement of the '154 patent.

456.   Shenzhen Mindray has been injured and damaged by Masimo filing a Complaint asserting the '154 patent.

457.   Declaratory relief is both appropriate and necessary to establish that the '154 patent is unenforceable and thus cannot be asserted against Shenzhen Mindray.

<p style="text-align:center"><strong>COUNTERCLAIM 35:</strong></p>

<p style="text-align:center"><strong>INFRINGEMENT OF U.S. PATENT NO. 6,308,089</strong></p>

458.   Shenzhen Mindray repeats and realleges Paragraphs 1-48 of its Counterclaims above as if fully set forth herein.

459.   United States Patent No. 6,308,089 ("the '089 patent"), entitled "Limited Use Medical Probe," duly and legally issued on October 23, 2001.  A true and correct copy of the '089 patent is attached hereto as Exhibit 1.

460.   Shenzhen Mindray is the owner by assignment of all rights, title and interest in the '089 patent, including the right to sue and recover for past infringement.

461.   Upon information and belief, beginning in 2009, Masimo has directly infringed one or more claims of the '089 patent by making, using, offering for sale, and/or selling pulse oximeter monitors and OEM circuit boards that include its X-Cal technology.

462.   Upon information and belief, beginning in 2011, Masimo has directly infringed one or more claims of the '089 patent by making, using, offering for sale, and/or selling disposable sensors that incorporate its X-Cal technology.

463.   Upon information and belief, beginning in 2009, Masimo actively induced infringement of one or more claims of the '089 patent by requiring its licensees and distributors to re-engineer their pulse oximeter monitors to accept Masimo OEM circuit boards that include the X-Cal technology.

464.   Upon information and belief, beginning in 2009, Masimo actively induced infringement of one or more claims of the '089 patent by requiring its licensees and distributors to use, offer for sale, and/or sell Masimo disposable sensors that include the X-Cal technology.

465.   Masimo's infringement of the '089 patent has injured and been to the detriment of Shenzhen Mindray and, as a result thereof, Shenzhen Mindray is entitled to recover damages adequate to compensate it for the infringement complained of herein, but in no event less than a reasonable royalty.

466.   Upon information and belief, Masimo's infringement of the '089 patent has been and continues to be deliberate and willful.  Upon information and belief, Masimo's infringement will continue unless enjoined by this Court.

## COUNTERCLAIM 36:

## INFRINGEMENT OF U.S. PATENT NO. 7,048,687

467.   Shenzhen Mindray repeats and realleges Paragraphs 1-48 of its Counterclaims above as if fully set forth herein.

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

468.   United States Patent No. 7,048,687 ("the '687 patent"), entitled "Limited Use Medical Probe," duly and legally issued on May 23, 2006.  A true and correct copy of the '687 patent is attached hereto as Exhibit 2.

469.   Shenzhen Mindray is the owner by assignment of all rights, title and interest in the '687 patent, including the right to sue and recover for past infringement.

470.   Upon information and belief, beginning in 2009, Masimo has directly infringed one or more claims of the '687 patent by making, using, offering for sale, and/or selling pulse oximeter monitors and OEM circuit boards that include its X-Cal technology.

471.   Upon information and belief, beginning in 2011, Masimo has directly infringed one or more claims of the '687 patent by making, using, offering for sale, and/or selling disposable sensors that incorporate its X-Cal technology.

472.   Upon information and belief, beginning in 2009, Masimo actively induced infringement of one or more claims of the '687 patent by requiring its licensees and distributors to re-engineer their pulse oximeter monitors to accept Masimo OEM circuit boards that include the X-Cal technology.

473.   Upon information and belief, beginning in 2009, Masimo actively induced infringement of one or more claims of the '687 patent by requiring its licensees and distributors to use, offer for sale, and/or sell Masimo disposable sensors that include the X-Cal technology.

474.   Masimo's infringement of the '687 patent has injured and been to the detriment of Shenzhen Mindray and, as a result thereof, Shenzhen Mindray is entitled to recover damages adequate to compensate it for the infringement complained of herein, but in no event less than a reasonable royalty

475.   Upon information and belief, Masimo's infringement of the '687 patent has been and continues to be deliberate and willful.  Upon information and belief, Masimo's infringement will continue unless enjoined by this Court.

# **DEMAND FOR JURY TRIAL**

Shenzhen Mindray demands a trial by jury of any and all issues in this action so triable.

# **PRAYER FOR RELIEF**

Wherefore, Shenzhen Mindray requests that the Court enter judgment for Shenzhen Mindray, and award it the following relief:

A. Dismiss Masimo's First Amended Complaint with prejudice and find that Masimo takes nothing by its claims against Shenzhen Mindray;

B. Enter judgment in favor of Shenzhen Mindray, and against Masimo, on the Complaint;

C. Declare that Shenzhen Mindray has not infringed any of the '952, '222, '086, '194, '060, '986, '958, '154 or '533 patents or any valid asserted claim therein;

D. Declare that the claims of the '952, '222, '086, '194, '060, '986, '958, '154 and '533 patents are invalid;

E. Declare that the claims of the '222, '986, '958 and '154 patents are unenforceable for inequitable conduct;

F. Enter judgment that all of the '533, '060, '986, '958 and '154 patents are unenforceable under the doctrine of prosecution laches.

G. Declare that all of the '952, '222, '086, '194, '060, '986, '958, '154 and '533 patents are unenforceable against Shenzhen Mindray due to patent misuse;

H. Enjoin Plaintiff, its assigns, and all those in privity therewith from asserting any of the '952, '222, '086, '194, '060, '986, '958, '154 or '533 patents against Shenzhen Mindray or any of its customers or suppliers;

I. Declare that Masimo has violated the Antitrust laws by virtue of the anti-competitive conduct and exclusionary practices alleged herein

J. Award Shenzhen Mindray the damages to which it is entitled under the Antitrust laws, including treble damages, costs, and attorneys' fees pursuant to

156

15 U.S.C. § 15(a);

K.     Enjoin Masimo and grant Shenzhen Mindray permanent injunctive relief prohibiting Masimo from further engaging in the anti-competitive conduct and exclusionary practices alleged of herein;

L.     Award Shenzhen Mindray its actual damages to which it is entitled on Claims 10 and 11, including costs and attorneys' fees;

M.     Award Shenzhen Mindray punitive damages against Masimo for its willful, malicious and oppressive acts undertaken with intent to harm Shenzhen Mindray, as alleged in Claims 10 and 11;

N.     Enter judgment that Masimo has directly infringed one or more claims of the '089 patent;

O.     Enter judgment that Masimo has indirectly infringed one or more claims of the '089 patent;

P.     Enter judgment that Masimo has directly infringed one or more claims of the '687 patent;

Q.     Enter judgment that Masimo has indirectly infringed one or more claims of the '687 patent;

R.     Enter judgment that Masimo has willfully infringed one or more of the '089 and '687 patents;

S.     Enter judgment trebling damages for Masimo's willful infringement under 35 U.S.C. § 284;

T.     Issue a preliminary and permanent injunction enjoining Masimo, its officers, agents, servants, representatives, licensees, successors, assigns, and those person in active concert or participation with any of them, from directly or indirectly infringing the '089 patent;

U.     Issue a preliminary and permanent injunction enjoining Masimo, its officers, agents, servants, representatives, licensees, successors, assigns, and those person in active concert or participation with any of them, from directly or

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

1  indirectly infringing the '687 patent;

2      V.    Award Shenzhen Mindray damages adequate to compensate it for the

3  infringement of the '089 patent but in no event less than a reasonable royalty for

4  use of the invention together with interest and costs under 35 U.S.C. § 284;

5      W.    Award Shenzhen Mindray damages adequate to compensate it for the

6  infringement of the '687 patent but in no event less than a reasonable royalty for

7  use of the invention together with interest and costs under 35 U.S.C. § 284;

8      X.    Award Shenzhen Mindray pre-judgment and post-judgment interest

9  on the damages assessed;

10      Y.    Find this case an exceptional case and award Shenzhen Mindray its

11  attorneys' fees and costs under 35 U.S.C. § 285 and/or Rule 11 of the Federal

12  Rules of Civil Procedure; and

13      Z.    Grant Shenzhen Mindray such other and further relief as the Court

14  deems appropriate and just under the circumstances.

15

16  Executed on April 10, 2014

17                              FOLEY & LARDNER LLP

18                              /s/ *Nicola A.Pisano*

19                              Nicola A. Pisano

20                              Attorneys for Defendant, Counter-Plaintiff and Counter Counter-Defendant

21                              SHENZHEN MINDRAY BIO-MEDICAL

22                              ELECTRONICS CO., LTD.

23

24

25

26

27

28

4836-1853-1610.4

1

## CERTIFICATE OF SERVICE

2      I hereby certify that I electronically filed the foregoing with the Clerk of the

3 Court using the CM/ECF system which will send notification of such filing to the

4 Electronic Service List for this case.

5 Executed on April 10, 2014.

6                                        FOLEY & LARDNER LLP

7

8

9                                        /s/ Nicola A. Pisano
                                         Nicola A. Pisano (CA Bar No. 151282)
10                                           npisano@foley.com

11                                       Attorneys for Defendant, Counter-Plaintiff
                                         and Counter Counter-Defendant
12                                       SHENZHEN MINDRAY BIO-MEDICAL
                                         ELECTRONICS CO., LTD.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOURTH AMENDED ANSWER AND COUNTERCLAIMS
OF SHENZHEN MINDRAY

4836-1853-1610.4

# EXHIBIT 1

US006308089B1

| (12) | **United States Patent** | | (10) **Patent No.:** | **US 6,308,089 B1** |
|---|---|---|---|---|
| | von der Ruhr et al. | | (45) **Date of Patent:** | **Oct. 23, 2001** |

(54) **LIMITED USE MEDICAL PROBE**

(75) Inventors: **Gerhard von der Ruhr**, Brookfield; **Dennis E. Bahr**, Madison; **Michael T. Larsen**, Brookfield, all of WI (US)

(73) Assignee: **O.B. Scientific, Inc.,** Brookfield, WI (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/291,769**

(22) Filed: **Apr. 14, 1999**

(51) Int. Cl.[7] .......................................... **A61B 5/04**

(52) U.S. Cl. ............................................. **600/338**; 600/588

(58) **Field of Search** .................................. 600/588, 639, 600/325, 338, 372–377

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,898,179 | * | 2/1990 | Sirota ..................................... | 600/486 |
|---|---|---|---|---|
| 5,155,697 | * | 10/1992 | Altmayer et al. ..................... | 364/550 |
| 5,162,725 | * | 11/1992 | Hodson et al. ....................... | 324/115 |
| 5,228,440 | * | 7/1993 | Chung et al. ......................... | 600/338 |
| 5,400,267 | * | 3/1995 | Dinen et al. .......................... | 364/552 |
| 5,411,024 | * | 5/1995 | Thomas et al. ....................... | 600/325 |
| 5,438,996 | * | 8/1995 | Kemper ................................. | 600/437 |
| 5,645,563 | * | 7/1997 | Hann et al. ........................... | 606/202 |

FOREIGN PATENT DOCUMENTS

WO 00/53082    9/2000   (WO) .

* cited by examiner

*Primary Examiner*—Cary O'Connor
*Assistant Examiner*—Pamela Wingood
(74) *Attorney, Agent, or Firm*—Reinhart, Boerner, Van Deuren, Norris & Rieselbach, s.c.

(57)          **ABSTRACT**

A limited use medical probe is disclosed. The medical probe includes a memory storage component for maintaining a use value, representing either the number of uses and/or the duration of use of the medical probe. The medical probe is coupled to a medical monitoring device which prevents the performance of monitoring functions when the number of uses or the total duration of use reaches a predetermined threshold value, thereby preventing overuse of the probe.

**34 Claims, 5 Drawing Sheets**



EXHIBIT 1 PAGE 160

U.S. Patent          Oct. 23, 2001          Sheet 1 of 5          US 6,308,089 B1



Fig. 1

EXHIBIT 1 PAGE 161



40
WRITE TO PROBE WAIT FOR ACKNOWLEDGE
NO
DISPLAY MESSAGE DISABLE MONITOR
41
YES
42
SECURITY FUNCTION
FAIL
43
DISPLAY MESSAGE DISABLE MONITOR
PASS
44
STORE SERIAL NUMBER DATA
46
READ USE VALUE
50
48
COMPARE USE VALUE TO THRESHOLD
EQUAL
DISPLAY MESSAGE DISABLE MONITOR
NOT EQUAL
52
DISPLAY USE VALUE
62
54
CHECK FOR MONITOR ON SIGNAL
OFF
STOP MONITOR STORE USE VALUE STORE DATA/TIME STAMP
ON
56
DECREMENT USE VALUE
58
60
COMPARE USE VALUE TO THRESHOLD
EQUAL
DISPLAY MESSAGE DISABLE MONITOR
REPLACE PROBE

Fig. 2



*Fig. 3*

EXHIBIT 1 PAGE 163



Fig. 4



Fig. 5



Fig. 7



Fig. 8

EXHIBIT 1 PAGE 164

U.S. Patent        Oct. 23, 2001        Sheet 5 of 5        US 6,308,089 B1



*Fig. 6*

EXHIBIT 1 PAGE 165

US 6,308,089 B1

1

## LIMITED USE MEDICAL PROBE

### FIELD OF THE INVENTION

The present invention relates generally to medical sensor devices and methods for measuring clinical physiological parameters including vital signs. More particularly, the invention is concerned with a medical monitoring system that limits the duration and/or number of uses of an associated sensor device to prevent overuse and potential failure.

### BACKGROUND

Medical sensor devices, such as internal probes that are inserted into a body cavity or under the skin of a patient in order to monitor biological parameters, are well known in the art. Typically, such devices comprise a housing including at least one monitoring element such as a pressure sensor, a light emitting device and associated detector, an ECG sensor, or other vital sign monitoring device. One particular example of a medical sensor device is fetal sensor, such as that described in U.S. Pat. No. 5,425,362. Fetal sensors are inserted into the uterine wall of a mother to noninvasively monitor the condition of a fetus, a mother, and a placenta.

One problem associated with known medical sensor devices is that they have a limited life span. Sensor devices are prone to wear through repeated use or through extended use over a period of time. Problems associated with such overuse include spurious readings as internal wires and connectors become loose. More importantly, sensor devices that are used repeatedly or over an extended period of time are prone to break. Once such an incident occurs, it is often difficult to determine when the sensor failed, or to track the cause of such an occurrence.

To prevent these problems, medical clinicians may limit the number and duration of uses of a given medical sensing device through an equipment log or other manual system. While such systems may be effective in certain circumstances, they rely heavily on manual records, which are time-consuming and difficult to maintain, particularly since the cooperation of a number of clinical personnel is required. In busy hospital settings, and especially in emergency situations, such systems are difficult to manage and are easily overlooked or ignored.

There remains, therefore, a need for a medical monitoring system that can automatically limit the usage of medical sensor devices. Such a system would preferably limit the duration or number of uses of a given medical sensing device to a predetermined limit value. Preferably, the medical monitoring system would also provides additional functions, such as error checking, time and date stamping, and security checking.

It is therefore an object of the invention to provide a medical monitoring system that can limit the number of times a medical sensor device is used.

It is another object of the invention to provide a medical monitoring system that can limit the duration of the use of a medical sensor device.

It is still another object of the invention to provide a medical monitoring system that provides a time and date stamp to identify monitoring processes performed by monitoring equipment.

It is a still further object of the invention to provide a medical sensor device that can store information regarding the duration of use of the device.

It is another object of the invention to provide a medical monitoring device that can store information regarding the number of times the device has been used.

2

It is a yet further object of the invention to provide a medical monitoring system that can provide product identity of an associated medical sensor device.

It is still another object of the invention to provide a medical monitoring system that includes a security function for verifying the identity of attached sensors.

It is yet another object of the invention to provide a medical monitoring system that includes a security function to prevent tampering with stored data.

### SUMMARY OF THE INVENTION

In one aspect, the present invention is a medical probe that includes at least one sensor device and a memory storage component capable of communicating with external devices for maintaining data about usage of the probe. The memory storage component can include information regarding the number of times the medical probe has been used, the duration of each use, the total duration of use, and other information regarding the duty cycle of usage of the medical probe. Other parameters, including the date and time of a given use of the sensor, the date and time when a given condition occurred, product identity, clinical information such as patient or doctor data, and other medical information can also be stored in the memory storage location of the sensor device. The medical probe is preferably identified by a unique serial number that can be used in a security function to identify the device and prevent tampering with the use data.

The medical probe is coupled to a monitoring device to provide a medical monitoring system. The monitoring device, through communications with the medical probe, determines usage of the medical probe and limits the total use of each medical probe to a limit value by preventing use beyond a predetermined limit. The limit, as noted above, can be based on either total number of uses, total duration of use, or a combination of both. The monitoring device, in conjunction with the medical probe, provides a security function for verifying the identity of the sensor device. Preferably, the security function operates on internal serial numbers and encryption keys to ensure that the proper probes are coupled to the monitoring system, that the internal use data has not been tampered with, and to verify communications between the medical probe and monitoring device.

The monitoring system can also provide a series of product identity functions, as well as stored data for identifying the equipment used in a given monitoring procedure. The stored data can include serial numbers of the equipment used, a date and time stamp, information regarding the medical personnel involved in a monitoring procedure, patient data, and other information.

In one highly preferred embodiment of the invention, the medical monitoring system comprises a fetal sensor for monitoring oxygen saturation in the blood of a fetus while in the womb. Preferably the memory storage component comprises a token counter chip that is coupled directly to the fetal sensor connector. The token counter chip preferably includes memory storage, a counter that can store a use value, and a built-in security function to prevent tampering.

Other advantages and features of the invention, together with the organization and manner of operation thereof, will become apparent from the following detailed description when taken in conjunction with the accompanying drawings wherein like elements have like numerals throughout the drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a medical monitoring system constructed in accordance with one embodiment of the present invention.

EXHIBIT 1 PAGE 166

US 6,308,089 B1

3

FIG. 2 is an operational block diagram of a medical monitoring system constructed in accordance with one embodiment of the present invention.

FIG. 3 is a fetal sensor monitor constructed in accordance with one embodiment of the present invention.

FIG. 4 is a simplified view of a medical monitoring system constructed in accordance with the present invention.

FIG. 5 is a simplified internal view of the connector shown in FIG. 4.

FIG. 6 is a block diagram of one preferred component of the medical probe shown in FIG. 1.

FIG. 7 is a simplified isometric view of one embodiment of a memory storage component of FIG. 1.

FIG. 8 is a section view along the line 8—8 shown in FIG. 7.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring now to the figures, and more particularly to FIG. 1, a block diagram of a medical monitoring system constructed in accordance with one preferred embodiment of the present invention is shown at 10. Generally, the medical monitoring system 10 comprises a monitoring device 12 and a medical probe 14.

Preferably, the monitoring device 12 includes a controller 16, at least one memory storage component 18, and a display 20. Preferably, the controller 16 includes a communications port 19 for communicating with external devices, either serially or through other types of digital communications. In some applications, however, additional types of communication devices may also be used. The controller 16 is preferably a microprocessor, but can comprise a microcontroller or various other types of control devices. Furthermore, although the memory component 18 is shown as comprising a RAM device 22 and an EPROM 24, other known types of memory devices may be used without departing from the invention. Preferably, the monitoring device will include nonerasable memory components for storing a serial number, as will be described more fully below. In some applications, the controller 16 may include an on board memory component 18, thereby eliminating the need for external memory devices.

The medical probe 14 generally comprises a sensor 24 and a memory storage component 26. The sensor 24 may comprise any of a number of sensor devices including pressure sensors, ECG sensors, EEG sensors, temperature sensors, oxygen sensors, ultrasound transducers, chemical sensors, or, as shown, light emitting devices 28, 30 and associated detector 32. The selection of sensor devices 24 and associated hardware used in the medical monitoring system 12 is dependent only on the type of medical monitoring to be performed without reference to other aspects of the invention. The memory storage component 26 can comprise a number of various known devices including microcontrollers or microprocessors, EPROMS, EEPROMS, or application specific chips. These devices provide a memory location for maintaining data concerning use of the medical probe 14. The memory storage component 26 also includes communication capabilities such as a serial communications port 27 or other digital communication means. In some applications, separate communication devices may also be included. Preferably, more sophisticated devices that provide functions such as product identity, security checking, and date and time stamping are used. In one highly preferred embodiment of the invention, the

4

memory storage component comprises a token card chip that includes both memory storage and security functions. Other highly preferred devices include EEPROMS with built-in CRC and serial number functions. These preferred devices will be described more fully below.

As noted above, an important function of the memory storage component 26 is to provide a storage location for maintaining data regarding the duration of use of the medical probe 14, and/or to maintain a history of the number of uses of the medical probe 14. This data will hereinafter be referred to as the use value. The memory storage component can also store security information such as serial numbers, product identity and encryption keys; troubleshooting data such as date and time stamp data, the identity of medical workers involved in the monitoring process, and patient data; and other types of data. In alternative embodiments, the memory storage component 26 may also be used to store the results of error checking routines and other testing data. The memory storage 18 of the monitoring device 12 preferably also includes security information including serial numbers identifying the monitoring device and encryption keys, that can be used to verify communications and identify devices as will be described below. For security reasons, this information is preferably stored in nonerasable memory components (not shown). The memory storage 18 preferably also stores troubleshooting and calibration information to provide a cross check against the information stored in the medical probe 14.

In initial setup stages, an initial use value representing either a count or time duration is written into the memory storage component 26. A serial number identifying the medical probe 14, and one or more encryption keys can also be stored in the memory storage component 26. The serial number is preferably used to identify a specific medical probe 14, as well as to identify a type of probe. Serial number and encryption keys are also preferably stored in the memory component 18 of the monitoring device 12. As noted above, this type of information is preferably stored in nonerasable memory locations. The serial numbers and encryption keys can be used to provide a security function, as described below.

Referring now to FIG. 2, an operational block diagram of one embodiment of the medical monitoring system 10 is shown. To ensure a proper connection and verify that a proper medical probe 14 is coupled to the monitoring device 12, an initial query can be transmitted to the medical probe 14. After transmitting such a query to the medical probe 14, the medical monitoring device 12 waits for an acknowledge signal from the medical probe 14 prior to performing any further steps. The query and acknowledge sequence 40 verifies that the memory storage component 26 is receiving power and can communicate with the controller 16 in the monitoring device 12 through a serial or other communications link. If no acknowledgment is received, the controller 16 of the medical device 12 will determine that the medical probe 14 currently attached is an incorrect device or is not functional. Preferably, the controller will provide a message to the display 20 and disable monitoring functions until a suitable medical probe 14 is attached (Step 41). Although a query and acknowledge step is shown, it will be apparent to one of ordinary skill in the way that the step is not required. Furthermore, the ability to perform this step will depend on the functionality of the component chosen as the memory storage component 26 in the medical probe 14.

To further ensure that a proper medical probe 14 is coupled to the monitoring devices 12, to secure communications between the devices, and to prevent tampering with

EXHIBIT 1 PAGE 167

US 6,308,089 B1

5

the use value stored in the memory storage component **26**, the medical monitoring system **10** of the present invention preferably uses the serial numbers and encryption keys described above to provide a security function **42**. Each serial number is preferably encrypted and serially transmitted to the other device (i.e. from the medical probe **14** to the monitoring device **12** and from the monitoring device **12** to the medical probe **14**), which includes the numerical encryption keys and algorithms to decrypt the transmitted data. Encryption can be provided through known systems such as cyclical redundancy checks and/or public key encryption systems that serve not only to verify transmissions, and validate data, but also to determine a signature of the transmitted data, thereby identifying the specific sending device. Preferably, the monitoring device **12** cannot access the use value stored in the memory storage component **26** until the identity of the monitoring device **12** is established. If the security function fails to verify the identify of the probe **14**, a message is preferably written to the display **20** of the monitoring device **12** and the controller **16** of the monitoring device **12** disables monitoring functions until a new medical probe **14** is attached (Step **43**). Preferably, the security function also verifies the contents of the memory component **26** has not been tampered with before proceeding.

Upon completion of the security check, the identity of the medical probe **14**, as defined by the serial number, is preferably stored in the memory **18** of the monitoring system **12** for identification purposes. The serial number of the monitoring device **12** can also be stored in the memory storage component **26** to provide a cross check, as will be described more fully below (Step **44**). The monitoring system **12** can also use the serial number and other identification information to determine the type of probe being used. For example, the monitoring system **12** can determine if the attached medical probe **14** is a fetal monitoring sensor, a finger sensor, or other sensor device more commonly used with adults. Using this information, the monitoring system **12** can adjust monitoring parameters and algorithms to meet specific monitoring requirements.

Once the identity and contents of the memory storage component **26** of the memory probe **14** are verified, the monitoring device **12** reads the use value (Step **46**) from the memory storage component **26** and preferably stores the value in internal memory **18** of the monitoring device **12**. The use value can then be compared to a stored threshold value representing the probe use limit in terms of either count or duration to verify that the use value associated with the medical probe **14** has not reached the limit. (Step **48**) If the use value is substantially equivalent to the threshold value, a message indicating that a new probe is required is preferably written to the display **20**, and monitoring functions are disabled until a suitable probe is connected to the monitoring device **12**. (Step **50**). In some embodiments the use value is written to the display **20** by the controller **16** to alert medical personnel to the remaining usefulness of the medical probe **14** (Step **52**). If the amount of time or number or remaining uses is limited, this information can be used to determine whether to replace the medical probe **14** or proceed with the procedure. In alternative embodiments, an error checking routine, wherein each of the sensors **24** of the medical probe **14** are activated to verify proper output can be performed prior to using the probe **14**. The results of these tests can be stored in internal memory of the memory storage device **26** in the medical probe **14**, written to the memory **18** of the monitoring device **12**, written to the display **20** for immediate review by medical personnel, or a combination of

6

the above. In some applications, where the memory storage component **26** is a microcontroller, microprocessor, or other device with more advanced mathematical capabilities, the use value can be maintained in the memory storage component **26** and updated internally.

Any signal normally used by the monitoring device **12** to begin a monitoring sequence can be used as a signal to commence changing the use value (Steps **54** and **56**). Examples of suitable signals are reading an activated pushbutton or other switching device, reading an input signal from an external device, or, in some applications, connecting the medical probe **14** to the monitoring device **12**. In applications where the use value is a count representing a number of total uses, the use value must be changed only once for each monitoring sequence. In these types of applications, when the use value reaches a predetermined number of uses, a message is preferably written to the display **20** of the monitoring device **12**. Preferably, a warning will be written to the display **20** by the controller **16** prior to the last use, thereby allowing medical personnel to obtain a new probe for replacement. In some applications, a continual count may be maintained on the display **20** of the monitoring device **12**. Once the use value has reached the threshold use value, the controller **16** in the monitoring device **12** will prevent any additional monitoring sequences (Step **58**) until the medical probe **14** is replaced (Step **60**). Although changing the use value from an initial use number has been described, it will be apparent to one of ordinary skill in the art that the system **10** could be easily modified to increment, decrement, or use an apparent random sequence.

In applications where the monitored value is a duration of time, a timing function must be activated when a monitoring sequence begins. Preferably, the timing function is performed by the controller **16** in the monitoring device **12**, but in applications where the memory storage device **26** is a microcontroller or other device capable of providing a timing function, the timing function may be performed in the medical probe **14**. When the duration of use of the medical probe **14** is substantially equivalent to a predetermined value, a signal is preferably sent to the display **20** of the monitoring device **12** warning that the limit has been reached. The signal can comprise a message written to an alphanumeric display. Alternatively, the display **20** may comprise a bank of indicator lights or LEDs that provide use and error information. Upon reaching the use limit, the medical probe **14** will preferably continue to operate until the monitoring sequence is complete. Prior to beginning another monitoring sequence, however, the monitoring device **12** will read the use value and will not allow another monitoring sequence to begin until the medical probe **14** is replaced. Again, the timing function can be operated to count either up to a known value, or down from an initial value to zero.

When the monitoring signal is dropped, or a stop monitoring signal is received, (Step **62**) a date and time stamp, along with the identification information of the medical probe **14**, is preferably stored in the memory **18** of the monitoring device, and can be used in conjunction with clinical logs to track the identity of the equipment and the personnel that were involved in a given monitoring procedure. In some applications, the monitoring device **12** may include input devices such as keyboards, serial links, and other communication devices, for logging the identity of clinicians and the patient involved in a procedure, thereby providing a complete log for later review. In a preferred embodiment, RFS identification functions can be incorporated in the monitoring device **12** to identify medical

EXHIBIT 1 PAGE 168

US 6,308,089 B1

7

personnel, patients, and other information. Preferably, date and time stamps, identification of the monitoring device 12, and other identifying information is stored in both the memory storage component 26 of the medical probe 14 and the memory 18 of the monitoring device 12 as a cross check. Storing this information in both locations simplifies the process of later identifying the equipment used in a given monitoring process in the event of a failure. In some applications, detailed information regarding medical parameters encountered in a given procedure may be stored. Alternatively, the controller may check for defined errors or conditions and store data when such conditions occur. Although storing date and time stamp information at the end of a monitoring sequence has been described, it will be apparent to one of ordinary skill in the art that this step could also be taken at the beginning of a monitoring sequence, after the occurrence of predefined conditions, in the event of a serial failure, periodically, or in a number of other ways.

Although a distinct functional block diagram has been shown, it will be apparent to one of ordinary skill in the art that changes in the order of certain functions, modifications of functions, and additions could be made without departing from the invention.

The problems associated with prior art medical sensing devices are particularly acute in fetal monitoring devices. Consequently, in a highly preferred embodiment of the present invention, the medical probe 14 comprises a fetal sensor device 80, as can be seen in FIG. 3. This device is more fully described in U.S. Pat. No. 5,425,362 which is incorporated herein by reference. The fetal sensor device 80 (hereinafter "device 80") includes a housing 82 and a flexible distal end portion 84 with a soft molded tip 86. Preferably the distal end portion 84 is integrally coupled to the remainder of the device 80. The flexible distal end portion 84 and the soft molded tip 86 help minimize the possibility of membrane rupture. As shown in FIG. 3, the device 80 includes a flexible strip 88 (such as spring steel coated with a smooth surfaced coveting 90)(such as a silicone rubber or Teflon).

The device 80 can include preferably one or more of a variety of sensors, such as a pressure sensor 100, an ECG sensor 102, an EEG sensor 104, a temperature sensor 106, an oxygen sensor 108, an ultrasound transducer/sensor 110, a laser diode 112 emitting IR signals with an associated sensor 114, and a chemical sensor 116. In some applications, the pressure sensor 100 can include a balloon type device 118 that can be inflated to variable pressures and used with conventional feed back electronics to maintain a substantially constant pressure of engagement of the device 100 with at least one of the fetus and the uterus of the mother.

In a preferred embodiment, the device 80 uses the various sensors described hereinbefore to measure fetal heart rate (the ECG sensor 102), oxygen saturation in the fetal blood (the oxygen sensor 108 which generally comprises one or more light emitting diodes and associated detectors (not shown), and differences in fetal versus uterine temperature (the temperature sensor 130) to allow a three-pronged decision tree analysis to assess fetal wellness. If there is uterine-placental-fetal insufficiency, there is usually a rapid rise in fetal temperature since fetal heat loss is facilitated by heat exchange by the well-perfused placenta 136. Performance of oximetry studies can differentiate between clinically insignificant marginal heart rate values and significant fetal distress. It is also useful to accumulate ECG data to ascertain the need to deliver a child when a condition of fetal distress occurs. Although a fetal sensor 80 for monitoring a number of medical parameters has been shown, it will be apparent to

8

one of ordinary skill in the art that any combination of sensors could be used depending on the desired application. In preferred embodiments, the device 80 can comprise an oximetry sensor including two or more light emitting devices of varying wavelengths and corresponding detectors. Reflection and absorption of the light is used to calculate oxygenation levels in known ways. In this application the monitoring device 12 comprises an oximeter for calculating the oxygenation levels.

Referring again to FIG. 3, all of the sensor connections are routed to a single electrical connection point designated 120. In a preferred embodiment, the connection point 120 comprises a connector 122 (FIGS. 4 and 5) that couples to a mating connector 124 to the monitoring device 12. The memory storage component 26 is preferably coupled directly to the connector 122 to limit the overall size of the medical probe. Power for the fetal sensor 80 is provided, preferably, by the monitoring device 12.

As noted above, in one highly preferred embodiment of the invention, a token card chip is used as the memory storage component 26. One suitable device is the Keeloq™ Token Card Chip SCS152 manufactured by Microchip Technology Inc. The Data Sheets related to the SCS152 published by Microchip Technology Inc. in 1997 are hereby incorporated by reference. Referring now to FIG. 6, a block diagram reproduced from the referenced data sheet is shown at 130. The token card chip provides memory storage 132 for maintaining a token count value, additional undefined memory storage, a signature calculator 134, a serial input/output port 136, a controller 138, and a command interface 140 comprising two inputs. The signature calculator comprises a built-in security function, thereby eliminating the need to provide additional encryption software. A count value is initialized in the device to provide a use value for the present applications. The token card chip described requires an external signal to change the count value, however, similar devices that automatically change the count value are also available. The command interface 140 and serial input/output port 136 can be coupled to external controllers such as the controller 16 described previously, serial interface devices and other known components to provide memory storage and use value information as described above.

One advantage of the token count chip is that the chip has very low power requirements, and can be powered directly from the power lines routed to the light emitting devices in traditional systems. Connecting the chip to these power lines eliminates the need for additional wiring and prevents tampering to remove power to the counting device.

The token card chip, and other available devices suitable for the present application, are preferably small to fit on the back of the connector 122. Preferably, the token card chip is constructed in a configuration commonly known as the "chip on a shingle". (FIGS. 7 and 8) Chips of this type comprise a glass or ceramic layer 119, a semiconductor layer 121, and a plurality of surface mount-type connectors 123 extending from the side of the semiconductor layer. The chip is consequently very small and can be easily slid onto a connector and soldered in place, thereby minimizing the size of the medical probe 14. Once the chip is soldered to the connector 120, a coating layer 125 is preferably layered over the chip to protect the chip and prevent inadvertent contact with adjacent connecting elements. This layer may comprise liquid tape or any of a number of commonly known substances.

When the medical probe 14 is constructed to include the token card chip, the monitoring device 12 includes the

EXHIBIT 1 PAGE 169

US 6,308,089 B1

9

appropriate hardware and software to interface to the token card chip. Operation of this system is described more fully in U.S. Pat. No. 5,841,866, which is incorporated herein by reference. Generally, however, interfacing equipment must include the ability to complete the security function including the keys required to encrypt and decrypt secure communications and the ability to decrement the token count value.

In another highly preferred embodiment, the memory storage component **26** comprises an EEPROM produced by Dallas Semiconductor, part number DS2430A. The data sheet for this component, as published by Dallas Semiconductor, is hereby incorporated by reference.

The EEPROM is a small, low-powered chip including only three leads: power, ground, and a serial communications pin. A unique serial number is burned into each device during a manufacturing stage, thereby allowing easy identification. The memory further includes a CRC to verify the data contents. The device, therefore, provides many security advantages.

Like the token card chip described above, this device can be coupled directly to the connector **20** to minimize the size and complexity of connections to the medical probe **14**. Communications between the memory storage component **26** and the monitoring device **12** are transmitted through the single communication pin, allowing for simple connections and reduced wiring.

While preferred embodiments have been illustrated and described, it should be understood that changes and modifications can be made thereto without departing from the invention in its broadest aspects. Various features of the invention are defined in the following claims.

We claim:

1. A method for limiting the use of a medical probe to a threshold use value, the method comprising the following steps:

coupling a memory storage component to a medical probe;

coupling the medical probe to a medical monitoring device;

coupling the medical probe to a patient;

retrieving a use value associated with use of the medical probe from the memory storage component;

decrypting stored data to verify that the use value has not been corrupted or tampered with;

updating the use value of the medical probe during use; and

disabling monitoring functions when the use parameter is substantially equivalent to the threshold use value.

2. The method as defined in claim **1**, wherein the decrypted stored data is a serial number identifying the fetal sensor device.

3. The method as defined in claim **1**, wherein the decrypted stored data is the use value.

4. A method for limiting the use of a medical probe to a threshold use value, the method comprising the following steps:

coupling a memory storage component to a medical probe;

coupling the medical probe to a medical monitoring device;

coupling the medical probe to a patient;

monitoring a use value of the medical probe;

disabling monitoring functions when the use parameter is substantially equivalent to the threshold use value;

10

storing identifying information in the memory storage of the medical probe; and

encrypting the identifying information stored in the medical probe, transmitting the encrypted serial number to the monitoring device, and decrypting the serial number in the monitoring device.

5. The method as defined in claim **4**, further comprising the step of displaying a message indicating that a new medical probe is required.

6. The method as defined in claim **4**, further comprising the step of storing identifying information in a memory storage of the medical monitoring device.

7. The method as defined in claim **6**, further comprising the steps of using the stored identifying information to verify the identity of the medical monitoring device.

8. The method as defined in claim **4**, further comprising the step of storing a time and date stamp in the medical probe.

9. The method as defined in claim **4**, further comprising the step of storing a time and date stamp and the identifying information in the monitoring device.

10. The method as defined in claim **4**, further comprising the steps of transmitting a query signal from the monitoring device to the medical probe and waiting for an acknowledge signal from the medical probe device prior to beginning a medical monitoring process.

11. The method as defined in claim **4**, wherein the threshold use value comprises a duration of use of the probe in conjunction with a medical device.

12. The method as defined in claim **4**, wherein the threshold value is a count of number of uses of the probe in conjunction with a medical device.

13. The method as defined in claim **4**, wherein a public key encryption system is used to encrypt and decrypt the transmitting serial number.

14. A limited use fetal sensor device comprising:

a housing;

at least one sensor device; and

a token chip card including a communications port, the token chip card storing a use value for limiting the use of the probe to a predetermined threshold value.

15. A medical monitoring system comprising:

a medical probe including at least one sensor, a memory storage component, a communications port, a sensor, and a probe connector, wherein the memory storage component includes a use value for limiting a usage of the medical probe, a serial number identifying the medical probe and at least one encryption key; and

a monitoring device including a monitor connector, a controller, a memory storage device storing a serial number identifying the monitoring device and at least one encryption key, and a communications port, wherein the monitoring device limits the usage of the medical probe to a predetermined threshold value.

16. The medical monitoring system as defined in claim **15**, wherein the medical probe is a fetal sensor.

17. The medical monitoring system as defined in claim **15** further comprising a display coupled to the monitoring device.

18. The medical monitoring system as defined in claim **17**, wherein the display provides alphanumeric messages relating to the use value or the use threshold.

19. A method for verifying the identity of components of a medical monitoring system to prevent tampering with stored data:

storing a serial number, an encryption key, and at least one medical monitoring parameter in a memory storage component of a medical probe;

EXHIBIT 1 PAGE 170

US 6,308,089 B1

**11**

storing a serial number and an encryption key in a memory storage component of a medical monitoring device;

coupling the medical probe to the medical monitoring device,

encrypting the serial number stored in the medical probe, transmitting the encrypted serial number to the medical monitoring device, and decrypting the serial number in the medical monitoring device;

verifying the identity of the medical monitoring device through the decrypted data;

allowing the medical monitoring device to access the medical monitoring parameter if the identity of the medical monitoring device is verified; and

preventing the medical monitoring device from accessing the medical monitoring parameter if the identity of the monitoring device is not verified.

**20**. The method as defined in claim **19**, wherein the medical monitoring parameter is a use value.

**21**. The method as defined in claim **19**, further comprising the step of storing the medical monitoring parameter in a non-erasable memory component to prevent erasure.

**22**. The method as defined in claim **21**, wherein the memory component is an EPROM.

**23**. The method as defined in claim **19**, wherein the medical monitoring parameters include a use value and a threshold value.

**24**. A method for maintaining a history of the use of a medical probe, the method comprising the following steps:

storing a serial number identifying the medical probe in a memory component of the medical probe;

storing a date and time stamp in the memory component of the medical probe;

storing the identity of a medical worker associated with a procedure and storing the identity of the medical worker in the memory component of the medical probe;

storing patient data in the medical probe; and

retrieving the stored information to provide a history of a medical procedure.

**25**. The method as defined in claim **24**, further comprising the steps of coupling the medical probe to a medical monitoring device, storing the serial number of the medical monitoring device in a memory component of the medical probe, and storing a serial number identifying the medical probe in the medical monitoring device.

**26**. The method as defined in claim **25**, further comprising the step of storing the date and time stamp in the medical probe.

**12**

**27**. The method as defined in claim **25**, further comprising the step of storing the identity of the medical worker in the medical probe.

**28**. The method as defined in claim **25**, further comprising the step of storing the patient data in the medical probe.

**29**. The method as defined in claim **25**, further comprising the steps of coupling a medical probe to the medical monitoring device, transmitting a serial number identifying the medical probe to the medical monitoring device, storing the serial number identifying the medical monitoring device in the medical probe, storing the patient data, medical worker identity, and patient data in the medical probe as a cross check of the data in the medical monitoring device.

**30**. The method as defined in claim **25**, further comprising the step of encrypting at least one of the serial number of the medical monitoring device and the serial number of the medical probe to prevent tampering.

**31**. A limited use fetal sensor device comprising:

a housing;

at least one sensor device; and

a memory storage component storing a protected use value for limiting the use of the probe to a predetermined threshold value, wherein the memory storage component further includes a medical history of the use of the fetal sensor device.

**32**. The fetal sensor device as defined in claim **31**, wherein the memory storage component includes an encrypted serial number identifying the fetal sensor device.

**33**. The fetal sensor device as defined in claim **31**, wherein the memory storage component further includes an encrypted serial number of each of a plurality of medical devices to which the fetal sensor device has been connected.

**34**. A medical monitoring system comprising:

a medical probe including at least one sensor, a token card chip, a communications port, a sensor, and a probe connector, wherein the token card chip includes a use value for limiting a usage of the medical probe and a serial number identifying the medical probe; and

a monitoring device including a monitor connector, a controller, a memory storage device storing a serial number identifying the monitoring device, and a communications port, wherein the monitoring device limits the usage of the medical probe to a predetermined threshold value.

\*    \*    \*    \*    \*

EXHIBIT 1 PAGE 171

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.   : 6,308,089 B1                                              Page 1 of  1
DATED          : October 23, 2001
INVENTOR(S)  : Gerhard von der Ruhr, Dennis E. Bahr and Michael T. Larsen

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

<u>Title page,</u>
Item [73], "**O.B. Scientific, Inc.**" should be -- **OB Scientific, Inc.**"

Signed and Sealed this

Fifteenth Day of October, 2002

*Attest:*

*Attesting Officer*

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

EXHIBIT 1 PAGE 172

# EXHIBIT 2

US007048687B1

(12) **United States Patent**　　　　　　　(10) **Patent No.:**　　**US 7,048,687 B1**
Reuss et al.　　　　　　　　　　　　　　　　(45) **Date of Patent:**　　　　**May 23, 2006**

(54) **LIMITED USE MEDICAL PROBE**

(75) Inventors: **James L. Reuss**, Waukesha, WI (US);
**Gerhard von der Ruhr**, Brookfield,
WI (US); **Dennis E. Bahr**, Middleton,
WI (US); **Michael T. Larsen**,
Brookfield, WI (US)

(73) Assignee: **OB Scientific, Inc.**, Germantown, WI
(US)

( * ) Notice:　　Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 262 days.

(21) Appl. No.: **10/361,167**

(22) Filed:　　　**Feb. 6, 2003**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/045,475,
filed on Oct. 22, 2000, now abandoned, which is a
continuation of application No. 09/291,769, filed on
Apr. 14, 1999, now Pat. No. 6,308,089.

(51) **Int. Cl.**
　　*A61B 5/00*　　　　(2006.01)
(52) **U.S. Cl.** ........................ **600/300**; 600/338; 600/376
(58) **Field of Classification Search** ................ 600/300,
600/325, 338, 588, 639, 372–377;  705/2,
705/29
See application file for complete search history.

(56)　　　　　**References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,162,725 A | 11/1992 | Hodson | |
| 5,383,874 A | 1/1995 | Jackson et al. | |
| 5,400,267 A | 3/1995 | Denen et al. | |
| 5,425,362 A | 6/1995 | Siker et al. | |
| 5,651,780 A | 7/1997 | Jackson et al. | |
| 5,720,293 A * | 2/1998 | Quinn et al. | 600/505 |
| 5,850,443 A * | 12/1998 | Van Oorschot et al. | 380/285 |
| 5,860,099 A * | 1/1999 | Milios et al. | 711/103 |
| 5,939,609 A | 8/1999 | Knapp et al. | |

| | | | |
|---|---|---|---|
| 5,987,343 A * | 11/1999 | Kinast | 600/323 |
| 5,991,355 A | 11/1999 | Dahlke | |
| 6,163,715 A | 12/2000 | Larsen et al. | |
| 6,237,604 B1 | 5/2001 | Burnside et al. | |
| 6,266,551 B1 | 7/2001 | Osadchy et al. | |
| 6,298,255 B1 * | 10/2001 | Cordero et al. | 600/372 |
| 6,308,089 B1 | 10/2001 | von der Ruhr et al. | |
| 6,339,715 B1 | 1/2002 | Bahr et al. | |
| 6,708,049 B1 * | 3/2004 | Berson et al. | 600/323 |
| 2002/0095077 A1 | 7/2002 | Swedlow et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

DE　　　　19825754 A1　　1/1999

(Continued)

OTHER PUBLICATIONS

Cammack T. Statement to the Food & Drug Administration,
Public Hearing on Bar Coding, Friday, Jul. 26, 2002
Bethesda MD; NIH, Jul. 26, 2002 pp. 1-3.

(Continued)

*Primary Examiner*—Eric F. Winakur
(74) *Attorney, Agent, or Firm*—Reinhart Boerner Van
Deuren sc

(57)　　　　　　**ABSTRACT**

A limited use medical probe is disclosed, including a
memory for maintaining a use value. The medical probe is
coupled to a medical device that inhibits its function when
the use value reaches a predetermined threshold value,
preventing improper use of the probe. The probe memory
may also store identification, usage, and clinical data. A
probe auto-identification function, a probe re-identification
function and a probe functional test sequence are disclosed
for the medical probe. After use, a reprocessing step may
reset the probe memory, permitting further probe use.

**19 Claims, 9 Drawing Sheets**



EXHIBIT 2 PAGE 173

**US 7,048,687 B1**

Page 2

U.S. PATENT DOCUMENTS

2002/0095078 A1    7/2002  Mannheimer et al.

FOREIGN PATENT DOCUMENTS

| WO | WO97/29678 | 8/1997 |
| WO | WO 99/49313 | 9/1999 |

OTHER PUBLICATIONS

Kohn T. Corrigan J. Donaldson M (ed). To err is human: Building a safer health system. Institute of Medicine, National Academy Press; 1999, pp. 23-38, Washington, D.C..

DS2480 Serial 1-Wire™ Line Driver. Dallas Semiconductor, Inc.; 1999, pp. 1-26.
DS2502 1 kbit Add-Only Memory. Dallas Semiconductor, Inc.; 1999, pp. 1-22.
Labeling Recommendations for Single-Use Devices Reprocessed by Third Parties and Hospitals; Final Guidance for Industry and FDA. US HHS FDA CORH, Rockville MD; Jul. 30, 2001, pp. 1-9.
Premarket Guidance: Reprocessing and Reuse of Single-Use Devices; Draft Guidance for Industry and FDA Staff. US HHS FDA CORH, Rockville MD; Jun. 1, 2001, pp. 1-12.

* cited by examiner

EXHIBIT 2 PAGE 174



**FIG. 1**

EXHIBIT 2 PAGE 175

Case 8:12-cv-02206-CJC-JPR   Document 144   Filed 04/10/14   Page 178 of 199   Page ID #:8009



**FIG. 2**

EXHIBIT 2 PAGE 176



Start
38
Probe in place?
NO
YES
41
42
40
Probe read: acknowledge?
NO
Display: "Replace Probe"
Inhibit probe functionality
YES
43
Security function?
fail
pass
44.1
44
Probe Functional Test?
fail
Report Functional Test Results
pass
45
Auto-identification & serial number storage
fail
pass
46
Read probe data (use values, clinical data)
re-identified
Using probe (Step 52)
50
new use
48
Usage criteria violated?
YES
Display violation message and/or generate audible alarm
NO
Using probe (Step 52)
Probe not in use

FIG. 3A

**U.S. Patent**          **May 23, 2006**          **Sheet 4 of 9**          **US 7,048,687 B1**



**FIG. 3B**

EXHIBIT 2 PAGE 178



**FIG. 3C**

EXHIBIT 2 PAGE 179



**FIG. 4**

EXHIBIT 2 PAGE 180



FIG. 5

EXHIBIT 2 PAGE 181

**U.S. Patent**     **May 23, 2006**     **Sheet 8 of 9**     **US 7,048,687 B1**



FIG. 6

EXHIBIT 2 PAGE 182



**FIG. 7**

EXHIBIT 2 PAGE 183

US 7,048,687 B1

**1**

## LIMITED USE MEDICAL PROBE

This application is a continuation-in-part of application Ser. No. 10/045,475, filed Oct. 22, 2001 now abandoned, which is a continuation of application Ser. No. 09/291,769, filed Apr. 14, 1999, which is now issued as U.S. Pat. No. 6,308,089 on Oct. 23, 2001, the disclosures of which are incorporated herein by reference.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to medical probes, including sensor devices and methods for measuring clinical physiological parameters including vital signs. More particularly, the invention is concerned with a medical system that limits the use of an associated medical probe according to usage criteria to prevent misapplication, overuse and potential failure, including auto-identification of the probe, addressing the problem of re-identification when the connection of a medical probe to the medical device is interrupted during use. The invention describes a medical reprocessing system that performs reprocessing (utilization history review, functional testing, and authorization for reuse) of a previously used medical probe. Usage criteria may include duration and/or number of uses, shelf or warranty life, and/or compatibility of the medical probe with the patient and/or selected medical probe function(s).

Medical probes include devices that are inserted into a body cavity or under the skin of a patient in order to perform therapy or monitoring. Such probes, including devices to view or scan tissue, or monitor biological parameters, are well known in the art. A sensor device typically comprises a housing including at least one sensor such as a pressure sensor; a light emitting device and associated detector comprising a pulse oximetry sensor; an ECG sensor; or other vital sign monitoring device; plus a means of conveying information from the sensor device to a caregiver. One particular example of a medical sensor device is fetal sensor, including external sensors placed on the maternal abdomen and internal sensors placed through the birth canal onto a part of the fetus. An example of an internal fetal sensor is a fetal pulse oximetry sensor, such as described in U.S. Pat. No. 5,425,362 to Siker et al. The sensor described therein is inserted past the cervical os into the uterus of the mother to non-invasively monitor the condition of a fetus, a mother, and/or a placenta.

One problem associated with known medical probes is that they have a limited life span. Probes are prone to wear through repeated use or through extended use over a period of time, and through cleaning and sterilization processes. Problems associated with such overuse include spurious readings as internal wires and connectors become loose. More importantly, probes that are used repeatedly or over an extended period of time are prone to break. Once such an incident occurs, it is often difficult to determine when the probe failed, or to track the cause of such an occurrence. Furthermore, medical probes often have a limited shelf life or warranty period, i.e., the period of time after manufacture during which they are guaranteed to function properly. An out-of-date medical probe may fail to function to manufacturer's specifications, posing a health risk to the patient.

To prevent these problems, medical clinicians may limit the number and duration of uses of a given probe through an equipment log or other manual system. While such systems may be effective in certain circumstances, they rely heavily on manual records, which are time-consuming and difficult

**2**

to maintain, particularly since the cooperation of a number of clinical personnel is required. In busy hospital settings, and especially in emergency situations, such systems are difficult to manage and are easily overlooked or ignored.

The prevalence of medical errors, some related to misuse of medical devices, has been detailed in the **1999**. Institute of Medicine report "*To Err is Human*," chapter 2, ISBN 0-309-06837-1. Interest in reducing medical errors has motivated an initiative to uniquely identify all drugs and medical devices, to assist in prevention of medical errors by correlating the drug or device with the patient's identification and intended procedure. In response to a U.S. Food & Drug Administration (FDA) suggestion to use bar codes under the Universal Product Numbering (UPN) system, the Advanced Medical Technology Association (AdvaMed), a medical device industry association, has suggested in a statement to employ generic "auto-identification" methods, which could include RF or other electronic means as an alternative to bar code technology. (Statement to the Food & Drug Administration by T. Cammack on Jul. 26, 2002.)

A particular class of medical probe is the single-use device (SUD). A device may be designed as an SUD by the manufacturer for several reasons, including: the risk of cross-contamination between patients; because some key component (for example, a battery or reagent) is sufficient only for one use; due to difficulty in the cleaning and sterilization to permit reuse; or due to the prohibitive cost of producing a device durable enough to be reused. Despite manufacturers designations, clinical institutions and third-party services sometimes choose to refurbish SUDs and reuse them. This practice has become increasingly common as clinical institutions experience financial pressures, since a SUD may be refurbished at a substantial discount from the retail price of a new one.

Typically, refurbishing of an SUD entails cleaning, inspection, sterilization, replacement of worn or exhausted components, and re-validation for safety and efficacy. The practice is so widespread that regulatory bodies in the United States and around the world have instituted legislation to limit and/or monitor the reuse of SUDs. The FDA documents "Premarket Guidance: Reprocessing and Reuse of Single-Use Devices" (Jun. 1, 2001) and "Labeling Recommendations for Single-Use Devices Reprocessed by Third Parties and Hospitals" (Jul. 30, 2001) have provided guidance with respect to compliance with the U.S. regulatory requirements. One aspect of regulation that is being emphasized is the need for good record keeping in tracking the history of use of an SUD, including how long and in what fashion the SUD was used.

The manufacturer of a medical device also faces the possibility of counterfeiting. In some cases, an unscrupulous manufacturer seeks to avoid paying licensing fees for proprietary technology used in the device. Even if misappropriation of intellectual property is not involved, a second manufacturer may seek to undercut the price of the original device by producing it with less expensive components, labor, or both. In any case, when a lower-quality device is used in a medical application, patient safety becomes the issue. In particular, SUDs or limited-use devices are generally designed to work in conjunction with a medical monitor. It is important to ensure that every medical sensing device utilized with the monitor is designed and calibrated to work properly with it.

Several partial solutions to the problem of controlling use of a medical probe have been proposed. U.S. Pat. No. 5,991,355 to Dahlke proposed a simple identification and counting system associated with an electrophysiology sen-

EXHIBIT 2 PAGE 184

US 7,048,687 B1

3

sor for the purpose of limiting reuse of said sensor. However, the method entails simple counting of uses, without support for usage limitation based upon utilization time; nor does it include device identification.

In U.S. Pat. No. 5,400,267 to Denen et al., a medical device (electro-surgical knife) with an embedded non-volatile memory component is described. The memory stores utilization limits and operating parameters. The invention permits the system attached to the device (in that case, a power supply) to (a) configure itself for appropriate operation with the device, and (b) disable the device after some operational limit is exceeded. The need for re-identification of the medical device if the connection with the system is broken is disclosed. This is intended to prevent the system from counting any pause in use less than a preset period as a new use. However, the patent proposes only to store the current time in the medical device during use, without considering how to prevent this data from being manipulated to prevent the system from detecting the occurrence of a new use.

U.S. Pat. No. 6,237,604 to Burnside et al. proposes usage control based upon cycles or usage time, but fails to address the management of legitimate medical probe reprocessing.

U.S. Patent Application 2002/0095078 A1 to Mannheimer et al. specifically relates to pulse oximetry sensor reuse, supporting limits on number of sterilization cycles or warranty expiration date. None of these patents or applications addresses the need for security features or security functions to prevent product counterfeiting or tampering with the usage control method.

Similarly, the non-medical sensing device for attachment to a measurement instrument described in U.S. Pat. No. 5,162,725 to Hodson et al. offers no provision for establishing the authenticity of the sensing device (e.g., probe) when it is coupled to the instrument. That is, no means is suggested to solve the problem of preventing use of a counterfeit sensing device, that is constructed to include similar calibration and identification data.

The prevalence of electronic technology in the world makes it relatively easy to counterfeit the memory devices proposed for control of reuse with modest effort. Potentially, a medical device could be reprocessed by replacing the memory component with a copy made from an unused original. The counterfeit memory could be placed in a reusable adapter used in conjunction with an expired medical probe. Alternatively, an entire counterfeit sensing device could be manufactured that was indistinguishable with respect to the memory component or its content.

The U.S. Health Insurance Portability and Accountability Act of 1996 expressed the need for protection of privacy in storage and transfer of healthcare information. This is detailed in the Federal Register, Vol. 63 No. 155, 45 CFR Part 142, Security and Electronic Signature Standards.

Another application of a memory component associated with a medical probe is storage of patient data and patient identification data, disclosed in related inventions U.S. Pat. No. 6,308,089 to von der Ruhr et al. and continuation application Ser. No. 09/291,769. The aforementioned patent reveals the use of encryption to permit the secure storage of data related to the usage of a medical probe, including one or more of its identifying data, duration of use, number of uses, or time and date stamp of use.

U.S. Patent Application 2002/0095077 A1 to Swedlow et al. discloses storage of patient identification data, pulse rate, and oxygen saturation values, etc., in a pulse oximetry sensor. However, a means for secure storage and data transfer to ensure data integrity and privacy is not disclosed.

4

Secure data storage and transfer in automated systems can be achieved utilizing a physical security method and/or an algorithmic security method. The physical security method relies upon the use of a physical object which might be difficult to bypass or forge, such as a door requiring a physical key to unlock it, whereas an algorithmic security method might rely upon the use of secret data, such as a password or personal identification number (PIN) entered into a keypad. In biometrics, the physical "key" is some characteristic physical property of the authorized user, such as a fingerprint, retinal image, voiceprint, and so forth. Combining multiple techniques of using physical and/or algorithmic security methods offers the best hope of providing a secure authentication method. This strategy can be applied to the problem of securing the data in a limited use medical sensor.

The more usage, calibration, and clinical data that is to be stored in a medical probe, the more important it becomes to utilize an efficient storage method. Data compression, particularly lossless data compression, is an encoding method to store more data in less physical memory without information loss. Error detection and correction can also be part of the method. The encoding of data in a medical probe should preferably address the needs of data security, integrity, and storage efficiency.

There remains, therefore, a need for a medical system that can automatically control the use of a medical probe through enforcement of usage criteria. Such usage criteria would include: limiting the duration and/or number of uses of the probe to a predetermined limit value; limiting use of the probe to a shelf life or warranty period; permitting use of the medical probe only after validation of the combination of medical probe, patient and procedure; and limiting access to patient data stored within the medical probe to ensure patient privacy. Preferably, the medical system would also provide additional functions, such as data compression, error checking, time and date stamping, and security checking, that would facilitate this usage control, as well as regulated reprocessing of medical probes prior to reuse. Data stored in the medical probe, related not only to probe usage but also patient identity and condition, should be held in a secure fashion.

It is therefore an object of the invention to provide a medical system that can limit the number of times a medical probe is used.

It is another object of the invention to provide a medical system that can limit the duration of the use of a medical probe.

It is yet another object of the invention to provide a medical system that can limit the use of a medical probe to a certain shelf life or warranty period.

It is still another object of the invention to provide a medical system that provides a time and date stamp to identify when the therapeutic or monitoring operation performed by the medical system in conjunction with the medical probe took place.

It is a still further object of the invention to provide a medical system that provides an auto-identification function to validate proper use of a medical probe with a medical device on a particular patient for a requested therapy or monitoring function.

It is another object of the invention to provide a medical probe that can store data regarding the duration of use of the probe.

It is yet another object of the invention to provide a medical probe that can store data regarding the number of times the probe has been used.

EXHIBIT 2 PAGE 185

US 7,048,687 B1

**5**

It is still another object of the invention to provide a medical probe that can store a usage limit on the number of times or duration of time the probe may be used.

It is yet another object of the invention to provide a medical probe than can store data regarding the reprocessing of the medical probe for subsequent reuse.

It is a yet further object of the invention to provide a medical system in which identifying data for the medical probe and other medical devices is stored in each.

It is another object of the invention to provide a medical system in which a medical device can re-identify a medical probe after an interruption in use, to prevent the interruption from being construed as a new use.

It is still another object of the invention to provide a medical system that includes a security function for verifying the identity of an attached probe.

It is another object of the invention to provide a medical system that includes a security function to prevent tampering with data stored in the probe.

It is a still further object of the invention to provide a medical system that employs a data encoding system including encryption as an algorithmic security method when storing data in the medical probe as part of a security function.

It is another object of the invention to provide a medical system that includes a probe functional test sequence.

It is another object of the invention to provide a medical reprocessing system that can read the usage data in an attached medical probe.

It is a yet further object of the invention to provide a medical reprocessing system that can store reprocessing data in an attached medical probe.

It is still another object of the invention to provide a medical reprocessing system that can store usage control data in an attached medical probe, indicating the number of reuses and/or duration of reuse of the probe to be permitted subsequent to reprocessing.

It is a still further object of the invention to provide a medical reprocessing system that can detect and delete patient data from an attached medical probe.

It is yet another object of the invention to provide a medical reprocessing system that includes a security function for verifying that reprocessing of an attached medical probe is permitted.

It is another object of the invention to provide a medical reprocessing system that includes an authorization function to prevent reprocessing of an attached medical probe without obtaining authorization in a secure fashion from a licensing or regulatory party.

SUMMARY OF THE INVENTION

In one aspect, the present invention is a medical probe that includes at least one effector or sensor device and a probe memory for maintaining use data, e.g., use values, about usage of the probe. The probe memory can include use values such as data regarding the number of times the medical probe has been used, the duration of each use, the total duration of use in conjunction with one or more medical devices, and other data regarding the duty cycle of usage of the medical probe. Other use values, include the date and time of a given use of the probe, the date and time when a given condition occurred, product identity, clinical data such as patient or doctor data, and other medical data can also be stored in the memory storage location of the sensor device. Certain contents of the probe memory are processed by an encoding system including encryption and

**6**

stored in encrypted form to facilitate security functions as well as maintain confidentiality of patient data. The medical probe preferably contains identifying data (such as a lot number or unique serial number) which is electronically readable, that can be used in a security function to identify the device and prevent tampering with the use data. The serial number can serve an auto-identification function for reducing medical errors.

The medical probe, capable of communicating with external devices, is coupled to a medical device to provide a medical system. The medical device, through communications with the medical probe, applies usage criteria to limit use of the medical probe. Usage criteria include data limiting the use of the medical probe. The medical device determines usage of the medical probe and limits the total use of each medical probe to a limit value by preventing use beyond a predetermined usage limit. The usage limit, as noted above, can be based on one or more of the following usage criteria: total number of uses, total duration of use, shelf life, warranty period, regulatory guidelines or licensing agreement. Usage criteria applied by the medical device may further include validating that the combination of the medical device, patient, and intended therapy or monitoring are correct.

The use of a medical probe may be interrupted without constituting a new use, i.e., use resumes on the same patient without intervening use on another patient after a period of interruption sufficiently short to not require changing the use value. A probe re-identification method is included in the invention to prevent unnecessary reduction of the medical probe's intended utility during the course of its useful life.

The medical device, in conjunction with the medical probe, provides a probe evaluation including a security function for verifying the identity of the medical probe. Preferably, the security function operates on internal serial numbers and encryption keys to ensure that the proper probes are coupled to the medical device, that the internal use data has not been tampered with, and to verify communications between the medical probe and medical device. An auto-identification function is advantageously included in the probe evaluation.

The medical device may include a functional test sequence applied to the medical probe prior to use. Preferably, the medical device can determine that the medical probe is working within normal operating parameters by performing the functional tests. For effectors, the testing may include a determination that power outputs are within expected values. For sensors, the testing may evaluate sensitivity and signal to noise ratio. Expected test results based upon design testing, factory calibration, or previous functional tests may be stored in the medical device and/or the medical probe for comparison purposes.

The medical system can also provide a series of product identity functions, as well as storing the identifying data (e.g., serial numbers) for the equipment used in a given medical procedure. The stored data can further include a date and time stamp, identifying data regarding the medical personnel involved in a monitoring procedure, identifying data about the patient, clinical data, and other data related to clinical use. The stored data can further include data related to reprocessing of the medical probe, such as personnel and facility identification, data and time of reprocessing, and authorization by a licensing or regulatory party. Once again, in a preferred embodiment an encoding system including encryption is utilized for data compression, error checking, and to ensure authenticity and to protect patient confidentiality.

EXHIBIT 2 PAGE 186

US 7,048,687 B1

7

Subsequent to use of the medical probe past usage limits, the medical probe may optionally be attached to a medical reprocessing system. The medical reprocessing system communicates with the probe memory of the medical probe, utilizing the data therein to direct reprocessing and maintain a database regarding the history of the probe. An optional authorization step by a licensing or regulatory party may further qualify the decision-making. If reprocessing is successful, the contents of the probe memory of the medical probe is amended or modified to permit further use; if reprocessing is unsuccessful, the medical probe is rendered inoperable.

The medical probe preferably includes a probe memory such as a low-power integrated circuit. In one preferred embodiment, the probe memory is an add-only memory (AOM) that is embedded in the medical probe. The AOM preferably includes a tamper-proof serial number and medical equipment manufacturer identification field written by the AOM manufacturer as a built-in security function to prevent counterfeiting of the AOM; a field of identifying data and usage criteria data written by the medical probe manufacturer at the time of probe production; a field of use values written by the medical system in the course of clinical use; and a field of reprocessing data written by the medical reprocessing system.

In one highly preferred embodiment of the invention, the medical monitoring system comprises a fetal sensor for monitoring oxygen saturation in the blood of a fetus while in the womb. The probe memory is embedded in the connector used to attach the medical probe to the medical device, which is a fetal pulse oximeter.

Other advantages and features of the invention, together with the organization and manner of operation thereof, will become apparent from the following detailed description when taken in conjunction with the accompanying drawings wherein like elements have like numerals throughout the drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a medical monitoring system constructed in accordance with the present invention;

FIG. 2 is a block diagram of a medical monitoring system constructed in accordance with a preferred embodiment of the present invention;

FIG. 3 is an operational block diagram of the medical monitoring system of FIGS. 1 and 2 of the present invention;

FIG. 4 is a fetal sensor for use with a medical device of the medical monitoring system of FIGS. 2 and 3 of the present invention;

FIG. 5 is a block diagram of a medical reprocessing system constructed in accordance with the present invention;

FIG. 6 is a block diagram of a medical reprocessing system constructed in accordance with a preferred embodiment of the present invention; and

FIG. 7 is an operational block diagram of the medical reprocessing system of FIGS. 5 and 6 constructed in accordance with the present invention.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENT

Referring now to FIGS. 1–7, and more particularly to FIG. 1, a block diagram of a medical system constructed in accordance with the present invention is shown at 10. Generally, the medical system 10 comprises a medical device 12 and a medical probe 14.

8

Preferably, the medical device 12 includes a data acquisition device 13, a controller 16, an audio output device 17, at least one memory 18, and a display 20. Preferably, the controller 16 includes a device (host) communications port 19 such as a serial communications port or other digital communication means. The controller 16 is preferably a microprocessor, but can comprise a micro-controller or various other types of control devices. The memory 18 preferably comprises a RAM (read/writable) device and an EPROM (read only) device, but other known types of memory devices may be used without departing from the invention. Preferably, the medical device will include non-erasable memory components for storing a serial number, as will be described more fully below. In some applications, the controller 16 may include a memory 18 as part of the integrated circuit, thereby eliminating the need for external memory devices.

Hereafter where reference is made to writing a message to the display 20 of the medical device 12, it will be understood that this can refer to a text message on an alphanumeric or graphic display. Alternatively, the display 20 may comprise a bank of indicator lights or LEDs that provide similar data.

The medical probe 14 generally comprises an effector/sensor 24, a probe memory 26, and an external connection 120 configured for communicating and transfeffing data between the medical device and the probe. An effector may comprise any of a number of therapeutic devices for cutting, delivering electrical, acoustic, or RF energy, etc. A sensor may include pressure sensors, ECG sensors, EEG sensors, temperature sensors, oxygen sensors, ultrasound transducers, chemical sensors, etc. The selection of effectors/sensor(s) 24 and associated hardware used in the medical system 12 is dependent only on the type of therapeutic or monitoring functions to be performed without reference to other aspects of the invention. The connection 120 between medical probe 14 and medical device 12 is preferably electrical in nature, but may alternately be fiber optic, free-space optical (e.g., infrared), or radio frequency.

In FIG. 2, a preferred embodiment of the medical system 10 is a pulse oximeter 101 having a medical probe 14 and a medical device 12. The medical probe 14 and medical device 12 are as previously described herein except that the effector/sensor 24 includes light emitting device(s) 30 and associated detector(s) 32. In a preferred embodiment, the light emitting devices 30 are light-emitting diodes (LEDs).

Data used in the medical system 10, 101 is preferably in a digital electronic format.

Referring now to FIGS. 1 and 2, the probe memory 26 can comprise a number of various known devices including microcontrollers or microprocessors, EPROMS, EEPROMS, or application specific chips. These devices provide a memory location for maintaining data concerning use of the medical probe 14. The probe memory 26 also includes probe communications port 27 such as a serial communications port or other digital communication means. In some applications, separate communication devices may also be included. Preferably, more sophisticated devices that provide functions such as product identity, security checking, and date and time stamping are used.

The security function includes a physical security method and/or an algorithmic security method. The physical security method and/or algorithmic security method may be used in the storage and transfer of data from the probe memory 26 to the medical device 12. In a preferred embodiment of a physical security method, the probe memory 26 is a memory that can be written only once, such as a PROM or EPROM, providing physical security of the data (i.e., 0's can be

EXHIBIT 2 PAGE 187

US 7,048,687 B1

**9**

rewritten as 1's, but not vice versa). In one highly preferred embodiment of the invention, the probe memory comprises an add-only memory (AOM) which has pre-programmed serial number and medical equipment manufacturer data. An add-only memory provides physical security of the already-written data (i.e., prevents remaining 0's in the written data from later being rewritten as 1's).

Algorithmic security methods involve the use of an encoding system including algorithms to verify the integrity of data, e.g., the cyclic redundancy check (CRC); and algorithms to prevent unauthorized access to the data, e.g., encryption. The algorithms may be implemented as software in a processor, or as a hardware circuit, without changing the intent. Preferably, the encoding system will also accomplish lossless compression of the data to reduce the physical storage requirements of the memory.

Other highly preferred devices that can be used for the probe memory **26** include a token card chip that includes both memory storage and security functions, and EEPROMS with built-in CRC and serial number functions. These preferred devices will be described more fully below. (The use of a token card chip for limiting the use of a medical probe is disclosed in Applicants' U.S. Pat. No. 6,308,089 and pending patent application Ser. No. 10/045, 475, the disclosures of which are herein incorporated by reference.)

As noted above, an important function of the probe memory **26** is to store data regarding the duration of use of the medical probe **14**, and/or to maintain a history of the number of uses of the medical probe **14**. This data will hereinafter be referred to as "use value". The probe memory **26** can also store data such as, but not limited to, date of manufacture, warranty information, security data such as serial numbers or lot numbers, product identity and encryption keys, history data such as the identity of medical workers (caregivers) involved in the monitoring process (procedure), patient data including physiological data collected by the sensor (or effector) **24** itself or transferred from another source via the medical device **12**, and other types of data. The serial number can serve an auto-identification function when combined with patient, procedural, and caregiver identifying data by the medical device **12** to determine if a valid combination has been made, as described below. In alternative embodiments, the probe memory **26** may also be used to store data as the results of functional test routines and other product testing data.

The memory **18** of the medical device **12** preferably also includes data such as identifying data (e.g., serial numbers) identifying the monitoring device and encryption keys, that can be used to verify communications and identify devices as will be described below. To provide physical security, this data is preferably stored in non-erasable memory components (not shown) such as a read-only memory (ROM). The memory **18** preferably also stores other data, such as troubleshooting and calibration data to provide a cross check against the data stored in the medical probe **14**.

Identifying data for the medical probe **14**, usage criteria, and one or more encryption keys can also be stored in the probe memory **26** at the time of manufacture of the medical probe **14**. The identifying data is preferably a serial number used to uniquely identify a specific probe, as well as to identify the type of probe. In some embodiments, identifying data may consist of a production lot number instead of a unique serial number. Preferably, data relating to the date of manufacture, revision codes, and calibration data, deter-

**10**

mined by the type of probe or its specific assembly, can also be stored in the probe memory **26** at the time of its manufacture.

At the time of manufacture of the medical probe **14**, data representing one or more usage limit(s) representing either a count (number of times of medical probe **14** use) or time duration (length of time medical probe **14** is used) can be written into the probe memory **26**. Alternatively, the usage limit(s) may be embedded in the memory **18** of the medical device **12**. In addition to or in place of these usage limit(s), data such as the date of manufacture or reprocessing stored in the medical probe **14** may serve as the basis for limiting probe use based upon shelf life or warranty period (stored in either the probe or the device). In this case, a real-time clock must be maintained in either the medical probe **14** itself, or the medical device **12**.

FIG. **3** (**3A**, **3B**, **3C**) is an operational block diagram illustrating a method of limiting use of medical probe **14** in the medical systems **10**, **101** shown in FIGS. **1** and **2**, respectively. FIGS. **3A**, **3B** show Steps **38**–**62**. FIG. **3C** illustrates the detail of Step **46**. The method preferably includes use of a security function, a probe auto-identification/re-identification function, and a probe functionality test sequence. It will be understood in the following description that the "reading" and "writing" of the memory storage device **26** in the medical sensor **14** encompasses, in a preferred embodiment, applying an encoding system with encryption to secure the data when reading from and writing to the memory.

Processing commences when a medical probe **14** is detected as attached to the medical device **12** in Step **38**. To ensure a proper connection and verify that a proper medical probe **14** is coupled to the medical device **12**, in Step **40** an initial query is transmitted to the medical probe **14**. After transmitting such a query to the medical probe **14**, the medical device **12** waits for an acknowledgement (signal or message) from the medical probe **14** prior to performing any further steps. This query and acknowledge sequence (Step **40**) verifies that the probe memory **26** is receiving power and can communicate with the controller **16** in the monitoring device **12** through a serial or other communications link.

If, in Step **40**, no acknowledgment is received, the controller **16** of the medical device **12** will determine that the medical probe **14** currently attached is an incorrect medical probe or is not functional. Preferably, in Step **41** the controller **16** will provide a message to the display **20**, such as "Replace Probe", and/or will emit an audible alarm (medical alarm) to the audio output **17**, and in Step **42**, the controller **16** will inhibit functions related to the medical probe **14** until a suitable one is attached to the medical device **12**. Although a query and acknowledge step, Step **40**, is shown, it will be apparent to one of ordinary skill that the step may not be required in all applications. Furthermore, the ability to perform this step will depend on the functionality of the component chosen as the probe memory **26** in the medical probe **14**.

Besides evaluating the correctness of a medical probe to the medical device and the immediate functionality via Step **40**, the method of the present invention in Step **43** further ensures that a proper medical probe **14** is coupled to the medical device **12**, to secure communications between the medical probe **14** and the medical device **12**, and to prevent tampering with the use value and/or usage limit(s) stored in the probe memory **26**. In Step **43** the medical system **10** of the present invention preferably uses the serial numbers and encryption keys described above to provide a security function. Each serial number is preferably transmitted from one

EXHIBIT 2 PAGE 188

US 7,048,687 B1

**11**

to the other i.e., from the medical probe **14** to the medical device **12**, and from the medical device **12** to the medical probe **14**, in encrypted form. The data in the keys and algorithms required by the encryption aspect of the data encoding system to decrypt the transmitted data are preferably stored in a secure fashion within each device (medical probe **14** and/or medical device **12**), or transmitted in a secure fashion. Suitable encryption algorithms for encoding systems are well known, including symmetrical key encryption systems, and asymmetrical key encryption systems, such as, but not limited to, public key encryption. A cyclic redundancy code (CRC) calculation and check is also commonly used to validate integrity of transmitted data. A data encoding system serves not only to verify transmissions and validate data, but can also determine a signature of the transmitted data, thereby identifying the specific sending device (medical probe **14** and/or medical device **12**). It will be apparent that some data encoding systems designed for data compression will also adequately ensure data encryption for a security purpose.

Preferably, the medical device **12** cannot access data relating to the use value(s) and/or usage limit(s) stored in the probe memory **26** until the validity of the medical device **12** is validated by the security function(s) in the medical probe **14**. Step **43** can be accomplished directly, by processing in the probe memory **26**, or indirectly, by employing a security key found only inside a valid medical device **12** when applying the encryption algorithms of the data encoding system to the contents of the probe memory **26**. If the security function fails to validate the medical probe **14**, a message is preferably written to the display **20** of the medical device **12** and/or an audible alarm is generated by the audio output **17** (Step **41**), and the controller **16** inhibits functions related to the medical probe **14** until a new one is attached (Step **42**).

Preferably, in Step **43** the security function also validates the memory component **26** integrity by verifying that the contents of the memory component **26** have not been tampered with before proceeding. Besides successful decryption in Step **43**, further steps at validation of memory integrity include examination of validity of date and time stamps, and possibly lookup of the serial number of the medical probe **14** in a database stored inside of or in communications with the medical device **12**, as part of the probe auto-identification function.

In alternative embodiments, as part of probe evaluation, a functional test sequence is invoked in Step **44**, wherein each of the effector/sensor(s) **24** of the medical probe **14** is activated to verify functionality. For example, in a pulse oximeter sensor the functional tests may include correlation of a response of the detector **32** with a drive, or electrical current level, of the LED **30** for the plurality of LED(s) illuminating the detector **32**. In Step **44.1**, the results of these functional tests can be reported by storing the results in internal memory **18** of the medical device **12**, writing the results to the probe memory **26** in the medical probe **14**, writing the results to the display **20** for immediate review by medical personnel, or a combination of the above.

If the probe fails the functional tests, the method defaults to Step **41** and a violation message, describing the functional test failure is described, and a message indicating "Replace Probe" is written to display **20** and/or an audible alarm is generated by audio output **17**. Functions of the medical device **12** related to this medical probe **14** are inhibited until another probe is connected to the medical device **12**.

Upon completion of the security function of Step **43** and functional tests of Step **44**, the identifying data of the

**12**

medical probe **14** (e.g., the serial number) is preferably stored in Step **45** in the memory **18** of the medical device **12** for identification purposes. The identifying data of the medical device **12** is preferably stored in the probe memory **26** to provide a cross check, as will be described more fully below.

This exchange of identifying data is the basis for the probe auto-identification function, considered to be part of the usage criteria testing. In Step **45**, the medical device **12** can use the probe's identifying data read from the medical probe **14** to determine the type of probe being used. For example, if the medical system **10** is used for fetal pulse oximetry, the medical device **12** can determine if the attached medical probe **14** is a fetal monitoring sensor, versus a sensor device more commonly used with adults, such as a finger sensor. Using this information, the medical device **12** can adjust parameters and algorithms to match the specific functional requirements of the medical probe **14**. Such parameters for sensor devices **24** include dynamic range, signal processing characteristics, probe calibration, medical alarm limit values, display content and format, trend data storage content and format, and network communications content and format. In a pulse oximeter sensor, the parameters may include LED emission characteristics (e.g., center wavelength(s) and spectrum width(s)), calibration table (normalized ratio versus $SPO_2$ value), and detector characteristics.

Another feature of the auto identification function of Step **45** uses the identifying data of the medical probe **14**, in conjunction with information about the configuration of the medical device **12** and patient data available in the medical system **10**, **101** to validate the combination of the medical probe **14**, the medical device **12**, a patient, and/or a mode of operation of the medical device **12**, e.g., a procedure (therapy or monitoring).

If an inappropriate combination of medical probe **14** and medical device **12** is detected (e.g., a fetal sensor attached to an adult monitor (medical device), rather than a fetal sensor attached to a fetal monitor (medical device)), in Step **50** a message describing the violation is preferably written to the display **20** and/or an audible alarm is generated by the audio output **17**. Functions of the medical device **12** related to this medical probe **14** are inhibited until another probe is connected to the monitoring device **12** (Step **42**). This is an automation of the safety features provided by the auto-identification function(s).

Once the identifying data and other contents of the probe memory **26** of the medical probe **14** are verified, in Step **46** the medical device **12** reads the use value(s) from the probe memory **26** and preferably stores the use value(s) in internal memory **18** of the medical device **12**. Optionally, the usage limit(s) of the usage criteria can also be read from the probe memory **26**.

A possibility exists that the connection of the medical probe **14** with the medical device **12** may be interrupted during a single use, so in Step **46** a probe re-identification feature may be invoked. This interrupted use of the medical probe **14** can commonly occur for technical reasons, e.g., in order to move or assist the patient, or by accident. If included in the usage criteria for the probe **14** is a limitation on the number of uses, an interruption could pose a problem. To avoid the inconvenience of counting the resumption of use after such an interruption as a "new" use, in a preferred embodiment of the invention, a re-identification method may be provided in Step **46**, further detailed in FIG. **3**C.

Probe re-identification corresponds to a medical probe **14** being used in conjunction with a particular medical device **12**, disconnected for a short time, and then reattached to

EXHIBIT 2 PAGE 189

US 7,048,687 B1

13

either the same or another medical device **12**. Even if the number of uses is not among the limitations on usage, the re-identification of a medical probe **14** by a different medical device **12** is important to the proper maintenance of patient data in the memory **18** of the medical device **12**, as will be revealed below.

In Step **46.1** the date and time of last use ($P_{LU}$) are read from the medical probe **14** as part of the use value(s) retrieved in Step **46**, and compared to the current date and time ($M_{CU}$) in the medical device **12**. Various methods of representing time over a sufficient range (days to years) and with sufficient accuracy (seconds to minutes) and readily permitting arithmetic operations, such as comparison, are well known in the art. The interruption time, T, is computed in Step **46.1** as the difference $M_{CU}-P_{LU}$ with the assumption that the "clocks" of all medical devices **12** in use are consistent.

The interruption time T is compared in Step **46.2** with an interruption time limit (ITL), stored in either the medical probe memory **26** or the medical device memory **18**. In one embodiment, if the currently attached probe was not last used within the interruption time limit (T>ITL), then a new use of the probe **14** must be counted. The logic for a new use of the probe **14** proceeds with the initial test of use values and establishment of "effective use" of the probe in Step **48**, described below. In the preferred embodiment of a fetal sensor for oxygen saturation measurement, one hour is a suitable interruption time limit.

A negative value of T (T<0) is indicative of a mismatch between clocks in different medical devices **12**. A small negative T may be treated as a zero result; a large negative magnitude would be interpreted as a usage criteria violation in Step **50**. However, if the currently attached probe was last used within the interruption time limit (0<T≦ITL), then re-identification has been accomplished, and a new use is not counted. In a preferred embodiment, the medical device **12** may further compare the identifying data for the medical probe **14** with the identifying data for recently used medical probe(s) **14** stored in the medical device memory **18**, as shown in Step **46.3**. If a match is found, and the identified probe **14** is the last one used with this medical device **12**, as determined in Step **46.4**, then the same use of the probe immediately resumes at Step **52**.

If this probe **14** is not the last one used with this medical device **12**, or if this probe was never previously used with the medical device, then it is advisable to warn the operator that a probe and/or patient change has taken place. Preferably, the newly-connected medical device **12** warns, in Step **46.5**, that the medical probe was previously connected to a different device by writing a message to the display **20** and/or generating an audible alarm by means of the audio output **17**. This situation could occur if, for example, the medical device **12** is taken out of service and replaced with another unit (medical device) after effective use of the probe **14** has commenced. However, it could also take place if multiple probes attached to monitors (medical devices) on different patients, e.g., in a ward or nursery setting, were accidentally interchanged, making re-identification important for patient safety. In a preferred embodiment, in Step **46.5** an operator will indicate whether this is indeed a re-identified sensor, proceeding to Step **46.6**, or a new use, proceeding with Step **48**.

Prior to enabling functions of medical probe **14**, the medical device **12** will preferably update the clinical data in the device memory **18** in Step **46.6**. In a preferred embodiment, old clinical data in the memory **18** is archived and/or purged, and patient data including identifying data and

14

clinical data stored in the probe memory **26** is transferred from the medical probe **14** to the memory **18** of the medical device **12**, as shown in Step **46.6**. This transfer is preferably conditioned upon use of security means to validate that the medical device's operator is authorized to obtain any confidential data from the probe **14**, including, but not limited to patient identification data and clinical data.

In another preferred embodiment, the medical device **12** may further validate the re-identification of the probe **14** by comparison of patient identifying information read from both the probe memory **26** and the device memory **18**. This may detect an attempt to reuse the probe **14** on a new patient without sufficient time for cleaning and/or sterilization.

In yet another preferred embodiment, the medical device **12** may in Step **46.6** read from the probe memory **26** the identifying data for a medical device **12** to which the medical probe **14** was previously connected. This identifying data can be used by the currently connected medical device **12** to request the transfer of stored patient data from the previously used medical device. The request may take the form of a message to medical personnel, or direct transfer via an electronic connection such as a network (not shown).

If re-identification is accomplished, the logic then proceeds directly to Step **52**. Otherwise, if the auto-identification of probe and intended use is deemed acceptable, in Step **48** the use value(s) can then be compared to usage limit(s), in terms of either count, duration, shelf life, regulatory guidance limit (if any) or warranty period to verify that the use value associated with the medical probe **14** has not reached a usage limit value. If a use value is substantially equivalent to the corresponding usage limit, in Step **50** a violation message, describing the type of violation and indicating that a new probe is required, is preferably written to the display **20** and/or an audible alarm is generated by the audio output **17**. In Step **42** functions of the medical device **12** related to this medical probe **14** are inhibited until another probe is connected to the medical device **12**.

Note that Step **42**, inhibition of functions related to the medical probe **14**, may be implemented in a number of ways. Without affecting the probe, the firmware of the controller **16** can simply be programmed to not perform processing related to the probe's functions. Alternately, the medical device **12** can change the probe memory **26** of the medical probe **14** in order to prevent any future reading and/or writing therein. Lastly, the medical device **12** can disable the functionality of the sensor/effector **24** by physically changing the device. For example, in a pulse oximetry sensor, a fuse or fusible link may be placed in line with the connections to one or both of the LEDs **30**. By applying a sufficiently high current, the controller **16** could thereby disable the pulse oximetry sensor.

If none of the "usage criteria" are violated, then in Step **52** the use value may be displayed on display **20**. In some embodiments, the use value(s) are written to display **20** by the controller **16** to alert medical personnel to the remaining usefulness of the probe **14** (Step **52**). If the remaining usefulness is limited, this information helps an operator to determine whether to replace the medical probe **14** or proceed with the therapy or monitoring.

In some applications, where the probe memory **26** is a microcontroller, microprocessor, or other device with more advanced mathematical capabilities, the use value(s) can be maintained in the probe memory **26** and updated internally, without further interaction with the medical device **12**, as long as power is applied to the medical probe **14**.

EXHIBIT 2 PAGE 190

US 7,048,687 B1

**15**

After the use value is displayed in Step **52**, the probe functions are enabled. From time to time, the medical device **12** will test whether the medical probe is still in use, Step **54**, and determine whether the medical probe has been in effective use for a length of time sufficient to count as a "use".

The commencement of therapeutic or monitoring activity with the medical probe **14** is indicated by a start-of-usage event. Any signal normally used by the medical device **12** to begin the therapeutic or monitoring sequence associated with medical probe **14** can be used as the start-of-usage event, to commence updating the use value(s) in Step **56**. Examples of suitable start-of-usage events are reading an activated pushbutton or other switching device indicating commencement of therapy reading an input signal from an external device, or, in some applications, connecting the medical probe **14** to the medical device **12**.

The start-of-usage event will typically be conditioned upon completion of a minimal amount of effective use. For example, in an application where medical monitoring may be expected to go on for hours, it is reasonable to require a short period of effective monitoring (medical probe in place, signals received and interpretable, results displayed, etc.) prior to considering the monitoring "effective". This prevents the system from deducting a "use" from the life of a medical probe because it was briefly tested, inadvertently turned on, connected in order to cause display of the useful life left, or was demonstrated without actual clinical benefit. These events would not be considered an effective use, to update the use value(s) in Step **56**. In a preferred embodiment in a pulse oximetry sensor, five minutes of successful monitoring of the oxygen saturation and pulse rate data is considered effective use to constitute a "use."

When the therapy or monitoring is deemed to have started, a date and time stamp, along with the identifying data of the medical probe **14**, is preferably stored in the memory **18** of the medical device **12** (Step **56**). A usage record consisting of the date and time stamp, along with the identifying data of the medical device **12**, is preferably stored in the probe memory **26** of the medical probe **14**. It will be obvious that the usage records can be stored either in the medical probe **14**, the medical device **12**, or both.

In Step **56** the use value is updated, e.g., a usage time limit is decremented, accordingly.

In Step **57**, a comparison is made with the usage criteria and the updated use value(s) to determine if any usage criteria are violated. If no usage criterion is violated, then the probe use logic returns to Step **54**, and the Steps **54**–**57** repeat until a usage criterion is violated or the probe is no longer in use. When a usage criterion is violated, e.g., the corresponding use value is equivalent to a predetermined value, in Step **58** a violation message is displayed and/or an audible alarm is made.

In applications where the usage criterion is duration of use, a timing function must be activated when the start-of-usage event occurs. Preferably, the controller **16** of the medical device **12** performs the timing function. Alternatively, in applications where the memory storage device **26** is a microcontroller or other device capable of providing a timing function, the timing function may be performed in the medical probe **14**. When the duration of use of the medical probe **14** is substantially equivalent to a predetermined value, the controller **16** in the medical device **12** will preferably write a usage criterion violation message to the display **20** and/or generate an audible alarm by means of the audio output **17** (Step **58**).

**16**

In applications where a usage criterion is a number of total uses, the use value must be changed only once for each therapeutic or monitoring sequence. When the use value reaches a predetermined number of uses, a message describing the usage criterion violation is preferably written to the display **20** of the medical device **12**, and an audible alarm is generated by the audio output **17**. Preferably, a warning will be written to the display **20** by the controller **16** prior to the last use, thereby allowing medical personnel to obtain a new probe for replacement. In some applications, a continual count may be maintained on the display **20** of the medical device **12**. Once the use value has reached the usage limit value, the controller **16** in the medical device **12** will preferably write a usage criterion violation message to the display **20** and/or generate an audible alarm by means of the audio output **17** (Step **58**).

Depending upon the type of medical probe **14**, its mode of use by the medical device **12**, and the usage criteria that has been violated, different actions may be selected when a usage criterion occurs. After the violation message has been displayed and/or the audible alarm made, in Step **58**, further function of the medical probe **14** may be immediately inhibited, or permitted to continue.

If the medical probe **14** is permitted to continue to be used, then the invention repeats Steps **54**–**59**, e.g., a determination is again made in Step **54** as to whether the medical probe **14** is in use, etc. If the function is not allowed to continue in Step **59**, processing will proceed to step **62**, wherein the invention will update the memory **18** of the medical device **12** and/or the probe memory **26** of the medical probe **14**, storing the use value, date and time stamp the use and then proceeding to Step **42** to inhibit the medical probe to function. Specifically, in some embodiments of the invention, especially those in which a time duration limit is employed (e.g., duration of delivery of a drug dose), the medical device **12** will immediately inhibit function Step **42** until the medical probe **14** is replaced (Step **38**).

In other embodiments, especially those in which the usage limit is based upon the number of uses of the medical probe **14**, it is permissible to finish the current treatment or monitoring operation. Prior to beginning another use of the same medical probe **14**, however, the medical device **12** will, in Step **46**, read the use value and will not allow another therapeutic or monitoring usage to begin until the medical probe **14** is replaced. Again, the timing function can be operated to count either up to a known value, or down from an initial value to zero. Although changing the use value from an initial use number has been described in terms of decrementing, it will be apparent to one of ordinary skill in the art that the medical system **10** could be easily modified to increment, decrement, or use an apparent random sequence.

Periodically during use of the medical probe **14**, a date and time stamp, along with the identifying data of the medical probe **14**, is preferably updated in the memory **18** of the medical device. This data can be used in conjunction with clinical logs to track the identity of the equipment and the personnel that were involved in a given monitoring procedure. Likewise, usage is preferably periodically updated in the probe memory **26** of the medical probe **14**. Although this storage of usage records could be done only when the therapy or monitoring ends (Step **62**), it may be possible to shut off the medical system **10**, or disconnect the medical probe **14**, preventing the usage data from being recorded. This is a form of tampering with usage data.

Therefore, in a preferred embodiment, a full usage record of date and time stamp, along with the identifying data of the

EXHIBIT 2 PAGE 191

US 7,048,687 B1

17

medical device **12**, is written to the medical probe **14** when effective usage is confirmed. Thereafter, at periodic time intervals during continued use, a bit is written in the probe memory **26** to keep an approximate record of duration of use. Preferably the periodic time interval is an hour, however the periodic time interval may be shorter, e.g., a second. Typically, the medical device **12** contains non-volatile RAM used to hold the current usage data, and this may be updated much more frequently, e.g., every second.

In some applications, the medical device **12** may include input devices such as keyboards, bar code readers, biometric scanners, serial links, and other communication devices, for logging the identity of clinicians and the patient involved in a procedure, thereby providing a complete log for later review.

In a preferred embodiment, radio frequency identification functions can be incorporated in the medical device **12** to identify medical personnel, patients, and other data. Preferably, date and time stamps, identifying data of the medical device **12**, and other identifying data is stored in both the probe memory **26** of the medical probe **14** and the memory **18** of the medical device **12** as a cross check. Storing this data in both locations simplifies the process of later identifying the equipment used in a given monitoring process in the event of a failure. In some applications, detailed data regarding medical parameters encountered in a given procedure may be stored. Alternatively, the controller **16** may check for defined errors or conditions and store data when such conditions occur.

Although storing usage, date and time stamp data at the beginning of effective use and periodically during the function of the medical system **10** has been described, it will be apparent to one of ordinary skill in the art that this step could also be taken at the beginning of effective use, after the occurrence of predefined conditions, in the event of a system failure, at the end of use, in combinations, or in a number of other ways.

Although a distinct functional block diagram has been shown in FIGS. **3**A, **3**B and **3**C, it will be apparent to one of ordinary skill in the art that changes in the order of certain functions, modifications of functions, and additions could be made without departing from the invention.

As noted above, in one highly preferred embodiment of the invention, an add-only memory (AOM) is used as the probe memory **26**. One suitable device is the DS2502, manufactured by Dallas Semiconductor, Inc. The data sheet for this component, as published by Dallas Semiconductor, is incorporated herein by reference. This device contains a factory-written registration number plus multiple pages of user-programmable memory. The registration number contains a unique code for the customer (in this case, the manufacturer of the medical probe); a serial number; plus a CRC for validating the integrity of the data. The user-programmable memory can be written once, one bit at a time, and pages can be individually write-protected after programming to prevent modification.

Another advantage of the DS2502 is its incorporation of the 1-Wire™ multi-drop communications scheme, serving as the probe communications port **27**. This method requires only a ground connection and second connection to supply power to the DS2502 as well as perform bi-directional communication. Since the ground connection may be connected to a common ground with other electrical functions in the medical probe, only one additional connection to the medical probe **14** is required.

Referring to FIGS. **1** and **2**, the medical device **12** includes a device (host) communications port **19** consisting

18

of appropriate hardware and software to interface to the probe memory **26**. A suitable implementation of the 1-Wire™ interface is the DS2480 Serial Wire™ Line Driver, also manufactured by Dallas Semiconductor, Inc. The data sheet for this component, as published by Dallas Semiconductor, is incorporated herein by reference. This device interfaces to the controller **16** via a standard UART, or serial interface. Generally, the firmware of the controller **16** must include the ability to operate the device (host) communication port **19**, send commands to the probe communication port **27** to read and write the probe memory **26**; interpret status information from the host communication port **19**, the probe communication port **27**, and the probe memory **26**; and complete the security function including the keys required by the encryption system used to secure communications and the ability to update the use values.

The problems associated with prior art medical devices are particularly acute in fetal monitoring devices, due to the internal placement of sensors and conditions surrounding perinatal monitoring. Consequently, in a highly preferred embodiment of the present invention, the medical probe **14** comprises a fetal sensor **80** for monitoring the oxygen saturation and/or other medical parameters in utero, as can be seen in FIG. **4**. An example of a fetal oxygen sensor is more fully described in U.S. Pat. No. 5,425,362, which is incorporated herein by reference. The fetal sensor **80** includes a flexible housing **82** and a soft molded tip **86**. Preferably the soft molded tip **86** is integrally coupled to the remainder of the fetal sensor **80**. The flexible housing **82** and the soft molded tip **86** help minimize the possibility of membrane rupture or tissue damage. The fetal sensor **80** includes a flexible strip, such as spring steel (not shown) coated with a smooth surfaced covering (such as a silicone rubber, thermoplastic elastomer (TPE), or Teflon).

The fetal sensor **80** can include preferably one or more of a variety of sensors, such as a pressure sensor, an ECG sensor, an EEG sensor, a temperature sensor, an oxygen sensor, an ultrasound transducer/sensor, a laser diode emitting IR signals with an associated detector, and/or a chemical sensor. In some applications, the fetal sensor **80** can include a balloon type device that can be inflated to variable pressures and used with conventional feed back electronics to maintain a substantially constant pressure of engagement of the device with at least one of the fetus and the uterus of the mother.

In a preferred embodiment, shown in FIGS. **2** and **4**, sensor **24** is preferably the fetal sensor **80**. Fetal sensor **80** includes a pulse oximetry sensor **108**, which generally comprises two or more light emitting devices **30** (e.g., LEDs) of varying wavelengths, and one or more photodetector(s) **32**. A light blocker **106** ensures that light passes through the fetal tissue rather than directly from the emitters to the detectors. Relative intensity of the light backscattered from the fetal tissue at different wavelengths is used to calculate oxygenation levels in ways known in the art.

Also, in the preferred embodiment, shown in FIG. **2**, the medical device **12** comprises an oximeter for calculating the oxygenation (SpO$_2$) level. One particular example of a pulse oximeter is described in U.S. Pat. No. 6,163,715 B1, issued to Larsen et al., which disclosure is incorporated by reference herein. The fetal pulse rate may also be derived from the detected signals of the fetal sensor **80**, as revealed in U.S. Pat. No. 6,339,715.

Referring again to FIGS. **2** and **4**, all of the connections of the fetal sensor **80** are routed via a cable **110** to a single connection point with the medical device **12**. In a preferred embodiment, the connection point comprises a connector

EXHIBIT 2 PAGE 192

US 7,048,687 B1

**19**

122 that couples to a mating connector of the medical device 12. The probe memory 26 is preferably embedded in the connector 122 to limit the overall size of the medical probe 14 and reduce the risk of tampering. The medical device 12 preferably provides power for the medical probe 14.

The medical device 12 is in this preferred embodiment a fetal pulse oximeter. The start-of-usage event is conditioned upon the fetal sensor 80 being connected and in place, yielding signals that result in successful monitoring of oxygen saturation and pulse rate for at least five minutes. At that time and every hour thereafter, a usage record is written to the probe memory 26 as long as the fetal sensor 80 remains attached the medical device 12 and the pair remain in use.

Although in the preferred embodiment the connector 122 has been shown for handling electrical signals, it will be apparent to one of ordinary skill in the art that infrared, radio frequency or fiber optic connections, or some combination of means, could be utilized with appropriate rearrangement of illustrated components without departing from the invention.

In FIG. **5**, another embodiment of the present invention, a medical reprocessing system **410** is shown. The medical reprocessing system **410** includes a medical probe **14** attached to a medical reprocessor **412** via an external connection **120**. The medical probe **14** that has been disabled as a result of usage criteria violation(s) is shown attached to the medical reprocessor **412**. In FIG. **6**, a preferred medical reprocessing system **411**, is shown having a medical probe **14**, where the medical probe **14** is preferably a pulse oximetry sensor. The medical probe **14** of FIG. **5** may be any of the previously discussed herein medical probes, having an effector/sensor **24**, a probe memory **26**, and an external connection configured for transferring data between the medical reprocessor **412** and the probe **14**. The external connection may be connection **120** previously described herein, or a unique connection may be employed foi reprocessing, without loss of generality. The medical reprocessor **412**, shown in FIGS. **5** and **6**, consists of a controller **416**, a memory **418**, a reprocessor communication port **419**, a function tester **420**, and an external connection means **430**. A function tester establishes whether the sensor(s) and effector(s) **24** of the medical probe **14** are functioning within normal operating limits, verifying, e.g., signal strength and signal to noise ratio of sensor(s) and current draw of effector(s).

FIG. **7** is an operational block diagram of the medical reprocessing system **410**, **411** as shown in FIGS. **5** and **6**. The medical reprocessing system **410** or **411**, performs security function(s) and functional testing to determine whether reuse of the medical probe **14** is authorized. In Step **538**, a medical probe **14** is detected to be attached to the reprocessor **412**.

In Step **540**, the reprocessor **412** attempts to read the contents of the probe memory **26** through the reprocessor communication port **419** in connection with the probe communication port **27** via a "Read Request" and detects an "acknowledge" from the probe memory **26**. If the medical probe **14** is damaged or the probe memory **26** is incorrectly programmed, the medical probe **14** will not acknowledge the read request and in Step **543** the display **420** will display a message "Probe Memory Error". Thus, in Step **540** and **543**, a medical probe with a damaged probe memory or with incorrectly programmed probe memory is rejected as unusable. In Step **542**, a security function is run on the probe **14**

**20**

as described previously herein. If the medical probe **14** fails the security function, then the display message is "Probe Memory Error."

In Step **544**, the controller **416** directs functional tests of the medical probe **14**. The functional testing of Step **544** may include verifying that: the sensor(s) and/or effector(s) in the medical probe **14** are operating within design parameters; the physical integrity of the medical probe **14** is adequate (e.g., surface testing for cracks); and/or determining the efficacy of cleaning and sterilization (e.g., evaluation of biological indicators, surface examination for contaminants, etc.). If the medical probe **14** fails functional tests, in Step **545** the display **420** displays a message "Probe Function Error".

In Step **546** the controller **416** seeks reuse authorization for reprocessing of the medical probe **14**. The reuse authorization of Step **546** may be a local function in the form of an algorithm run by the controller **416**, evaluating usage history, functional testing, and other data. Alternately, the reuse authorization step may depend upon a security code, manually entered by an operator, or obtained in a transaction with a remote party via the external connection means **430**. In yet another alternate embodiment, the entire reuse authorization step may be performed by a remote party supplied the usage history and functional testing data via the external connection **430**, and returning a reuse authorization decision. The external connection **430** may be telephonic, cable, radio frequency, or other technology. In a preferred embodiment, the controller **416** utilizes standard Internet technology to pass transactions reliably and securely to a remote reuse authorization party over the external connection **430**. Reuse authorization may include assessment of licensing fees related to reprocessing of the medical probe **14**.

If reuse authorization in Step **546** is refused, then in Step **550**, the display **420** displays a message that the "Probe Expired." The probe function is disabled in Step **551** and the medical probe **14** cannot be reused.

If the authorization for reuse is granted in Step **546**, then in Step **548**, the probe memory **26** is modified to permit further use of the medical probe **14**. The modification of the probe memory **26** may include data changes, such as resetting the date of manufacture to represent the date of reprocessing (extending shelf and warranty life); clearing the duration of use value; zeroing the count of uses; and so forth. Additionally, usage criteria data stored in the probe memory **26** may be modified to reflect a change in condition of the medical probe **14**. To protect the privacy of patient data, in a preferred embodiment all patient-specific data, including patient and caregiver identification, clinical data, procedures, physiological data, and timestamps thereof, are deleted from the probe memory **26**.

If in Steps **543**, **545**, or **550** a medical probe **14** fails reprocessing for any reason, in Step **551** the medical probe **14** may be disabled to prevent further attempts at use. Disabling the probe functions consist of at least removal of any patient-specific data from the probe memory **26**. In a preferred embodiment, the probe memory **26** may be locked to prevent any further write operations to it. Preferably, the functions of the sensor/effector(s) **24** are directly disabled, as suggested above for the case of a pulse oximetry sensor, for example by opening a fuse or fusible link with a sufficiently high electrical current.

In a preferred embodiment shown in FIG. **6**, the medical reprocessing system **411** is designed for use with a medical probe **14** that is a pulse oximetry sensor, such as fetal sensor **80** of FIG. **4** for performing fetal pulse oximetry. The function tester **413** provides means to sense open and short

EXHIBIT 2 PAGE 193

US 7,048,687 B1

21

circuits in the medical probe **14**, evaluate current draw and light output of the light emitting device(s) **30**, sensitivity and noise of the photodetector(s) **32**, and perform other tests.

While preferred embodiments have been illustrated and described, it should be understood that changes and modifications can be made thereto without departing from the invention in its broadest aspects. Various features of the invention are defined in the following claims.

What is claimed is:

**1**. A method for limiting the use of a medical probe according to a set of usage criteria using a security function, the method comprising the following steps:

(a) coupling a probe memory to a medical probe, the probe memory having an identifying data about the medical probe, therein;

(b) coupling the medical probe to a medical device;

(c) coupling the medical probe to a patient;

(d) retrieving a set of use values associated with use of the medical probe from the probe memory;

(e) using a security function to verify that the contents of the probe memory have not been corrupted or tampered with;

(f) applying a set of usage criteria periodically during use of the medical probe, comprising repetition of the following steps:

(i) updating the set of use values of the medical probe during use and creating an updated set of use values;

(ii) testing the updated set of use values against the set of usage criteria related to the medical probe;

(iii) performing an expiration response when one or a combination of the usage criteria are violated;

(iv) storing the updated set of use values on a periodic basis in the probe memory;

(g) retrieving and storing the identifying data about the medical probe from the probe memory, and storing the data in a memory component of the medical device;

(h) storing a time and date stamp of the use of the medical probe memory in a memory component of the medical device;

(i) comparing the identifying data about the medical probe, read from the probe memory, with the identifying data and time and date stamp of the use(s) corresponding to a previously coupled medical probe(s) as stored in the medical device memory; and including determining whether an interrupted usage of the medical probe has resumed, or a new usage of the medical probe has begun.

**2**. The method as defined in claim **1**, wherein Step (e), the security function includes a physical security method, or an algorithmic security method, or both.

**3**. The method as defined in claim **2**, wherein the physical security method includes a portion of the probe memory that is a write-once memory device.

**4**. The method as defined in claim **2**, wherein the algorithmic security function includes a data encoding system with encryption:

in the medical device for encrypting data before it is stored in the probe memory, and for decrypting data read from the probe memory in the medical device; or

in the medical probe for encrypting data from the medical device in the probe memory when it is stored therein, and for decrypting data stored in the probe memory when it is read by the medical device;

or in both.

22

**5**. The method as defined in claim **4**, wherein the data encoding system incorporates symmetrical encryption or wherein the data encoding system incorporates asymmetrical encryption.

**6**. The method as defined in claim **5**, wherein the data encoding system incorporates public key encryption.

**7**. The method as defined in claim **1**, wherein the probe memory contains the set of usage criteria.

**8**. The method as defined in claim **1**, further comprising the step of retrieving the set of usage criteria from the probe memory.

**9**. The method as defined in claim **1**, wherein the Step (f) set of usage criteria includes one or more of the following:

a) a duration of use of the medical probe in conjunction with the medical device or other medical devices; or

b) a count of the number of uses of the medical probe in conjunction with the medical devices or with the other medical devices; or

c) an elapsed time since manufacture or reprocessing of the medical probe.

**10**. The method as defined in claim **1**, wherein Step (f), the expiration response includes one or more of the following steps:

a) displaying a message indicating that a new medical probe is required; or

b) modifying the medical probe to disable a therapeutic function(s) and/or a monitoring function(s) of the medical probe after the present use; or

c) immediately disabling the therapeutic and/or monitoring function(s) of the medical device related to the medical probe.

**11**. The method as defined in claim **10**, wherein Step **47***b*, further comprises the step of causing a fuse or fusible link in the circuitry of the medical probe to open, thereby disabling the therapeutic and/or monitoring function(s) of the medical probe.

**12**. The method as defined in claim **1**, wherein the medical probe is a pulse oximetry sensor.

**13**. The method as defined in claim **1**, wherein the medical probe is a fetal sensor.

**14**. A method for limiting the use of a medical probe according to a set of usage criteria using a security function, the method comprising the following steps:

(a) coupling a probe memory to a medical probe, the probe memory having an identifying data about the medical probe, therein;

(b) coupling the medical probe to a medical device;

(c) coupling the medical probe to a patient;

(d) retrieving a set of use values associated with use of the medical probe from the probe memory;

(e) using a security function to verify that the contents of the probe memory have not been corrupted or tampered with;

(f) applying a set of usage criteria periodically during use of the medical probe, comprising repetition of the following steps:

(i) updating the set of use values of the medical probe during use and creating an updated set of use values;

(ii) testing the updated set of use values against the set of usage criteria related to the medical probe;

(iii) performing an expiration response when one or a combination of the usage criteria are violated;

(iv) storing the updated set of use values on a periodic basis in the probe memory;

EXHIBIT 2 PAGE 194

US 7,048,687 B1

## 23

(g) storing a time and date stamp of the use of the medical probe memory in the probe memory, and storing identifying data about the medical device in the probe memory; and

(h) comparing the stored medical device identifying data, read from the memory component of the medical device, to identifying data and time and date stamp of use(s) corresponding to previously coupled medical device(s) as read from the probe memory; and including determining whether an interrupted usage of the medical probe with the medical device has been resumed, or a new usage of the medical probe has begun.

**15**. A method for limiting the use of a medical probe according to a set of usage criteria using a security function, the method comprising the following steps:

(a) coupling a probe memory to a medical probe, the probe memory having an identifying data about the medical probe, therein;

(b) coupling the medical probe to a medical device;

(c) coupling the medical probe to a patient;

(d) retrieving a set of use values associated with use of the medical probe from the probe memory;

(e) using a security function to verify that the contents of the probe memory have not been corrupted or tampered with; and

(f) applying a set of usage criteria periodically during use of the medical probe, comprising repetition of the following steps:

(i) updating the set of use values of the medical probe during use and creating an updated set of use values;

(ii) testing the updated set of use values against the set of usage criteria related to the medical probe;

(iii) performing an expiration response when one or a combination of the usage criteria are violated;

(iv) storing the updated set of use values on a periodic basis in the probe memory;

(v) (performing an auto identification function, including comparing the medical probe type, the medical device, a patient, and a mode of operation of the medical device to verify that the mode of operation of the medical device is permitted when applying the medical probe to the patient.

**16**. A method for limiting the use of a medical probe according to a set of usage criteria using a security function, the method comprising the following steps:

(a) coupling a probe memory to a medical probe, the probe memory having an identifying data about the medical probe, therein;

(b) coupling the medical probe to a medical device;

(c) coupling the medical probe to a patient;

(d) retrieving a set of use values associated with use of the medical probe from the probe memory;

(e) using a security function to verify that the contents of the probe memory have not been corrupted or tampered with;

(f) applying a set of usage criteria periodically during use of the medical probe, comprising repetition of the following steps:

(i) updating the set of use values of the medical probe during use and creating an updated set of use values;

(ii) testing the updated set of use values against the set of usage criteria related to the medical probe;

(iii) performing an expiration response when one or a combination of the usage criteria are violated;

## 24

(iv) storing the updated set of use values on a periodic basis in the probe memory; and

(g) storing a functional test sequence in the probe memory; storing a set of function test results in the probe memory; activating the medical probe to perform the functional test sequence and gathering results of the functional test sequence; comparing results of the functional test sequence with the stored set of function test results and reporting the results of the functional test sequence.

**17**. A method for limiting the use of a medical probe according to a set of usage criteria using a security function, the method comprising the following steps:

(a) coupling a probe memory to a medical probe, the probe memory having an identifying data about the medical probe, therein;

(b) coupling the medical probe to a medical device;

(c) coupling the medical probe to a patient;

(d) retrieving a set of use values associated with use of the medical probe from the probe memory;

(e) using a security function to verify that the contents of the probe memory have not been corrupted or tampered with;

(f) applying a set of usage criteria periodically during use of the medical probe, comprising repetition of the following steps:

(i) updating the set of use values of the medical probe during use and creating an updated set of use values;

(ii) testing the updated set of use values against the set of usage criteria related to the medical probe;

(iii) performing an expiration response when one or a combination of the usage criteria are violated;

(iv) storing the updated set of use values on a periodic basis in the probe memory; and

(g) storing identifying information and demographic information about the patient coupled to the medical probe in the probe memory.

**18**. A method for limiting the use of a medical probe according to a set of usage criteria using a security function, the method comprising the following steps:

(a) coupling a probe memory to a medical probe, the probe memory having an identifying data about the medical probe, therein;

(b) coupling the medical probe to a medical device;

(c) coupling the medical probe to a patient;

(d) retrieving a set of use values associated with use of the medical probe from the probe memory;

(e) using a security function to verify that the contents of the probe memory have not been corrupted or tampered with;

(f) applying a set of usage criteria periodically during use of the medical probe, comprising repetition of the following steps:

(i) updating the set of use values of the medical probe during use and creating an updated set of use values;

(ii) testing the updated set of use values against the set of usage criteria related to the medical probe;

(iii) performing an expiration response when one or a combination of the usage criteria are violated;

(iv) storing the updated set of use values on a periodic basis in the probe memory; and

(g) storing a set of therapeutic and monitoring results associated with the patient in the probe memory.

EXHIBIT 2 PAGE 195

US 7,048,687 B1

**25**

**19**. A method for limiting the use of a medical probe according to a set of usage criteria using a security function, the method comprising the following steps:

  (a) coupling a probe memory to a medical probe, the probe memory having an identifying data about the medical probe, therein;

  (b) coupling the medical probe to a medical device;

  (c) coupling the medical probe to a patient;

  (d) retrieving a set of use values associated with use of the medical probe from the probe memory;

  (e) using a security function to verify that the contents of the probe memory have not been corrupted or tampered with;

**26**

  (f) applying a set of usage criteria periodically during use of the medical probe, comprising repetition of the following steps:

    (i) updating the set of use values of the medical probe during use and creating an updated set of use values;

    (ii) testing the updated set of use values against the set of usage criteria related to the medical probe;

    (iii) performing an expiration response when one or a combination of the usage criteria are violated;

    (iv) storing the updated set of use values on a periodic basis in the probe memory; and

  (g) transmitting a query signal from the medical device to the medical probe and waiting for an acknowledge signal from the medical probe device prior to beginning the therapeutic or monitoring function of the medical probe.

\*   \*   \*   \*   \*

EXHIBIT 2 PAGE 196

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.　　　: 7,048,687 B1　　　　　　　　　　　Page 1 of 1
APPLICATION NO. : 10/361167
DATED　　　　　　: May 23, 2006
INVENTOR(S)　　  : James L. Reuss

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On Title Page, Item (63), should read, in the Related U.S. Application Data:
"Continuation-in-part of application No. 10/045,475, filed on Oct. 22, 2000, now abandoned, which is a continuation of application No. 09/291,769, filed on Apr. 14, 1999, now Pat. No. 6,308,089," should be - -Continuation-in-part of application No 10/045,475, filed on Oct. 22, 2001, now abandoned, which is a continuation of application No. 09/291,769, filed on Apr. 14, 1999, now Pat. No. 6,308,089.- -

On column 22, line 32, in Claim 11, "47b" should read - -10b- -.

Signed and Sealed this

Fifteenth Day of August, 2006



JON W. DUDAS
*Director of the United States Patent and Trademark Office*

EXHIBIT 2 PAGE 197